[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 31, 2003
THOMAS K. KAHN
CLERK

_____

No. 97-2319

_____

D. C. Docket No. 95-00250-CIV-J-10

JOHN GARY HARDWICK, JR.,

Petitioner-Appellant,

versus

JAMES CROSBY, Secretary,
Florida Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 31, 2003)

Before TJOFLAT, ANDERSON and BIRCH, Circuit Judges.

BIRCH, Circuit Judge:

In this habeas corpus, death penalty appeal, we must determine whether an attorney who provided no defense at the guilt or penalty phase was ineffective in defending a young drug dealer, who was an alcohol and drug abuser. When relief was denied in district court, the petitioner appealed on the bases of ineffective assistance of counsel at the guilt and penalty phases as well as conflict of interests with counsel. While we AFFIRM denial of habeas relief as to the conviction, we VACATE the denial of habeas relief as to the death sentence and REMAND to the district court for an evidentiary hearing to determine if petitioner is entitled to habeas relief because of ineffective assistance of counsel at the sentencing phase.

## I. BACKGROUND

A. Factual Chronology

During the long Christmas weekend in 1984, petitioner-appellant, John Gary Hardwick, Jr., and various friends consistently consumed alcohol and quaaludes and smoked marijuana.[1]  Hardwick, who was unemployed but a drug dealer and

---

[1] For factual completeness to address the issues on appeal in our independent review, we relate the record facts from witness testimony in pretrial depositions taken by Hardwick's counsel, the trial, and the state Rule 3.850 proceeding. Additionally, we include facts from affidavits and expert reports that were exhibits at the 3.850 proceeding but were not part of the record before the district court. From the significant references to these exhibits in the transcript of the 3.850 proceeding, it was evident that we needed to review them. After repeated requests by our court, the exhibits were filed as "Requested Exhibits." The absence of these exhibits from the district-court record is part of the reason that we remand this case for an evidentiary hearing.

user, and his wife Darlene, who was fifteen and seven months pregnant at the time, had moved into the apartment of Dan Dimaggio in Jacksonville, Florida, two weeks before Christmas.[2] Most of the young men in the neighborhood that Hardwick had met were teenagers and either involved in drug trade or were drug purchasers/consumers. Hardwick's brother acknowledged that Hardwick "has always done a lot of drugs and drank a great deal" and that, in the latter months of 1984, he "was doing even more than usual" such that "[h]e would be so high that he wouldn't know whether he was coming or going and all of his friends were druggies."[3]

Connie Wright, a friend of Hardwick's wife and daily visitor, stated:

> From the first time I met John [November or December, 1984] he was doing drugs and selling drugs, including quaaludes and pot. He was messed up almost all the time; he was only straight in the morning when he got up. He took so many drugs that he would pop

---

Because the dissent accepts the 3.850 factual findings by the state trial judge, who, in turn, adopted the testimony of Hardwick's trial counsel, Frank Tassone, we are specific in stating record facts that directly contradict Tassone's testimony with particular relevance to the penalty phase.

[2] Dimaggio testified at trial that there were six people living in his apartment at the relevant time: Dimaggio, Hardwick and his wife, Pete McCoy and some of his family. Trial Transcript at 431.

[3] Affidavit of Jeff Hardwick ¶ 4 (Feb. 7, 1990). Although they had relevant testimony concerning Hardwick's drug and alcohol consumption at times proximate to the murder at issue, Tassone testified that the drug use of Hardwick's teenaged friends and acquaintances "was clearly an aspect" in his decision not to call them to testify. 3.850 Proceeding at 117-18.

3

pills in his mouth and swallow them without drinking water.  It seemed like he had problems and he took the drugs to get rid of his problems.[4]

Jeff Bartley, a neighborhood friend, described Hardwick's drug and alcohol consumption the weekend before Christmas:

> The weekend before Hardwick was arrested for murder,  Pete McCoy [Hardwick's brother-in-law], Hardwick and myself part[i]ed together.  Friday night we bought three fifths of vodka.  Hardwick had a bunch of quaaludes and quite a bit of pot.  <u>All weekend we were drinking and smoking.  Hardwick was eating quaaludes all weekend</u>. It was not unusual for Hardwick to be high.[5]

---

[4] Affidavit of Connie Wright ¶ 2 (Jan. 8, 1990) (emphasis added).  Dr. Henry L. Dee, a psychologist, testified at the 3.850 proceeding that Hardwick's childhood of neglect and abandonment by his parents was "a model" for creating an "anti-social personality," which was manifested by "act[ing] out against authority" in his adolescence and, combined with his being "emotionally sensitive," caused him to have "a lot of anxiety and distress," for which Hardwick used "psychoactive substances" as a "self cure."  3.850 Proceeding at 924, 925.  We note that we have not included any testimony from Erika Johnson, since she testified that she was biased against Hardwick and recanted her affidavit.  3.850 Proceeding at 1044, 1047-1101.

[5] Affidavit of Jeff Bartley ¶ 2 (Feb. 8, 1990) (emphasis added).  Bartley, who partied with Hardwick during the Christmas weekend, consumed alcohol and smoked marijuana with him, and was arrested with Hardwick for his participation in the murder, stated that, at their arrest, "Hardwick and I were pretty high."  Id. at ¶ 3.  Because Bartley passed out from this alcohol and drug consumption during the night of the murder, Tassone testified that "I didn't feel [Bartley] could give any useful information around a twenty- or twelve-hour period, either side of the homicide."  3.850 Proceeding at 94.  Tassone also testified that he knew from depositions that there was constant partying during the Christmas weekend and that all involved said that Hardwick was present.  Id. at 95.

> [M]y recollection is there was a good bit of testimony about the people who had gotten together within the two or three days immediately prior to or succeeding the homicide.
>  . . . .
> I know there was testimony concerning the use of drugs or alcohol by Hardwick and others at, from December 22 to say 26 or 27.

Id. at 135 (emphasis added).

Dr. Clifford A. Levin, a psychologist who specializes in addictions, prepared a report for

Michael Hyzer, a neighbor formerly convicted of possession of marijuana, testified at trial that, on Saturday, December 22nd, Hardwick came to his house at 10:00 A.M. and asked if Hyzer knew where he could get some marijuana to sell to make money.[6] When Hyzer told Hardwick that he did not know where he could get marijuana, Hardwick left and returned within an hour and asked to use Hyzer's telephone. Telling Hyzer that he was going to buy quaaludes, Hardwick left Hyzer's house and returned at 3:00 P.M. with 100 quaaludes.[7] He sold Hyzer twenty-five for $70.[8] That Saturday night before Christmas, Hardwick and others attended a party at Hyzer's house, where quaaludes and alcohol were consumed.

On Sunday morning, December 23rd, Dimaggio was awakened at 10:00 or 11:00 A.M. by Hardwick's "running around the house looking for his . . .

---

the 3.850 proceeding after talking with Hardwick, who told Dr. Levin that he had purchased 150 quaaludes on Thursday, December 20th and 100 quaaludes on Sunday, December 23rd. Levin Report at 2. Hardwick also reported to Dr. Levin "that during the five days leading to his offense that he ingested forty or fifty of the Quaaludes, continually smoked marijuana, drank a fifth of vodka and shared 'a couple of cases of beer' with friends." Id. Mary Braddy, a correctional officer with the Duval County Sheriff's Department and chaplain's assistant for the Duval County Jail, averred that Hardwick told her "that he had been doing drugs and drinking steadily over the whole weekend prior to his arrest" and that "[h]e looked as if he had been on a binge." Affidavit of Mary Braddy ¶ 3 (Feb. 7, 1990).

[6] Trial Transcript at 512.

[7] Id. at 511-13.

[8] Id. at 513.

Quaaludes and his money."[9]  Subsequently, Hardwick told Dimaggio "that he would take care of the mother fucker that took his Quaaludes," and "he accused a couple of people," including Keith Pullum, who sold marijuana for Hardwick.[10] Dimaggio testified that Hardwick told him that he would use his .357 Magnum to "stop" whoever took his quaaludes.[11]  Darlene Hardwick related that, "when she got up Sunday [Hardwick] was still drunk and doing Quaaludes."[12]

In the early afternoon that Sunday, Connie Wright testified that she went to see Darlene Hardwick and found Hardwick lying on the floor and that "[h]e looked pretty intoxicated to [her]."[13]  At approximately 3:00 P.M., Hardwick went to his

---

[9] Id. at 431, 423.  After interviewing Hardwick for his report for the 3.850 proceeding, Dr. Levin explained that, in 1984, Hardwick's "chronic pattern of drug addiction" manifested itself by a daily pattern of alcohol and drugs.  Levin Report at 2.  Hardwick's anger at discovering that his quaaludes were missing was his "inability to 'get high.'"  Id.  Describing his dependency on drugs, Hardwick reported to Dr. Levin: "'If I woke up in the morning without drugs, I couldn't handle the day. . . . I had to stay high to feel right.'"  Id. at 4.

[10] Trial Transcript at 423, 424; Pretrial Deposition of Jeff Showalter at 8.  Dr. Dee testified that Hardwick's threats were bravado instead of genuine intentions to kill and that the reason he shot Pullum was because he made Hardwick angry.  3.850 Proceeding at 1016.

[11] Trial Transcript at 424.  Neighbor Jeff Showalter testified at trial that Hardwick had the .357 Magnum in his waistband "[e]verywhere he went."  Trial Transcript at 309.

[12] 3.850 Proceeding at 286.  Although Hardwick's wife did not testify at any court proceeding and was unavailable, she was interviewed by the psychological experts who testified at the 3.850 proceeding from their notes made while talking with Darlene Hardwick.  Id. at 264-65. This information was related to Dr. George W. Barnard, the court-appointed psychiatrist.  Although Hardwick's recently acquired quaaludes were missing and, consequently, his opportunity to sell them, he kept a supply in the refrigerator for personal consumption.

[13] 3.850 Proceeding at 589 (confirming her pretrial deposition testimony at the 3.850 proceeding).

6

mother, Nell Lawrence's trailer home in Jacksonville. At the 3.850 proceeding, she

testified:

> [H]e was just totally out of his mind. He couldn't walk. He was
> stumbling. His words were slurred. You couldn't understand him,
> and my husband was at home and I had asked [Hardwick]
> to leave in that condition so that my husband wouldn't ask him to
> leave.
>  . . . .
> It was around 3:00 o'clock, and he was—his words were so slurred
> you really [could] not understand either what he was saying but he
> was trying to tell me that he had come to wish me a merry Christmas.
>  . . . .
>  I had just told him—he knew that I didn't want any arguments or
> anything. Of course Johnny never argued with my husband but I
> always asked him not to, and I had asked him to—if he would leave
> . . . before Allen came out and . . . said something to him, and he said,
> yeah, . . . and he stumbled on out the driveway.[14]

---

[14] Id. at 528, 529. Similarly, Nell Lawrence's affidavit describes Hardwick's visit that Sunday afternoon and states that he was "so high that he could not walk and his speech was slurred. He was talking crazy. There were a couple of people in the car with him. I had to ask him to leave so my husband would not see him in that condition." Affidavit of Nell Lawrence ¶ 20 (Jan. 7, 1990). Hardwick's brother Jeff, who had a trailer on his mother's lot, witnessed Hardwick's visit to his mother and described Hardwick as "so stoned that mom asked him to leave. He could barely walk up the steps and when he spoke, he didn't make sense." Affidavit of Jeff Hardwick ¶ 5. In contrast to this 3.850 and affidavit testimony, Tassone testified that he did not recall that Hardwick's mother had seen him "within any of the timeframe of this homicide." 3.850 Proceeding at 118. Similarly, his recollection was that Jeff Hardwick had not seen his brother "in a long time." Id. at 191. Tassone admitted that, if he had known the condition of Hardwick witnessed by his mother and brother at 3:00 P.M. prior to the murder early the next morning, then he would have used them at trial. Id. at 181, 184.

In her affidavit, Hardwick's mother describes Hardwick's deprived and abusive childhood. Her father had been an alcoholic: "His life centered one hundred percent on drinking." Affidavit of Nell Lawrence ¶ 2. After she left her first husband and left their five children with her mother, Hardwick's mother married his father, who was an alcoholic. Id. at ¶ 6. Hardwick, the oldest of the three boys from this union, witnessed his father beat his mother, and he was abusive to Hardwick, once pulling his shoulder out of its socket. Id. ¶¶ 7, 9; see Levin Report at 3 (Hardwick "described his father as an alcoholic and reported receiving

7

Thereafter, Darlene Hardwick saw Hardwick take eight to ten quaaludes between 3:00 and 6:00 P.M. on that Sunday afternoon.[15]

---

'whippings' from his father that left him black and blue from being hit with a belt buckle."). Her third husband, with whom she had three more children, was jealous of her other children, and Hardwick did not get along with the children in that family; as a small boy, Hardwick twice hitchhiked back to South Carolina to be with his father. Id. ¶¶ 13-14.

Florrie Benton, Hardwick's aunt, sister of Hardwick's father, stated that Hardwick's father s his wife Nell and their children because of his drinking." Affidavit of Florrie Benton ¶ 3 (Jan. 22, 1990). She explained that Hardwick "grew up on his own, with no one to tell him right from wrong. He grew up feeling unloved and unwanted." Id. at ¶ 7. Grady Hardwick, Hardwick's uncle, brother of Hardwick's father, stated that his father, Hardwick's paternal grandfather, was "an alcoholic" and that Hardwick's father "was drinking heavily by the time he was a teenager." Affidavit of Grady Hardwick ¶¶ 2,3 (Jan. 22, 1990). Hardwick spent "a few months" with this uncle when he was "about 19 or 20 years old." Id. at ¶ 7. The uncle knew that Hardwick was taking drugs because he had left some pills on a counter, and the uncle could tell "when he was high" because Hardwick "would talk crazy and do stupid things. He would go through a complete personality change when he was doing drugs." Id. at ¶ 8.

Dr. Barnard recognized that some people can be "genetically at risk for becoming alcohoics" and that circumstances cause them to be "more endangered" than a low-risk individual. 3.850 Proceeding at 293. Hardwick's father was "a role model in terms of the people for him to see and to imitate." Id. Additionally, Hardwick's childhood environment would cause him to "lack the ability to feel good about himself," which would make him "more prone then to use these other drugs to . . . bolster his own self-esteem." Id. Dr. Levin testified that "it's well documented that a person whose father is addicted is nine times more likely to become addicted themselves, and so [Hardwick] had a physical tendency to become alcoholic or drug addicted." Id. at 770. Yet, as to Hardwick's father, Tassone testified: "I am almost certain that I did not know where Mr. Hardwick's father was at the time of the trial or whether he was alive or dead." Id. at 128.

When Hardwick was seven, his mother put him in a boy's home in Jacksonville because she "had no money to take care of him." Affidavit of Nell Lawrence ¶ 15. Hardwick's mother knew that he "was smoking pot and doing drugs when he was a young teenager. . . . because some of the other kids told [her] and also because he acted differently when he was high. Additionally, when he was about 13 years old he called and told [his mother] that he had just gotten out of the hospital after having hepatitis" from intravenous drug use. Id. ¶ 18; see Levin Report at 3.

[15] 3.850 Proceeding at 284 (testimony of Dr. Barnard, the court-appointed psychiatrist based on notes from his interview of Darlene Hardwick). Hardwick's wife told Dr. Barnard that Hardwick's behavior "that whole weekend" through his arrest was "very scary" and that his argumentative and aggressive conduct had caused her to tell "him she was going to leave him."

8

Regarding Hardwick's condition on that Sunday night, Connie Wright averred: "I saw John a few hours before Keith Pull[u]m was killed, somewhere around 8:00 p.m. I saw him eat some quaaludes. He was really high, even before he ate the quaaludes."[16] At the 3.850 proceeding, Wright testified concerning the effects of Hardwick's taking the quaaludes: ""He was acting real weird. He was laying on the floor and sweating and walking and pacing around."[17] She also witnessed an argument between Hardwick and his wife "[o]ver him taking too many quaaludes"; there was no doubt in her mind that Hardwick "was high."[18]

In the early evening, Jeff Showalter came over, listened to the radio, and watched television with Hardwick's wife. At approximately 7:00 P.M., Hardwick, Jeff Bartley, and Keith Pullum arrived with 160 quaaludes.[19] Showalter left

---

Id. at 288.

[16] Affidavit of Connie Wright ¶ 5. Wright also averred that Hardwick called her from jail after he was arrested for murder "and he said he had done 10 quaaludes the night of the offense." Id. ¶ 7.

[17] 3.850 Proceeding at 580. Darlene Hardwick also told Dr. Barnard that she noticed that Hardwick was sweating profusely that weekend. Id. at 289.

[18] Id. at 580. The state trial judge in his factual findings subsequent to the 3.850 proceeding describes Wright's testimony as "equivocal on the issue of intoxication." Transcript of Record, Vol. IV at 594. Wright was 14 at the time of the murder. Hardwick's wife told Dr. Barnard that, in addition to the quaaludes that she saw Hardwick consume that Sunday afternoon, she had seen him drink "some of the whiskey straight on the rocks and then some in a mixed amount. The best of her recollection he had maybe four small glasses on the rocks prior to the mixed stuff." Id. at 317.

[19] Trial Transcript at 310-12, 322-23.

between 10:00 and 10:30 P.M. and rode his bicycle home, which was five minutes away.[20] Showalter's father went to bed, and Showalter lay down on the couch in the front room of the house to watch television. Between 10:30 and 11:00 P.M., Showalter heard his dog barking, looked out the window, and saw Pullum at the gate and Hardwick's car parked on the other side.[21]

Showalter went outside, where Pullum informed him that Hardwick wanted to talk to him to ask if he had seen Hardwick's quaaludes. Showalter went over to Hardwick's car; Hardwick, accompanied by Jeff Bartley, told him that his quaaludes were missing and that Showalter and Pullum were his two suspects. Hardwick, who was driving, Bartley, and Pullum drove away, and Showalter went back inside and lay on the couch.

Between 11:00 and 11:30 P.M., Showalter heard his dog bark again, and, when he went outside, saw only Pullum, who said that he was going home to eat and then return to Hardwick's.[22] Pullum said that Hardwick "was driving around mad looking for his Quaaludes."[23] Showalter went inside his home. Between 11:30 P.M. and midnight, Hardwick, Bartley, and Pullum returned a third time, and

---

[20] Id. at 312, 323.

[21] Id. at 312.

[22] Id. at 314-15.

[23] Id. at 315.

Pullum informed Showalter that Hardwick, who was driving, wanted to talk to him.[24] When Showalter walked over to Hardwick's window, he cocked and aimed his .357 Magnum at Showalter and accused him of stealing his quaaludes, which Showalter denied. Hardwick threatened that, if he did not have his quaaludes in an hour, then he would kill either Showalter or Pullum.[25] When Showalter offered to help Hardwick look for the quaaludes in the morning, Hardwick informed Showalter that he wanted him at his house in an hour, and Hardwick and Bartley, who had a .22 automatic rifle, drove away.[26] Hardwick was driving "pretty slow."[27]

Showalter urged Pullum to go into his house, talk to his father, and call the police. Asserting that Hardwick and Bartley would not "'mess'" with him, Pullum

---

[24] The murder did not occur till some six hours after Showalter last saw Hardwick. Bartley was with Hardwick and Pullum after they left Showalter's house. Bartley averred:

> Just a few hours before Keith was killed Hardwick and I were real messed up. As I said before, Hardwick had been doing quaaludes all weekend. I saw Hardwick take at least one quaalude just a few hours before the murder. That night Hardwick was acting pretty crazy. He was drinking whiskey, smoking pot, laughing and running around.

Affidavit of Jeff Bartley ¶ 2 (Feb. 8, 1990). Characterizing Bartley as "a criminal associate," 3.850 Proceeding at 988, Dr. Levin concluded that Showalter's testimony regarding Hardwick's condition "cancel[led] out" because "Jeff Showalter[, who was 14 at the time] was a potential victim, and I would assume he was fairly angry with Mr. Hardwick. He is a friend of Keith Pullum," id. at 987.

[25] Id. at 316.

[26] Id. at 326.

[27] Id. at 317.

11

started walking toward his house down the same road on which Hardwick and Bartley had driven away.[28]  As he watched, Showalter saw the car in which Hardwick and Bartley were riding stop, turn around, go back to where Pullum was walking, and stop beside Pullum, but he neither saw Pullum get into the car nor the interior light illuminate.[29]  Showalter ran into his house, looked out the window, and saw the car drive in front of his house.  He could not see who was inside Hardwick's car because it was "too dark."[30]

The description of the events that transpired after Hardwick, Bartley, and Pullum drove away from Showalter's house occurs in Dr. Clifford A. Levin's testimony at the 3.850 proceeding and his report.  Dr. Levin not only interviewed Hardwick, but also he reviewed the pretrial depositions, the trial testimony, and the affidavits of the witnesses and found internal consistency.  While Hardwick told Dr. Levin that he had killed Pullum, he described his state of mind at the time of the homicide "as foggy, implying that he didn't have complete knowledge of

---

[28] Id.

[29] Id. at 317-18, 331.

[30] Id. at 319, 332.

12

all the details that took place."[31]  Dr. Levin related Hardwick's description to him

of how the murder evolved from his notes from his interview with Hardwick:[32]

> Mr. Hardwick reported that he was with the victim after driving the victim to a secluded area <u>for the purpose of holding the victim ransom to obtain his—return of his drugs, quaaludes</u>, and he alternately said that <u>he took the victim as a way to influence him to return his drugs</u>.  He stated that he became angered when the victim would not return the drugs. . . .
>
> . . . .

---

[31] 3.850 Proceeding at 781.  Dr. Levin also related Hardwick's description of his alcohol and drug use at the relevant time and, specifically, the Christmas weekend during which Pullum's murder occurred:

> [Hardwick] described a period of time in 1984 wherein he was extensively using alcohol and drugs, a daily usage to the point of intoxication.  He described it in increased usage during the weekend prior to the death of the victim and he reported being concerned that he had a quantity of quaaludes stolen from his possession and became very incensed about the absence of these quaaludes mostly for his personal usage but he also had been reportedly selling these quaaludes.
>
> From the description of the record and the affidavits provided to me it was a period surrounding the incident of extensive usage where Mr. Hardwick was often characterized as looking highly intoxicated and appearing very emotional and very erratic in his behaviors.
>
> . . . .
>
> He reported using multiple dosages of quaaludes, smoking marijuana, drinking alcohol and beer.

<u>Id.</u> at 780 (emphasis added).  Dr. Levin explained that "whenever an individual . . . who is addicted to chemicals finds one's self in a stressful circumstance one tends to use to excess in order to cope with the stress in the fears or whatever feelings that are being felt, and there is a tendency to indulge to a greater extent than is even typical." <u>Id.</u> at 788-89.  Specifically as to Hardwick, Dr. Levin determined that the apparent drug ingestion, intoxication, and behavior under the circumstances that resulted in the murder of Pullum exemplified the "characteristic profile" of the way Hardwick had "dealt with stressful circumstances in the past with the use and extensive abuse of alcohol or drugs." <u>Id.</u> at 792.

[32] Regarding Hardwick's willingness to discuss the murder, Dr. Levin testified that "[h]e didn't seem hesitant in terms of willingness.  He seemed unsure at times about the specifics." <u>Id.</u> at 782.

13

He reported that he became very <u>angered at the victim's denial that he had the stolen drugs</u>, and he reported reacting to the victim in anger and <u>shooting the victim twice with his head turned so he could not see the victim get shot</u>.

. . . .

<u>He said that he was having difficulty focusing on what he was doing. He described himself as intoxicated, and he described himself as confused and unable to clearly think out what he was doing.</u> That was a verbal report.

He reported that he felt that <u>after shooting the victim he felt sorry for him and he thought about . . . aiding the person in getting hospitalized and help and also reported checking with a person who was with him, who he did not state who it was, for assistance on what he should do and he was—he reported that he was advised to go ahead and kill the person.</u>

. . . .

<u>He reported that he was confused as to what he should do at that point, was wondering if he should take the victim to the hospital and conferred with apparently someone who was there with him who encouraged him to in quotes finish the job.</u>

. . . .

At that point, [Hardwick commenced his attempts to kill Pullum.]

. . . .

Tried to stab him with a crowbar was the next thing. Was unsuccessful. Was unable to stab him with a crowbar. Got a knife. Stabbed him twice. The victim passed out, put him in the truck, drove him to the river[, thinking that Pullum was dead].

. . . .

He thought he was dead and he was going to put him in the river.

. . . .

<u>He also characterized his thinking at the time saying he wasn't sure what he was doing—he wasn't sure exactly what he should do</u>, statements to that effect and <u>talked about stumbling, talked about being unclear</u> and took a while to get out the information. <u>He was not sure exactly the sequence of events</u>. He was trying to reconstruct that.

. . . .

14

He did not seem to be holding back information in the sense of I am not going to tell you that I killed this guy or I am not going to tell you the gory details. <u>He seemed to be struggling with what exactly my thoughts were and what exactly was the sequence of events, and that was of concern to me in terms of it seemed to give credence to this was not a clear-thinking individual and not a clear memory of the events that transpired</u>.

. . . .

He put him in the water. He thought he was dead. The victim got up, stood up and . . . he stated that he went back down to the victim . . . .

. . . .

And hit him on the head with a car jack and held him under water until the air bubbles were gone.

. . . .

<u>He said he went back home is the information I got and started crying and a friend calmed him down</u>.[33]

At trial, a resident in the Haulover Creek area testified that she heard two shots between 6:00 and 6:30 A.M. on Christmas Eve, December 24th.[34] At 9:40 that morning, a man fishing from a dock at the point where Haulover Creek empties into the St. Johns River discovered a body floating in the water and called

---

[33] Id. at 781-82, 783, 863, 864, 865-66, 867 (direct and cross examination) (emphasis added). Dr. Barnard, the court-appointed psychiatrist, also interviewed Hardwick regarding the killing of Pullum. Dr. Barnard agreed that he had noted that Hardwick told him that he drew his .357 Magnum on Pullum "to scare him" but instead shot him in the hip. Id. at 327-28. When Pullum fell down and asked Hardwick to take him to the hospital, Hardwick was "too scared" and shot Pullum again. Id. at 328. Hardwick could not look at Pullum, "and the bullet hit him in the arm." Id. Pullum was still alive, and Hardwick "stabbed him with a knife, put him in the car, took him to the water[;] [Pullum] was still alive and asked to be taken to the hospital." Id.

[34] Trial Transcript at 343-44.

15

the police and rescue unit.[35]  The medical examiner, who performed the autopsy on Pullum on Christmas Day, testified that Pullum's body evidenced head injuries as well as knife, and gunshot wounds; he fixed the time of death as being between 5:40 A.M. and 7:40 A.M.[36]

On Christmas Eve morning, approximately 10:00 or 11:00 A.M., Dave Tanner and William Bavar, walking down a road, encountered Hardwick, who also was walking.[37]  Hardwick told them that two people had stolen his quaaludes, that he had taken care of one and fed him to the sharks, and that he was looking for the other.[38]  At his deposition, Tanner described Hardwick as being "half wiped out," which he clarified as meaning almost "passed out."[39]  He also testified that Hardwick was intoxicated, upset over his missing quaaludes, and "[l]ook[ed] like he had been out partying all night" and "smoking a little pot that night."[40]  Tanner further noticed that Hardwick had a pistol in his pants.[41]

---

[35] Id. at 349-50.

[36] Id. at 392, 393.

[37] 3.850 Proceeding at 721, 726.

[38] Id. at 726-27.

[39] Id. at 721, 723.

[40] Id. at 718, 728-29, 730, 733.

[41] Id. at 729.

16

Between 10:00 A.M. and noon on Christmas Eve, Connie Wright went to the apartment where Hardwick and his wife were staying. She testified: "Darlene was yelling at Johnny. She was really very mad because he didn't come in the whole night before and they didn't get to go where they wanted to go."[42] At the 3.850 proceeding, Wright testified that Hardwick's clothes were dirty, he looked like he had been up for days, and "he was just real high."[43] Her affidavit details Hardwick's demeanor:

> The next day, the day before Christmas, 1984, John and Jeff [Bartley] were acting weird. <u>I knew that they had been messed up on drugs for days</u>. They were dirty, their clothes were messy and they looked like they had been up for days. <u>John looked worse than usual. He kept walking down the road and coming back. He would lay on the floor a few minutes and then get up and pace. He didn't say much but when he did talk he didn't make any sense. He was shaking, sweating a lot and his moods kept changing quickly</u>.[44]

---

[42] Trial Transcript at 465.

[43] 3.850 Proceeding at 581.

[44] Affidavit of Connie Wright ¶ 6 (emphasis added). In his supplemental order following the 3.850 proceeding, the trial judge concluded that Wright would not be a good witness for the defense at trial because Hardwick confessed to her that he killed Pullum. The trial judge's discussion of Wright, however, related only to the guilt phase. Transcript of Record, Vol. IV at 594. Her testimony concerning Hardwick's condition that evidenced his consumption of drugs and alcohol was relevant to the sentencing phase, irrespective of Hardwick's confession to her and others. Additionally, Wright substantiated the same description of Hardwick's condition given by his wife to the experts who testified at the 3.850 proceeding. As opposed to testimony showing guilt, Wright's testimony at the penalty phase, when guilt was no longer an issue, would have been significant.

17

Wright also testified that she saw Hardwick take ten quaaludes that day.[45]  Wright reaffirmed her deposition testimony that, on Christmas Eve afternoon, Hardwick said that he had taken care of "the mother fucker that stole his drugs, and if Keith Pullum walked in the door he would believe in ghosts."[46]  Hardwick's mother averred that, when he called her on Christmas Eve, "his speech was still slurred and he was not making sense."[47]  Additionally, on Christmas Eve, Hardwick robbed a Marine.[48]

Between 10:00 P.M. and midnight on Monday, Christmas Eve night, Joseph Delgross was going home in his pickup truck, when Hardwick came out on the road and waved to him to stop.[49]  Hardwick asked Delgross if he had heard that 150 of Hardwick's quaaludes had been stolen.  Learning that Delgross did not

---

[45] 3.850 Proceeding at 583.

[46] Id. at 593.  Dimaggio also heard Hardwick's comments.  Between 2:00 and 3:00 P.M., on Christmas Eve afternoon, Dimaggio returned from Gainesville, where he had gone with Pete McCoy and his family, Jasper Davis, and others the previous afternoon.  Trial Transcript at 436.  Later, Hardwick "walked in the door [and] told [Dimaggio] he took care of the mother fucker that got his shit."  Id. at 426. When Dimaggio asked him what he was talking about, Hardwick responded: "well, I will put it this way: If Keith Pullum walks through that door he's got a ghost." Id.  Concerning Dimaggio's testimony following his return from Gainesville on the afternoon of  December 24th, Dr. Levin testified  Dimaggio's testimony that Hardwick was "jumpy," "[r]eal nervous," and "[s]weating" are characteristics of drug ingestion.  3.850 Proceeding at 883-84.

[47] Affidavit of Nell Lawrence ¶ 21.

[48] 3.850 Proceeding at 328.

[49] Trial Transcript at 493-94.

18

know about the theft, Hardwick told him that the quaaludes were stolen by two people, that he had taken "care of one of them and fed him to the sharks and he was looking for the other."[50]

At approximately 2:30 A.M. Christmas morning, Michael Marchbanks was walking along a road when Hardwick drove by in his car, and Marchbanks asked for a ride home.[51]  On the way home, Hardwick said "that he had been ripped off" and that he had taken "care of one guy and he was looking for another guy."[52]  At 8:00 A.M. Christmas morning, Michael Hyzer and his family were opening Christmas gifts when he heard his dogs bark.[53]  Hyzer looked out his window and saw Hardwick walking toward his driveway; he met him at the road.  Hardwick wanted Hyzer to assist him in getting his stuck truck out of the woods. When Hyzer told Hardwick that he could not help him, Hardwick said that Pullum had stolen some quaaludes and that he had shot, stabbed, and thrown him into the jetties for the sharks.[54]  Although Hardwick told Hyzer that "we took care of him,"

---

[50] Id. at 494.

[51] Trial Transcript at 504.

[52] Id. at 505.

[53] Id. at 514.

[54] Id. at 514.  Hyzer was taken aback at Hardwick's description of killing Pullum:

He said Keith ripped me off of some Quaaludes and I shot

19

he did not disclose the identity of the other person.[55] After sending Hardwick to his neighbor to assist with the car, Hyzer called the police homicide division and talked with Detectives Pruett and Kesinger. He also agreed to go to the morgue that Christmas morning to identify Pullum.[56]

Christmas afternoon, police officers arrived in the neighborhood to search for Hardwick. The neighborhood residents joined in the search and one located Hardwick in the woods and detained him until the police arrived.[57] In performing a body search of Hardwick, the arresting officer recovered a knife that did not show blood or any other bodily fluid.[58] A .22 revolver also was located in the palmetto bushes, but Hardwick's .357 Magnum was never located.[59]

---

> him and stabbed him and threw him into the jetties, and he said nobody would find him but the sharks. But I kind of thought about that hard. You know, I'm not around, that kind of thing every day. I asked him, I said, what did you say. And he said yeah, he ripped me off and I blew his shit away.

Id. at 514-15.

[55] Id. at 515.

[56] Id. at 516.

[57] Trial Transcript at 541.

[58] Id. at 535, 537. Hardwick was arrested at 2:45 P.M. on Christmas day. Id. at 620.

[59] Id. at 543.

At 5:30 P.M. on Christmas day, Detectives Robinson, Hill, and Officer Register photographed Hardwick as part of the booking process.[60] Hardwick asked three times "what was happening," and Detective Robinson told him to be quiet and that the pictures and other vital information would only take a few moments.[61] At the third inquiry, Officer Register told Hardwick that officers from homicide would talk with him, whereupon Hardwick, who had not yet received his Miranda rights, voluntarily stated: "[A] man can't go around robbing dope dealers and not expect to get killed. He kept doing that and he got what was coming to him."[62] Detective Robinson wrote down Hardwick's statement, which became a state exhibit at trial. While Detective Robinson testified that Hardwick appeared "disheveled," no sobriety test was conducted.[63] Both he and Detective Hill testified that Hardwick did not seem to be intoxicated or under the influence of drugs and that he was "rational," "calm," and "coherent."[64]

---

[60] Id. at 575. Detectives Robinson and Hill of the Robbery Division were investigating Hardwick on the robbery charge and were assisting the Homicide Division by taking the booking photographs and obtaining preliminary information. Id. at 598.

[61] Id. at 576.

[62] Id. at 576-77.

[63] Id. at 579.

[64] Id. at 578, 596-97.

At 5:40 P.M. on that Christmas day, Detective Kesinger of the Homicide Division interviewed Hardwick, who was not represented by counsel.[65] Detective Kesinger testified that he did not record Hardwick's statements or have a court reporter present to transcribe them; he relied on his memory and the "notes on the back of the constitutional waiver form" that he made.[66] He advised Hardwick that he had been arrested for the murder of Keith Randall Pullum and read him his constitutional rights for the first time.[67] Detective Kesinger then proceeded with the interview whereupon Hardwick "made a spontaneous statement. He out of the blue said I'm missing some Quaaludes, but it's not a big deal."[68] Detective Kesinger testified at trial that he did not ask Hardwick <u>anything</u> about quaaludes.[69] Shortly after the termination of the interview, Detective Kesinger testified that Hardwick became incoherent and aggressive:

> That was about 15 minutes after the interview had ended
> and we had him in the room, and the only thing I can
> think of is he apparently had been in possession of some
> drugs and had ingested them at some point and <u>totally</u>

---

[65] <u>Id.</u> at 610. In his interview of Hardwick, Detective Kesinger was accompanied by Detective Pruett of the Homicide Division. <u>Id.</u>

[66] <u>Id.</u> at 681, 705.

[67] <u>Id.</u> at 610-11.

[68] <u>Id.</u> at 614.

[69] <u>Id.</u>

went out of it and started kicking the door, kicking the walls inside. I opened the door. He attempted to kick me. I grabbed him by the throat and tried to go to the wall with him to pin him against the wall, but there was a chair and we went over the chair. He was completely incoherent after that. We had to physically carry him from the building.

I saw him later that night once I got the search warrant and he didn't know where he was, who I was. I read it. They had him in a strip cell. Totally incoherent.[70]

After his arrest, Hardwick called his mother and asked her to retrieve some of his possessions from Dimaggio's apartment.[71] She and her son Jeff went to Dimaggio's apartment and found a number of passed-out individuals from the partying that had involved drugs and alcohol.[72] Jeff Hardwick described the scene

---

[70] Id. at 622 (emphasis added). Dr. Levin testified at the 3.850 proceeding that the testimony of the robbery detectives who said that Hardwick was coherent at his booking was inconsistent with the "psychotic episode" that shortly followed. 3.850 Proceeding at 1011-12. He also noted that, while Detective Kesinger testified that Hardwick was coherent during his interview concerning the murder, "[h]e also reported that fifteen minutes after his interrogation of Mr. Hardwick ended that he displayed an unprovoked violent outburst and became 'totally incoherent.'" Report of Dr. Levin at 3. Consequently, Dr. Levin's view that Hardwick was intoxicated at the time of the murder or had diminished capacity is not necessarily challenged. 3.850 Proceeding at 1011-12.

[71] Affidavit of Nell Lawrence ¶ 21.

[72] Nell Lawrence described the scene when she arrived:

I went in the house and there were beer bottles all over the place. There were a bunch of people there, drunk and passed out. I remember seeing Darlene's brother [Pete McCoy] and Daniel Dimaggio and a bunch of other people. I tried to wake some of them but I could only wake up one person.

23

similarly: "After Johnny's arrest, I went with mother to where Johnny lived, to get his belongings. The place was a wreck, with beer bottles all over and everyone passed out. It was hard to even wake someone up."[73]

During the day on December 26th, Mary Braddy, who then was employed by the Sheriff's Office as a chaplain's assistant, visited Hardwick.[74] She found him "not responsive at all when spoken to," apparently unaware of her presence, and "his eyes were very glassy and glazed," and "never seemed to focus."[75] Braddy clarified that her affidavit description of Hardwick looking "as if he had been on a binge" meant "an alcoholic that would come in the back door that hadn't slept or eaten in a week and had just been drinking or doing drugs and [had] not bother[ed] to take care of [himself]."[76] In her subsequent conversations with Hardwick, Jeff Bartley, and Jasper Davis, who also had been arrested for his participation in the homicide, they consistently related that "there had been a lot of drinking and drugs

---

Id.

[73] Affidavit of Jeff Hardwick ¶ 6.

[74] 3.850 Proceeding at 600, 601.

[75] Id. at 603, 604, 606. She also testified that Hardwick's long hair was "matty and stringy" and that "he looked dirty." Id. at 604.

[76] Id. at 608. Braddy further testified that Hardwick appeared to be intoxicated when she first saw him. Id. at 623.

through their partying over the weekend," and she specifically remembered Hardwick's "talking about quaaludes."[77]

Braddy, who had worked as a booking officer, testified that Hardwick's booking document was dated December 25th at 6:35 P.M., but that it was not processed until December 26th.[78] That document showed "unable" on the line for Hardwick's signature, which Braddy explained to mean that the inmate was "physically unable" to sign, which included intoxication, as opposed to refusal to sign.[79] In her affidavit, Braddy noted that Hardwick's intoxicated state should have been mentioned by the arresting officers: "It would be hard to believe arresting officers didn't report that Mr. Hardwick was intoxicated when he was brought to jail. Mr. Hardwick definitely appeared to be under the influence of drugs when he was brought in. Mr. Hardwick was not even coherent when I saw him [the day after his arrest]."[80]

---

[77] Id. at 607, 642. In her affidavit, Braddy stated: "Mr. Hardwick related to me that he had been doing drugs and drinking steadily over the whole weekend prior to his arrest." Affidavit of Mary Braddy ¶ 3. Braddy developed a counseling relationship with Hardwick, arranged special visits in her office for his mother to see him, and became fond of Hardwick through her professional, counseling relationship with him. 3.850 Proceeding at 617-18, 625-26.

[78] Id. at 634, 637, 640.

[79] Id. at 612, 614, 615, 616.

[80] Affidavit of Mary Braddy ¶ 4. Despite her description of Hardwick's condition in custody the day after his arrest with his having no ability to consume drugs or alcohol, the state trial judge made a factual finding following the 3.850 proceeding in his supplemental order that Braddy "had no relevant contact with the Petitioner." Transcript of Record, Vol. IV at 597.

On December 27th, Detective Kesinger and a patrolman went to a fire pit on Alvin Road, where Hardwick shot bullets from his .357 Magnum into concrete blocks.[81] The officers collected copper jackets, shell casings, and lead fragments.[82] These items were sent to the Florida Department of Law Enforcement and then to the FBI laboratory in Washington, D.C., where they ultimately were found to match the .357 casings found in Hardwick's car and the bullet in Pullum's body.[83]

B. Procedural History

1. Pretrial Proceedings

Hardwick was indicted for first-degree murder and pled not guilty. In response to discovery, his court-appointed attorney, Frank Tassone,[84] filed a list of fifty-two witnesses that Hardwick "expect[ed] to call as witnesses at the trial."[85]

---

[81] Trial Transcript at 637.

[82] Id. at 645.

[83] Id. at 646, 731-32, 739. A firearms examiner from the Florida Department of Law Enforcement testified that he could state with a reasonable degree of scientific certainty that the recovered shells were fired from the same weapon and matched the bullet found in Pullum, and an FBI agent testified: "It is my opinion that the bullet taken from the victim came from the same box of ammunition as the four lead fragments found at the fire pit, or from another box of ammunition which contained bullets of that exact same composition." Id. at 741, 749-50, 761.

[84] Originally, the Public Defender for the Fourth Judicial Circuit of Florida was appointed to represent Hardwick. Because of his prior representation of one of the state's listed witnesses and a possible conflict of interest, he was permitted to withdraw, and Tassone was appointed to be Hardwick's counsel.

[85] Transcript of Record, Vol. I at 124.

26

Although he took the depositions of the majority of the prospective witnesses, most of whom were involved in the law enforcement investigation of the murder, Tassone called none of them at trial.[86]

On February 13, 1986, Tassone moved to withdraw as Hardwick's counsel or, alternatively, to appoint Hardwick as co-counsel so that he could participate in his defense.[87] The impetus for this motion was because Hardwick had informed Tassone that he wanted to represent himself but that he wanted Tassone's advice and needed him to perform other tasks, such as taking depositions and having subpoenas issued.[88] The trial judge conducted a hearing on this motion on February 25, 1986. At this hearing, Hardwick explained his reasons for wanting another attorney appointed to represent him, which he also stated in handwriting that the judge made it part of the record:

Incompetency of Counsel

---

[86] Notably, the state trial judge's findings regarding Tassone's strategic reasons for not calling Nell Lawrence, Jeff Hardwick, Connie Wright, and Jeff Bartley relate to the guilt-innocence portion of the trial, concerning Counts II and IV, failing to prepare and present a voluntary intoxication defense. Transcript of Record, Vol. IV at 593-95. The sentencing phase, however, involves a more expansive analysis of mitigation factors, such as family background and inability to conform conduct to the requirements of law, than the guilt-innocence phase. These witnesses could have provided significant mitigation evidence for the different analysis required at the sentencing phase.

[87] Transcript of Record, Vol. I at 129-30.

[88] Id.

Counsel has repeatedly told me I should plead guilty to first degree murder for life with a mandatory 25 years.

He has refused to subpoena people I want subpoenaed to trial for witnesses, and to get addresses.

I told counsel I wanted motions filed so I could be present during depositions that were never filed.

I also don't have any confidence he will fight the case for me, because he has already told me several things that are not true.

I know more about [the] case than he does, and I have only saw him twice until I fired him.

I ask the court to appoint me another attorney, because I cannot adequately represent myself.[89]

Regarding his impasse with Tassone, Hardwick informed the judge that, without dismissal of Tassone, he would be forced to represent himself, which he did not believe that he was qualified to do:

MR. HARDWICK: . . . .
      You know, if the Court so forces me to do so I will represent my own self. But it's not my choice I want to represent myself. Because I don't feel I'm adequate to represent my own self in this trial. But if the Court so forces me to do so I will represent myself rather than have Mr. Tassone as my counsel.

---

[89] Id. at 131 (emphasis added); Hearing Transcript at 64. Hardwick's statement in his motion requesting another attorney that he had only seen Tassone twice is in stark contrast to Tassone's 3.850 testimony that he had "a minimum of thirty or forty meetings prior to trial" with Hardwick. 3.850 Proceeding at 36.

THE COURT: Well, the law is pretty clear that you either have the right to represent yourself, if you are qualified,—

MR. HARDWICK: I'm not choosing to represent myself.

THE COURT: — or to have Court-appointed counsel. <u>You are not allowed to fire Court-appointed counsel.</u>
 . . . .
I don't hear anything in what you have said that would cause me to think that [Tassone's] handling of the case has not been proper.

MR. HARDWICK: Would you like me to read it again?

THE COURT: No. I heard it.
 . . . .
Filing a motion to have you moved all around to attend depositions would have been a waste of his time and mine and yours because I wouldn't grant it.

MR. HARDWICK: Well, Your Honor, <u>I don't feel that that's a waste of time because I know Florida Statutes states it's my right</u>, you know, and—I mean, <u>my life is at stake in this case.  I believe I should be able to exercise all my rights</u>.  I feel like the reasons I have stated—you know, we have got irreconcilable differences . . . .[90]

The trial judge denied Tassone's motion to withdraw as counsel[91] and proceeded to examine Hardwick as to his competency to conduct his defense.  The judge determined that Hardwick was not competent to represent himself, which

---

[90] Hearing Transcript at 66-67, 68 (emphasis added).

[91] <u>Id.</u> at 69; Transcript of  Record, Vol. I at 132.

resulted in Tassone's continuing as his counsel.[92] Tassone also asked for

clarification of the judge's ruling:

> MR. TASSONE: . . . I find myself in a quandary.  I have
> received messages, my office has received messages,
> from Mr. Hardwick that regardless of what the Court's
> ruling is today that I was fired.
>      . . . .
> I don't want to get into a quandary or a box of being
> between an order of the Court and the instructions by my
> client not to proceed further.

---

[92] The exchange between Hardwick and the judge regarding this ruling is as follows:

> MR. HARDWICK: If the Court doesn't relieve Mr. Tassone and is
> forcing me to represent myself because I do not want Mr. Tassone
> as my counsel, I will represent myself before I accept Mr. Tassone
> as my counsel.
>
> THE COURT: Let the record show that I find Mr. Hardwick is not
> permitted to represent himself and I will deny such request.
>      . . . .
> MR. HARDWICK: So, basically what the Court is saying is that
> Mr. Tassone is still going to represent me?
>
> THE COURT: That's correct.
>
> MR. HARDWICK: And that I'm being denied the right to another
> attorney?
>
> THE COURT:  Yes, sir.
>      . . . .
>      The law does not give you the right to choose what attorney
> represents you.  If you convince me that I have appointed an
> attorney that is incompetent, that is not representing you
> adequately, or that because of some personality conflict he is out to
> see you lose the case, then I could do it.  But I'm not convinced of
> that at all.

Hearing Transcript at 75, 76 (emphasis added).

30

. . . .

I don't want to get into the position of perhaps violating any request by my client as opposed to one of the Court, and I would ask the Court to perhaps inquire of Mr. Hardwick as to whether it is his decision that I do or do not perform certain functions on his behalf?

THE COURT: I don't think he can make that decision. He didn't hire you and he can't fire you. . . . . as long as I have heard his request to have you relieved and to have other counsel and I have denied those. I think at this point that the thing that is binding on you is my order appointing you. Until you are relieved of that order you are to fulfill all the duties as his attorney.[93]

2. State Trial

The testimony and evidence at Hardwick's trial, March 11-13, 1986, focused on identifying Hardwick as the murderer through witnesses and ballistics evidence. At the commencement of the second day of trial, Tassone informed the judge that Hardwick desired to address him. Hardwick again, orally and in handwriting, filed by the court, moved to have Tassone dismissed as his counsel:

---

[93] Id. at 80, 81-82 (emphasis added).

31

    1. <u>Mr. Tassone has refused to ask state witnesses who took the witness stand questions I wanted asked about differences in their sworn statements and depositions.</u>

    2. <u>He has also refused to call the defense witnesses I want called to the witness stand to tell my side of this case.</u>

    3. For this reason <u>Mr. Tassone is incompetent as counsel and he is also in collusion with the state</u>, and trial court has erred by not letting me dismiss Mr. Tassone as counsel on February 25, 1986 and appoint[]ing substitute counsel. <u>This deprives me of my constitutional right to effective assistance of counsel.</u> Because of this I have to ask to represent myself because the court is forcing me to do this.[94]

In a side-bar conference with Hardwick and counsel, Hardwick reiterated his

request for appointment of another counsel, which again was denied.[95]

---

[94] Transcript of Record, Vol. I at 145 (emphasis added); Trial Transcript at 664. Apparently, inconsistencies in the state witnesses' depositions and subsequent testimony were problematic to Hardwick, who knew the true facts. For example, Connie Wright's deposition testimony regarding Hardwick's intoxicated/drugged condition undermined her subsequent testimony. If Tassone had called the witnesses in the defense case, then their conflicting testimony could have been resolved. Obviously, Hardwick believed such testimony would have helped him.

[95] The side-bar conference was as follows:

    THE COURT: . . .
        Mr. Hardwick, from the request that you just made am I to understand that you want to fire Mr. Tassone and represent yourself?

    MR. HARDWICK: I would like the Court to appoint me another counsel.

THE COURT: Okay. I can't do that.

MR. HARDWICK: But if not—yeah, the Court is forcing me to represent myself rather than proceeding with Mr. Tassone.

THE COURT: There are not three choices. There are only two. You either have to be represented by Mr. Tassone or you will have to represent yourself.

MR. HARDWICK: Uh-huh (yes).

THE COURT: I can't appoint anybody else.

MR. HARDWICK: Why not?

THE COURT: That is not the law.

MR. HARDWICK: I feel I have valid reasons to fire Mr. Tassone and dismissing him.

THE COURT: It's not the law. The law is you get one attorney appointed.

MR. HARDWICK: It says if you have voluntarily—reason to dismiss this attorney, another one will be appointed for you.

THE COURT: No.
I will do either of those two ways you want to do. You can represent yourself or you can have Mr. Tassone.

MR. HARDWICK: Is the Court forcing me to represent myself rather than appointing another attorney?

THE COURT: Well, you need to tell me whether you are—

MR. HARDWICK: I'm not going to say that I want to represent myself in front of this Court.

THE COURT: Yes.

MR. HARDWICK: That's all there is to it.

33

While cross examining Detective Kesinger, Tassone introduced his other apparent defense of Hardwick, in addition to sufficiency of the evidence, by asking Detective Kesinger if Mr. Buettner had confessed to killing Pullum. This resulted in a discussion among counsel, and the judge sustaining the state's objection with the ruling that the testimony that Tassone was attempting to place before the jury was hearsay. Later that day, the state rested, and Tassone moved for a directed

---

THE COURT: Okay.

MR. HARDWICK: I'm not going to say that. Because I do not—I want another attorney.

THE COURT: <u>Do you think you are capable of representing yourself</u>?

MR. HARDWICK: <u>No, sir, I do not</u>.

THE COURT: Well, quite frankly, I'm certain that you are better off with an attorney than without one. I agree with you on that. The only point on which we disagree is you are telling me <u>Mr. Tassone is not competent.</u>

MR. HARDWICK: <u>We have a big disagreement there</u>.

Trial Transcript at 665-67 (emphasis added); Transcript of Record, Vol. I at 146.

34

verdict of acquittal based on the state's failure to prove first-degree murder.[96]  The

judge denied this motion and asked Tassone to call his first witness.

The only witness that Tassone offered was David Buettner on a proffer

outside the presence of the jury.  Buettner, a Navy seaman, testified to participating

in killing, with a Marine and another sailor, an individual in Jacksonville while on

limited duty there between December 12, 1984 and August 1, 1985.[97]  While that

victim also was beaten, stabbed, and shot in the same vicinity as Pullum, he was

stabbed with a bayonet, not a pocket knife, and shot in the back of the head with a

.38 pistol by another sailor with Buettner.[98]  Moreover, Buettner testified that he

_____

[96] Tassone's motion for directed verdict of acquittal was as follows:

> The State has charged Mr. Hardwick with murder in the
> first degree and they must prove a number of elements, which we
> would submit that the State has not brought out any testimony
> under the theory of felony murder, and recognizing Mr. Hardwick
> is not charged under that particular statute, but the State has failed
> to specify elements involving that the death was caused by the
> criminal act or agency of Mr. Hardwick, or that there was a
> premeditated killing of Mr. Pullum.  The Court has heard the
> testimony of the various witnesses.  We would submit, Your
> Honor, that the testimony fails to establish a prima facie case of
> guilt against Mr. Hardwick.

Id. at 771.  We note that Tassone failed to present testimony to substantiate the bases for his
motion for directed verdict of acquittal.

[97] Id. at 774.

[98] Id. at 775-76, 777.  The motive for this killing allegedly was because the victim had
seduced Buettner's girlfriend and the wives of the other two men while they were at sea.  Id. at
795.

was certain that the killing occurred on February 2 or 3, 1985, and that the body was left on the beach by a seaway and not thrown into the river.[99] Buettner even testified that aspects of the killing were the result of his "very vivid imagination."[100] Notably, "Banana Man" was an individual that Buettner had met and who had told him a story that became part of the story that Buettner told about the murder to his leading petty officer, his immediate supervisor on his ship.[101] The judge sustained the state's objection to Buettner's testimony because it was either fabrication or another murder, since the facts were different.[102] Tassone then informed the judge that "the Defense will present no witnesses to the jury and will rest."[103]

While the jury was absent, the judge addressed Hardwick concerning witnesses on his behalf and his not testifying:

> THE COURT: . . . .
>       Let me make one inquiry of Mr. Hardwick. . . . I want to state for the record that we are in the part of the trial where you can present

---

[99] Id. at 776, 778, 791.

[100] Id. at 777. This imagination extended to identifying the victim as Keith Kennedy, a man who had drowned. Id. at 791.

[101] Id. at 773, 777.

[102] Id. at 778-79, 796-97. The judge also ascertained that Tassone did not want to offer the hearsay statements of Banana Man. Id. at 796.

[103] Id. at 798.

36

evidence. <u>Mr. Tassone has indicated that you do not wish to present any other evidence other than which you have tried to present.</u>

MR. HARDWICK: <u>I would like to present a bunch of evidence, Your Honor.</u>

THE COURT: I understand. <u>I understand there are things that you want to present that he has told you you can't or that he thought you ought not.</u>

MR. HARDWICK: <u>That's correct.</u>

THE COURT: . . . .
     <u>Specifically with regard to you taking the stand,</u>—

MR. HARDWICK: Yes.

THE COURT: —it is my understanding that you and he have discussed that, is that correct; whether or not you should take the stand?

MR. HARDWICK: <u>I'm the defendant.  I'm the defendant.  I wouldn't</u>.
     . . . .
THE COURT: . . . .
     But, for the record, <u>I do understand there are other witnesses and things that you want to call and that Mr. Tassone has advised you not to do that</u>.

MR. HARDWICK: <u>Yes, sir, about 20 of them to be exact</u>.

THE COURT: But none of them are yourself?

MR. HARDWICK: No, sir, <u>none of them are myself</u>.
     . . . .

MR. HARDWICK: <u>What I want to know is how Counsel can deny me the right to call witnesses into this trial</u>?

THE COURT: <u>Because your Counsel has to call the witnesses</u>.[104]

Following the close of the evidence in the case, the judge ordered dinner for the jurors and resumed the trial for closing arguments at 7:30 P.M. on March 12, 1986. A bailiff advised the judge that Hardwick would not leave his cell, and the judge recalled that Hardwick had said that he wanted to do his closing argument.[105]

---

[104] <u>Id.</u> at 798, 799, 800-01, 804 (emphasis added). Prior to trial, the state judge conducted a hearing on Hardwick's motion to dismiss Tassone. In the course of that proceeding, Hardwick informed the state judge that the witnesses that he wanted called on his behalf were all of the state witnesses:

> [W]hen it's time for trial if all my witnesses aren't called that I want called and they aren't on the record—I want it to reflect that I have requested that these witnesses be called. All State witnesses that are testifying against me, I want them called on my behalf too because there are so many different statements. I want them. You know, some of them are disappearing and all this. I don't want to—they are talking about they can't find them and stuff. I would like the record to reflect I want all State witnesses called so far that have given depositions and sworn statements in this matter.

Pretrial Hearing (Feb. 25, 1986) at 77 (emphasis added). Because cross examination is restricted to the scope of direct examination, it is insufficient for eliciting testimony beyond the scope of direct examination. Thus, the state witnesses who gave depositions and sworn statements were identifiable and calling them in the defense case would have resolved conflicts in their testimony.

[105] The account of Hardwick's refusal to leave his cell is as follows:

> THE COURT: . . . .
>      Mr. Tassone, your client has indicated to the bailiffs that he doesn't want to come out.
>
> MR. TASSONE: Yes, Your Honor, he has indicated the same to me.
>
> THE COURT: I don't mind. He doesn't have to hear closing arguments.
>
> MR. TASSONE: Your Honor, I agree.
>      . . . .

38

The judge, counsel, and the court reporter went to Hardwick's cell for the judge to conduct an inquiry as to the voluntariness of Hardwick's absence from closing arguments:

> MR. TASSONE: Judge, the Judge, court reporter and [the prosecutor] are here.
>     I have advised Judge Haddock that it was your decision not to come out, and the bailiffs have advised him of the same;
>     Is that your decision?
>
> MR. HARDWICK: Yes. That's my decision because my witnesses wasn't called and I don't feel that justice is being done and achieved in this trial.  This is a mockery of justice.
>
> MR. TASSONE: Okay.
>     Mr. Hardwick, I was advised by the bailiff—he indicated that—you had advised me of that, but one of the bailiffs indicated to me and to the Court that it was your desire to proceed and do your own closing argument.
>
> MR. HARDWICK: You may as well do it.   You done did everything else.
>
> MR. TASSONE: Okay.

---

> THE COURT: Prior to my leaving I heard him say something about him wanting to do his own closing argument.
>
> MR. TASSONE: No, Your Honor.
>
> BAILIFF MONIES: He said that to me.
>
> THE COURT: I would just as soon avoid that.  I am not going to let him do that.

Id. at 810 (emphasis added).

39

THE COURT: <u>Do you understand you have the right to be present during this stage of the trial</u>?

MR. HARDWICK: Yeah. I understand it.

THE COURT: <u>And you are waiving that right</u>?

MR. HARDWICK: <u>I reckon. I don't know. I'm just not coming in there</u>.[106]

In his closing argument, Tassone argued insufficiency of the circumstantial evidence with no mention of how Hardwick's drugged and intoxicated condition during the subject weekend could have affected his ability to formulate premeditated intent. The prosecutor argued the incriminating testimony and evidence presented through the state's eighteen witnesses and emphasized Hardwick's premeditated murder of Pullum. Following closing arguments, the judge conducted the charge conference with the attorneys late into the night.

The next morning, March 13th, the third and last day of trial, Tassone tendered two jury instructions, the first of which dealt with the effect of drugs and/or alcohol on formulating specific intent.[107] The prosecutor objected to this

---

[106] <u>Id.</u> at 811-12 (emphasis added). In this exchange, in layman's terms, Hardwick actually is complaining that he has been denied his Sixth Amendment right to confront the witnesses against him, and, therefore, he believes that his trial has been unjust and unconstitutional.

[107] Defendant's first Requested Jury Instruction provides:

The crime of First Degree Murder is a specific intent crime.
In order <u>to find the Defendant guilty, you must find that he had the</u>

instruction and stated: "I don't recall a scintilla of evidence that this defendant was intoxicated. As a matter of fact, the evidence was quite to the contrary; that he seemed very sober the night of the offense."[108] The trial judge agreed: "With regard to number 1, I recall no evidence of intoxication of any sort on the night of the alleged killing. Therefore, I don't think it's an appropriate charge with this evidence. I will deny defendant's requested jury instruction number 1."[109] After the instructions and the jury retired to deliberate the verdict, the judge asked counsel if there were any exceptions or objections to the instructions. Tassone stated that the defense had none.[110] At 4:05 P.M., the jury signaled that it had a

---

specific intention to kill.
Intoxication from ingesting drugs and/or alcohol may render an individual incapable of formulating the specific intent required.
Therefore, if you find the Defendant was intoxicated to the extent that he was unable to formulate a specific intent to kill, you must find the Defendant not guilty of Murder in the First Degree.

Transcript of Record, Vol. I at 147 (emphasis added).

[108] Trial Transcript at 918 (emphasis added).

[109] Id. at 919 (emphasis added). At the 3.850 proceeding, Tassone testified that, because of the "very, very valuable forensic evidence that tied Mr. Hardwick to the homicide," the jury did not need to know about Hardwick's drug use or possession "to convict Mr. Hardwick": "I think they could prove premeditation without ever having mentioned a drug." 3.850 Proceeding at 141. Tassone's statement demonstrates his lack of understanding of the voluntary intoxication defense and his failure to comprehend the mitigation groundwork/foundation this evidence would have been for the penalty phase.

[110] Id. at 935-36.

verdict.[111]  The jury found Hardwick guilty of murder in the first degree; the judge

set sentencing for March 27, 1986.[112]

### 3. Sentencing Proceeding

At sentencing, the judge informed the jurors that it was their duty to render

an advisory opinion as to whether Hardwick's punishment for first-degree murder

should be death or life imprisonment by evaluating the aggravating and mitigating

circumstances.[113]  The prosecutor presented the judgments and sentences from

Hardwick's previous convictions.[114]  Tassone presented no mitigating evidence.[115]

---

[111] Id. at 944.  The jury began its deliberations at 10:53 A.M., went to lunch from 12:45 P.M. till 1:45 P.M., when it continued deliberations, and announced a verdict at 4:05 P.M.  Id. at 935, 944.

[112] Id. at 949-50.

[113] Sentencing Transcript at 963-64.

[114] Id. at 964.  In his argument to the jury at sentencing, Tassone did attempt to moderate the effect of Hardwick's other convictions by explaining them:
> [The prosecutor] argues [these convictions] show[] that
> [Hardwick] has a lengthy prior criminal history record.  I ask you
> to look at the judgment and sentences that were introduced.  One in
> 1978.  The other in June of 1985.  The 1985 conviction occurring
> for robbery and kidnapping which occurred the day after Keith
> Pullum's death, December 25th, 1984.  The other one occurred in
> 1978.  The offense in the State of North Carolina where it occurred
> is a misdemeanor.  And the method of this heinous crime, of this
> horrible thing the State says, was attempting to hit someone with, I
> believe, a steel hardhat.  So, look at those.  Look at what
> circumstances are that are in those judgments and sentences.

Id. at 992-93.  Had Tassone provided the details of the 1978 offense, committed while Hardwick was incarcerated and provoked by a prison guard, as Hardwick's mother explained at the 3.850 proceeding, the effect of that conviction may have been lessened for the jury:

Again emphasizing the premeditated and cruel nature of the murder, the prosecutor told the jury that statutory mitigating factors did not exist to counter the aggravating circumstances. For example, the prosecutor stated that "there isn't one shred of evidence that indicates that this defendant was under the influence of any mental or emotional disturbance" and "[t]here is no evidence that the defendant's mind was impaired or that he was out of control."[116] Rather than giving the jury any mitigating factors to consider, Tassone's closing and rebuttal arguments reviewed the evidence in keeping with his sufficiency-of-the-evidence defense.[117]

---

When Little Johnny was in a North Carolina road camp some of the young men in camp with him called me collect. They told me that a certain guard had been harassing Little Johnny for a while and had thrown hot tar at Johnny's face. I found out that Little Johnny was charged with assault because he then threw his hard hat at the guard. I hired an attorney over the phone to represent him on that charge.

Affidavit of Nell Lawrence ¶ 17; see 3.850 Proceeding at 523-24 (Lawrence's testimony concerning this incident).

[115] Id. at 965.

[116] Sentencing Transcript at 983, 985.

[117] Since Hardwick had been convicted under Tassone's sufficiency-of-the-evidence defense, sentencing had a different defense purpose: to present mitigating factors to be weighed against the aggravating factors of the murder to obtain a life sentence instead of death. In response to questioning about his knowledge of nonstatutory mitigating factors at the 3.850 proceeding, Tassone responded: "I would think anything to try and make a jury to have some type of sympathy for the defendant I would probably try and get in, or an understanding of the defendant to lessen his culpability in the crime for which he stood convicted." 3.850 Proceeding at 151 (emphasis added). Inconsistent with this testimony was Tassone's testimony that, although he knew from either Dr. Barnard or Hardwick's mother "that when Mr. Hardwick used alcohol he became violent," id. at 99, he did not ask Dr. Barnard to evaluate Hardwick for

43

Having presented no defense for Hardwick and following the state's closing argument graphically describing Pullum's murder, Tassone's last statement to the jury in his rebuttal argument was notable for its lack of foundation: "I think the evidence is clear and the lack of evidence even clearer that John Gary Hardwick is innocent of the crime of first degree murder."[118]

The judge then instructed the jury that its advisory sentence was to be based on its

> determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.
> Your advisory sentence should be based upon the evidence that you have heard while trying the guilt or innocence of the defendant and evidence that has been presented to you in these proceedings.
> . . . .
> Each aggravating circumstance must be established beyond a reasonable doubt before it may be considered by you in arriving at your decision.

---

substance abuse, id. at 113, or statutory mitigating factors in the penalty phase, id. at 180. With respect to the depositions of witnesses describing Hardwick's intoxication and use of drugs during the Christmas weekend, Tassone testified that he did not give those depositions to Dr. Barnard, and further "that the chance of him receiving the depositions w[as] virtually nil." Id. at 111. Tassone could have presented to the judge and jury Hardwick's deprived and abusive childhood that led to his alcohol and drug addictions that was manifested particularly during the time period of the murder, when Hardwick participated in the binge, extended holiday weekend where numerous individuals witnessed his alcohol and drug consumption as well as the effects on Hardwick of his overindulgence. Instead, Tassone presented no mitigating evidence on Hardwick's behalf.

[118] Trial Transcript at 892.

44

> If one or more aggravating circumstances are established, you should consider all the evidence tending to establish one or more mitigating circumstances, and give that evidence such weight as you feel it should receive in reaching your conclusion as to the sentence that should be imposed.
>
> A mitigating circumstance need not be proved beyond a reasonable doubt by the defendant. If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established.
>
> . . . .
>
> If a majority of the jury determines that [Hardwick] should be sentenced to death, your advisory sentence will be: A majority of the jury, by a vote of blank, you will fill in that blank, advise and recommend to the Court that it impose the death penalty upon [Hardwick].
>
> On the other hand, if by six or more votes the jury determines that [Hardwick] should not be sentenced to death, your advisory sentence will be: The jury advises and recommends to the Court that it impose a sentence of life imprisonment upon [Hardwick] without possibility of parole for 25 years.[119]

Tassone stated that he had no exceptions or objections to the instructions as given.[120] The jury retired to deliberate its advisory recommendation at 3:17 P.M. on March 27, 1986, and returned a verdict at 4:18 P.M that afternoon "by a vote of 7 to 5" recommending that Hardwick receive the death penalty.[121]

---

[119] Id. at 1002-03, 1005-06, 1006-07 (emphasis added).

[120] Id. at 1008.

[121] Id. at 1008, 1010, 1011.

4. Sentencing

At sentencing on April 24, 1986, the judge found that five aggravating

circumstances existed: (1) three prior, violent felony convictions,[122] (2) the capital

felony was committed while Hardwick was engaged in a kidnaping, (3) the capital

felony was committed for pecuniary gain, (4) "the murder was especially wicked,

---

[122] The judge stated that the first of these felony convictions was the 1978 North Carolina incident, and he took "special notice" that the second and third felony convictions "were actually committed within 24 hours after the defendant committed the murder for which he is now to be sentenced." Sentencing Hearing at 1029. The Florida Supreme Court has strictly interpreted prior felony convictions that qualify as an aggravating circumstance at sentencing in a capital case. See Fla. Stat. § 921.141(5)(b) (1985) ("The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person."). Rejecting previous felony convictions "involving violence [,] . . . two convictions of breaking and entering with intent to commit a felony, two convictions of escape, one conviction of grand larceny, and one conviction of possession of a firearm by a convicted felon," the Florida Supreme Court held

> that none of these crimes falls within the meaning of this aggravating
> circumstance as defined by the statute. Only previous conviction of "another
> capital felony or of a felony involving the use or threat of violence" will satisfy
> section 921.141(5)(b). This subsection refers to life-threatening crimes in which
> the perpetrator comes in direct contact with a human victim.

Lewis v. State, 398 So. 2d 432, 438 (Fla. 1981) (per curiam). Hardwick's misdemeanor in North Carolina, which arose from his throwing a hard hat at a prison guard who had thrown hot tar in Hardwick's face while he was incarcerated, see supra note 114, does not appear to be eligible for a prior felony conviction, constituting an aggravating circumstance.

Additionally, Hardwick's second and third felonies were committed subsequent to Pullum's killing. Whether these crimes, committed within 24 hours of Pullum's death, had resulted in felony convictions prior to Hardwick's trial for Pullum's murder is determinative of whether they qualify as an aggravating circumstance. The Florida Supreme Court has explained that, under § 921.141 (5)(b), "[i]t is clear that the Legislature referred to 'previous convictions' and not 'previous crimes.'" Elledge v. State, 346 So. 2d 998, 1001 (Fla. 1977). Citing Provence v. State, 337 So. 2d 783 (Fla. 1976), where two armed robbery charges, and not convictions, were pending at the time of the defendant's murder trial, the Florida Supreme Court reiterated that "[i]t was there emphasized that prior conviction was the essential element of that aggravating circumstance." Elledge, 346 So. 2d at 1001.

46

evil, atrocious, or cruel,"[123] and (5) the homicide "was committed in a cold, calculated, and premeditated manner."[124]  Having found five aggravating circumstances and "no statutory or non-statutory mitigating circumstances," the judge sentenced Hardwick to death.[125]  Following the imposition of the death penalty, Tassone thanked the judge.[126]

5. <u>Direct Appeal</u>

On direct appeal, the Florida Supreme Court affirmed Hardwick's conviction and sentence.  <u>Hardwick v. State</u>, 521 So. 2d 1071 (Fla. 1988).  The Florida Supreme Court did determine that two of the aggravating factors found by the trial court were erroneous: "[T]he trial court erred in finding that the killing was committed during a kidnapping and was for pecuniary gain.  Each of these factors requires proof beyond a reasonable doubt, not mere speculation derived from equivocal evidence or testimony."  <u>Id.</u> at 1075.  That court determined that the error in weighing the aggravating and mitigating factors was harmless because "[t]he record before us reflects three aggravating factors and no valid mitigating

---

[123] <u>Id.</u> at 1030.

[124] <u>Id.</u> at 1033.

[125] <u>Id.</u> at 1034.

[126] <u>Id.</u> at 1035.

47

factors."[127]  Id. at 1076-77.  Regarding discounting the mitigation factor of alcohol

and drug addiction, the Florida Supreme Court explained that no supporting

evidence was presented at either the guilt or sentencing phase.[128]

---

[127]  Under Florida law, "[w]here there are one or more valid aggravating factors that support a death sentence and no mitigating circumstances to weigh against the aggravating factors, death is presumed to be the appropriate penalty."  Blanco v. State, 452 So. 2d 520, 526 (Fla. 1984) (per curiam).

> Florida's death penalty statute, section 921.141, Florida Statutes (1983), provides that the jury shall hear the evidence on aggravation and mitigation and render an advisory sentence based on whether there are sufficient aggravating circumstances to warrant a death sentence, and, if so, whether there are sufficient mitigating circumstances to outweigh the aggravating circumstances.  The statute goes on to provide that, notwithstanding the recommendation of the jury, the judge shall weigh the aggravating and mitigating circumstances and enter a sentence of life imprisonment or death based on the judge's weighing process.  In the event the death sentence is imposed, the judge is required to set forth in writing the findings on which the death sentence is based. . . . [T]he judge is the sentencing authority and the jury's role is merely advisory.
>     . . . .
> [The Florida Supreme Court] routinely applies harmless error analysis to, and affirms, death sentences where the judge has improperly found invalid aggravating factors provided one or more valid aggravating factors exist which are not overridden by one or more mitigating factors.

Grossman v. State, 525 So. 2d 833, 839, 844 (Fla. 1988) (per curiam); see Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418 (1983) (holding that, when a trial judge has considered an invalid aggravating circumstance, applying harmless-error analysis does not render the death sentence unconstitutional).  This case is distinguished, however, because our review of the record reveals that Hardwick's counsel failed to present statutory and nonstatutory mitigating factors that should have been weighed against statutory aggravating factors, which we address in our subsequent discussion of the sentencing phase.

[128] The Florida Supreme Court stated:

> [T]his record contains nothing beyond a mere implication that Hardwick suffered from drug or alcohol dependency.  Appellant presented no evidence or testimony from qualified witnesses during either the guilt or penalty phases of trial.  The only evidence remotely touching on this question was from several lay

48

6. Florida Postconviction, Rule 3.850 Proceeding

Following the signing of a death warrant, Hardwick filed an emergency motion for stay of execution and a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 on February 16, 1990. The trial judge conducted an evidentiary hearing on the latter motion on February 22, 1990, and denied it. On appeal, the Florida Supreme Court stayed Hardwick's execution and remanded his case "for a complete evidentiary hearing on Hardwick's claims under Florida Rule of Criminal Procedure 3.850."[129] The trial judge conducted further proceedings on Hardwick's 3.850 motion on May 3-4, 1990, and August 15-16, 1990.

The evidence introduced at these proceedings included the testimony of Tassone,[130]

---

witnesses, friends or acquaintances of appellant, who testified that on certain occasions he had used drugs and alcohol, had Quaaludes in his possession and sold drugs to others. <u>Nothing suggests that appellant's use of intoxicants had reached the level of a continuing impairment to any degree or that he actually was impaired at the time of the killing</u>. Indeed, there was testimony to the contrary. <u>We therefore cannot fault the trial court for failing to find this factor in mitigation, since it was not established by any significant evidence in the record.</u>

Hardwick, 521 So.2d at 1076 (emphasis added).

[129] Hardwick v. Dugger, Nos. 75,556, 75,673, slip op. at 1 (Fla. Mar. 20, 1990).

[130] The Florida Supreme Court found the first of the three evidentiary 3.850 proceedings, which occurred on February 22, 1990, and contains solely Tassone's testimony, and resulting

49

order of the trial judge to be insufficient. Tassone's testimony at this initial evidentiary hearing is significant not only because Tassone is the focus of the ineffective-assistance-of-counsel claims at issue in this case, but also it implicates the fairness of the state judge's conduct of the proceeding. Tassone's testimony further reveals his misunderstanding of mitigating factors critical to the penalty phase. Tassone did not testify again at either of the subsequent 3.850 evidentiary hearings on May 3-4, 1990, or August 15-16, 1990, following the remand of the Florida Supreme Court. While the dissent accepts and adopts the state trial judge's factual findings from his supplemental order after conducting additional evidentiary hearings on remand, we note that any findings concerning Tassone derive from his testimony at the initial, February 22, 1990, evidentiary hearing, found to be deficient by the Florida Supreme Court.

The portion of the 3.850 proceedings that contains Tassone's testimony commenced at 2:15 P.M. on February 22, 1990. 3.850 Proceedings at 4. At the outset, counsel appearing for Hardwick requested a continuance because Hardwick's primary counsel was litigating a 3.850 motion in another case in another city. Id. at 5. The "stand in" counsel, who had never met Hardwick or worked on the case, id., further explained that he had been up all the preceding night preparing a 3.850 motion for filing that day in another city, id. at 6. Therefore, he "had absolutely no time to familiarize [himself] with [Hardwick's] records." Id. The state judge determined that "there is really no reason for continuance here today. We can take Mr. Tassone's testimony." Id. at 11.

When the state prosecutor asked Tassone if Hardwick admitted to him that he committed the murder, his attorney objected, and the judge overruled the objection. Before answering, Tassone asked for time to consult his attorney, and the judge gave him five minutes. Prior to cross examination, the judge, at 4:28 P.M., granted Hardwick's counsel's motion for a recess, but ordered that the hearing would reconvene at 8:30 P.M. that evening and required the counsel "to either have an attorney here who is prepared to go forward with the hearing or, [stand-in counsel] will have to prepare yourself as best you can in the interim." Id. at 72.

The hearing reconvened at 8:40 P.M. that evening. Id. at 76. As the hearing proceeded into the night, Hardwick's stand-in counsel requested a two-minute restroom break. Id. at 130. Later, after discussing an objection, the stand-in counsel stated: "I am tired, Your Honor, so I will try again, but I think Your Honor understands," whereupon the judge overruled the objection. Id. at 138.

Subsequently, Hardwick's attorney asked Tassone about statutory mitigating circumstances in Florida:

Q Sir, do you know what the statutory mitigating circumstances are in the Florida system?
A Probably.

 . . . .

THE WITNESS: I probably remember some of them.
BY [Hardwick's Attorney]:
Q It's late and I know you are tired. Can you tell us which ones you can recall right now, sir?
A Whether the defendant was under the substantial domination of another, an

50

insignificant prior criminal history, whether he was an active participant in the crime for which he stood convicted or played some lesser role.

    I just can't remember anymore right now.

Q All right.

A His age at the time of the offense is another one. I think there is two more, maybe three more.

Q Under extreme mental or emotional distress?

A Yes, sir.

Q <u>The defendant's capacity to conform his conduct to the requirements of the law were substantially impaired at the time of the offense?</u>

A <u>I think that is one.</u>

<u>Id.</u> at 151, 152 (emphasis added).

As the hearing continued into the night, Tassone asked the judge: "Your Honor, may we take a five-minute break? All I want to do is walk up and down and splash water on my face." <u>Id.</u> at 168. A short recess followed. <u>Id.</u> at 169. Later, Hardwick's substitute counsel requested a recess to call to see if his principal attorney had returned from his 3.850 appearance in another city. <u>Id.</u> at 177. Unsuccessful at reaching that counsel, Hardwick's stand-in attorney subsequently showed weariness in his examination:

[Hardwick's Attorney]: If the court can bear with me for a moment, sir?

THE COURT: uh-huh.

[Hardwick's Attorney]: I am losing my train of thought here. I am sorry.

<u>Id.</u> at 179. Following cross examination, the prosecutor requested redirect examination, to which the state judge responded: "I am not sure you are entitled to a redirect in this kind of hearing." <u>Id.</u> at 185. The judge then agreed: "I am indicating he may redirect but with reluctance." <u>Id.</u>

The hearing proceeded, and the questioning concerned whether Hardwick's recollection of the facts of the murder was consistent with someone under the influence of intoxicants, at which point, Tassone stated: "Your Honor, I—and counsel—I would feel very, very uncomfortable with the question. <u>I would say I would call my attorney but I would be very reluctant at this time in the morning.</u> And I think in light of Mr.Hardwick's counsel asserting the privileges I probably would decline to answer that question. <u>Id.</u> at 187-88 (emphasis added). When the prosecutor wanted to question Tassone concerning Bartley's participation in the murder, Hardwick's attorney stated: "Your Honor, I guess I would have to ask <u>at this late time in the evening</u> what the relevance of all that is? <u>Id.</u> at 190 (emphasis added). At 1:00 A.M., Tassone was excused, the prosecutor said that the state had no other witnesses to present, and the judge asked if the defense had any witnesses to present, to which Tassone's attorney replied:

[Hardwick's Attorney]: We have witnesses to present but none that are here at this time, Your Honor.

THE COURT: <u>Now is the time</u>.

[Hardwick's Attorney]: <u>It's 1:00 o'clock in the morning</u>, Your Honor. <u>We have no witnesses available at this time.</u>

THE COURT: I want you to tell me, for the record, if you had somebody at 1:30 this afternoon who has left. <u>I will send for them.</u>

[Hardwick's Attorney]: No, Your Honor. I indicated on the record this afternoon that I did not have any witnesses that were available to testify at this time.

I would strenuously argue if we are not allowed to call any witnesses at this time that we have just wasted everyone's entire day because, clearly, we have not resolved any of the issues upon which you indicated we needed to rule, Rule 3.850, evidentiary hearing.

We have obvious witnesses that need to be called based upon the testimony that has been presented here and, clearly, which is in conflict, and we would request the court allow us to do that.

THE COURT: Do I interpret that as a motion for continuance?

[Hardwick's Attorney]: Yes, sir.

THE COURT: I will deny the motion for continuance and —

[Hardwick's Attorney]: And, Your Honor, if I could, just for the record proffer at this time that, clearly, we could call Dr. Barnard, and we would proffer his testimony which I think would contradict significant aspects of the testimony of Mr. Tassone.

Clearly, all of the witnesses that were proffered through the affidavits indicated that that information was never specifically asked of them; that they would have testified to that.

We definitely would want to proffer the evidence, the testimony from Mr. Hardwick, himself, concerning discrepancies that he would have with Mr. Tassone's testimony.

Additionally, we would ask the court to allow us to present copies of Mr. Tassone's files which will contradict things that he said on the record here today.

And, additionally, we would ask the court to allow us to present the testimony from Dr. Dee and from Dr. Levin which would contradict things that Mr. Tassone has said and would also be relevant evidence as to the Claim No. XI [failure to assist defense counsel] which Your Honor indicated we were entitled to an evidentiary hearing on.

Clearly, all of those witnesses need to be called for Your Honor to make any kind of factual findings in this case.

The affidavits from Mrs. Lawrence and from Jeff Hardwick are in direct contradiction of what Mr. Tassone says.

Your Honor cannot make fact findings without hearing from those witnesses. We would proffer that what Dr. Barnard would say would contradict that.

Again, Your Honor does not have any of that evidence before him and we would renew our request for a continuance in order to present that information.

[Prosecutor]: . . .

The State can attach a little credence, perhaps, to the proffer.

. . . .

The fact is they have been allowed to present the affidavit[s] of these

52

psychiatric experts, members of Hardwick's family, and other witnesses, as well as

affidavits and diagnostic reports from the expert witnesses. Tassone's testimony

---

witnesses and the State has stipulated to what they say they will testify to. I don't see how anyone has been prejudiced here today.

. . . .

[Hardwick's Attorney]: Clearly, Your Honor, <u>affidavits cannot be drafted to anticipate what may need to be rebutted in the course of cross examination of an attorney/witness and, clearly, our affidavits couldn't do that and don't do that.</u>

And, <u>therefore, calling them as witnesses is obviously necessary, not to mention the fact that Your Honor did not determine an issue of credibility based upon a piece of paper.</u>

Additionally, as to Dr. Barnard, we didn't feel we needed an affidavit based on a report that Your Honor has before you. And I think the report speaks pretty clear for itself. <u>There is not one mention of Dr. Barnard ever indicating that his evaluation of Mr. Hardwick had anything to do with anything but competency and sanity.</u>

And so, no, Your Honor, we didn't waste any time trying to get an affidavit from an expert who clearly in his report indicated what he did for a case.

[Prosecutor]: . . ..

The fact of the <u>matter is the State is prejudiced because we cannot cross exam affidavits, either and, therefore, you know, the State has been prejudiced here more</u> than the defense.

. . . .

The issue here is the performance of counsel from his shoes at the time. And we have already stated that these people would come in, and at least now, according to affidavits procured from them, they now allege that they would come in and testify. That has been stipulated to.

. . . .

THE COURT: Okay. I am going to <u>deny the defendant's motion for a continuance,</u> and I will <u>declare the evidentiary phase of this hearing closed.</u>

It is 1:00 a. m. Friday morning. I do not propose to start listening to arguments at this time of night. I will take the case under advisement.

. . . .

I will, while we're here, enter an order on the application for a stay of execution. Since we have now held the hearing that was the grounds for that motion, <u>I will deny the application for stay of execution.</u>

Id. at 192, 193-195,196, 197-99 (emphasis added). The state judge deferred Hardwick's motion to compel because "I just don't want to ask you to argue, mainly because my court reporter is about to give up on us." Id. at 200. <u>The hearing ended at 1:05 A.M.</u> Id. at 201.

reveals his misunderstanding of aggravating and mitigating factors as they relate to a voluntary intoxication defense:"I am not too sure an abuse of alcohol or drugs is a aggravating or a mitigating factor. I mean, I guess what I am saying is I am not too sure it's mitigating or aggravating."[131] This misunderstanding, together with his belief that Hardwick would be convicted of first-degree murder,[132] appeared to govern his defense of Hardwick at both the guilt and penalty phases. Although Tassone recognized that voluntary intoxication is "where an individual through ingesting either alcohol or drugs may be unable to formulate the intent or the requisite intent required in a specific intent crime,"[133] he did not ask the court-appointed psychiatrist to evaluate Hardwick relative to a voluntary intoxication defense but to determine his competency to stand trial and his sanity at the time of

---

[131] 3.850 Proceeding at 52. Tassone explained his perception of whether voluntary intoxication was an aggravating or mitigating factor:

> I feel that — and my theory is in terms of voluntary intoxication that there is a difference between an individual say perhaps who is addicted to some narcotic and steals bologna and cheese from the 7/Eleven and an individual who is intoxicated on narcotics, who is not only a user, whether occasional or regular, but who also sells the narcotic for a living.
> To me, that is a aggravating factor rather than a mitigating factor.

Id. at 57-58.

[132] Id. at 133.

[133] Id. at 121. In his supplemental order denying Hardwick post-conviction relief, the state trial judge concluded that "[o]f course, Hardwick was sane and competent despite any drug problem." Transcript of Record, Vol. IV at 599.

the offense.[134]  In contrast, the two other psychiatric experts who were asked to

perform this evaluation opined and testified, based on their review of the record

and interviews with Hardwick, his family, and witnesses, that the degree of

_____

[134] Id. at 122.  Based upon the state judge's undocumented assertion that Tassone discussed mitigating testimony and evidence with Dr. Barnard, the court-appointed psychiatrist, the dissent accepts as a fact entitled to a presumption of correctness, that Tassone did discuss mitigating evidence with Dr. Barnard relating to Hardwick's case.  Instead, Dr. Barnard's 3.850 testimony is clear that he performed a two-part evaluation of Hardwick pursuant to the state court's order for him to determine: (1) Hardwick's competence to stand trial and (2) his sanity at the time of the homicide.  3.850 Proceeding at 252-53.   Both of these inquiries focused on the guilt-innocence phase of Hardwick's trial and not on mitigating circumstances relevant to sentencing.  Practically, Tassone wanted a determination of whether Hardwick was capable of assisting in his defense.  As Dr. Barnard explained, a negative finding as to competence to stand trial would be the basis for involuntary hospitalization.  Id. at 261.  Tassone also wanted a determination of whether Hardwick could be considered sane at the time of the murder; if not, an insanity plea would be appropriate.  Id. at 309.  Consequently, Dr. Barnard's conclusion that Hardwick knew what he was doing at the time of the murder related only to his sanity at the time of the murder and did not encompass mitigating circumstances.  As the trial judge explained: sanity is not an issue at the penalty phase because it has no purpose at that point in the proceedings.  Id. at 850.  Dr. Barnard testified that, if he had been asked to evaluate specific intent as it related to statutory or nonstatutory mitigating factors relevant to voluntary intoxication, then this analysis would not only be in his report but also in his notes.  Id. at 262, 342.  Dr. Barnard specifically testified that he did not provide an opinion concerning Hardwick's voluntary intoxication at the time of the homicide or statutory or nonstatutory factors present in his case.  Id. at 262.

In contrast, Dr. Dee and Dr. Levin were asked to evaluate Hardwick as to mitigating factors.  In addition to talking with Hardwick and his wife as well as reviewing the depositions and trial testimony of witnesses, both doctors independently determined that, to a reasonable degree of psychological certainty, Hardwick was substantially impaired such that he did not have the capacity to formulate specific intent or to conform his conduct to the requirements of law at the time of the homicide.  Id. at 787, 975.  To the extent that Dr. Barnard talked in these terms at the 3.850 proceeding, he also made abundantly clear that he simply did not assess statutory or nonstatutory mitigating factors in his evaluation of Hardwick because he was not asked to do so.  Dr. Barnard, however, testified that he did not recall discussing statutory or nonstatutory mitigation evidence with Tassone, 3.850 Proceeding at 262, 300, and that he received no correspondence from Tassone, id. at 253.  Moreover, if the judge or Tassone had asked him to evaluate mitigating factors relating to Hardwick's case, then Dr. Barnard testified that he would have done so.  Id. at 262.

55

Hardwick's intoxication at the time of the homicide mitigated his ability to

formulate specific or premeditated intent.[135]

Additionally, Tassone testified that he either discounted or discredited many

of the witnesses at the relevant time because of their age or drug use.[136] He did not

recall interviewing Hardwick's mother as to whether she saw her son and his

condition within the relevant time of the homicide.[137] Hardwick's family members,

including his siblings, who could have testified concerning Hardwick's alcohol and

drug use from childhood, averred that Tassone did not contact them and that they

would have been willing to testify.[138] The trial court denied Hardwick

---

[135] Id. at 791 (Dr. Clifford A. Levin); id. at 975 (Dr. Henry L. Dee).

[136] Tassone explained his disinterest in many of the young witnesses in the drug community who saw Hardwick at the relevant time:

> Most of them admitted to being drug users, a lot of them because of their age, a lot of them because of their or some of them because of their past criminal history.
> Some of them were seventeen and eighteen, were not going to school, were not working. Their parents were not supporting them but, but they had no means of support and things like that.
> So, all those factors. But, clearly, drug use was one of the factors.

Id. at 118.

[137] Id. at 118-19.

[138] See, e.g., Affidavit of Nell Lawrence ¶ 23 (mother); Affidavit of Jeff Hardwick ¶ 7 (brother); Affidavit of Jerry Hardwick ¶ 7 (brother); Affidavit of James Britt ¶ 10 (half brother); Affidavit of Grady Hardwick ¶ 11 (uncle); Affidavit of James Hardwick ¶ 9 (uncle); Affidavit of Grace Powell ¶ 6 (aunt); Affidavit of Florrie Benton ¶ 8 (aunt).

postconviction relief,[139] and the Florida Supreme Court affirmed and also denied

his petition for writ of habeas corpus. Hardwick v. Dugger, 648 So. 2d 100 (Fla.

1994) (per curiam).

7. Federal Habeas Corpus Proceeding

Hardwick then filed the subject petition for habeas corpus relief pursuant to

28 U.S.C. § 2254 in the Middle District of Florida, which the district court

dismissed with prejudice. Of the twenty issues raised, only the subject claims of

ineffective assistance of trial counsel at the guilt and penalty phases and a claim of

conflict of interests between Hardwick and his trial attorney remain. Without an

evidentiary hearing, the district judge determined that alleged guilt-phase

ineffective assistance for failure to advance a voluntary intoxication defense was

inconsistent with the evidence, that alleged penalty-phase ineffective assistance

was justified as attorney strategy, and that Hardwick was not entitled to another

appointed counsel.

When Hardwick sought a certificate of appealability/probable cause, the

district judge applied the Antiterrorism and Effective Death Penalty Act of 1996

---

[139] Discounting any potential mitigating evidence that could have been presented at the penalty phase and approving Tassone's "strategic decision to rely upon argument rather than this evidence of mixed value," the state trial judge stated in his supplemental order: "The court does not find any reasonable probability that a different recommendation would have come from the advisory jury. The evidence would not, if offered, have prompted a sentence other than death from this Court." Transcript of Record, Vol. IV at 599.

(AEDPA), 28 U.S.C. § 2253(c) and issued a certificate of appealability for three of Hardwick's twenty claims for relief. Pursuant to Hardwick's argument that the district judge erroneously had applied the AEDPA because his petition was pending on April 26, 1996, when the AEDPA was enacted, our court remanded for "reevaluation of Hardwick's application for a certificate of probable cause in light of pre-AEDPA law." Hardwick v. Singletary 122 F.3d 935, 936 (11th Cir. 1997) (per curiam). On remand, the district judge again relied on the AEDPA and granted a certificate of appealability. Following Hardwick's motion for relief from the order, we construed the district court's certificate of appealability "as a grant of a certificate of probable cause to appeal all issues presented in the petitioner's federal habeas petition." Hardwick v. Singletary, 126 F.3d 1312, 1313 (11th Cir. 1997) (per curiam). After oral argument, we directed counsel to provide supplemental briefs discussing the effect of Williams v. Taylor, 529 U.S. 420, 120 S.Ct. 1479 (2000), on this appeal. We now turn to the three issues before us: Tassone's neffective assistance of counsel at the guilt and penalty phases and conflict of interest between Hardwick and his counsel.[140]

## II. DISCUSSION

---

[140] "Issues not clearly raised in the briefs are considered abandoned." Marek v. Singletary, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995).

A. Review Standards

Under pre-AEDPA law, we review the denial of a § 2254 petition and a
district court's legal conclusions de novo. Johnson v. Alabama, 256 F.3d 1156,
1169 (11th Cir. 2001). A district court's factual findings are reviewed for clear
error. Id. While factual findings by a state court following a merits hearing on the
claims raised generally are accorded a presumption of correctness, this
presumption does not obtain if any of the eight exceptions in former § 2254(d)
apply.[141]

_____

[141] Regarding the presumption of correctness and the eight exceptions, the applicable
former statute provides:

> In any proceeding instituted in a Federal court by an
> application for a writ of habeas corpus by a person in custody
> pursuant to the judgment of a State court, a determination after a
> hearing on the merits of a factual issue, made by a State court of
> competent jurisdiction in a proceeding to which the applicant for
> the writ and the State . . . were parties, evidenced by a written
> finding, written opinion, or other reliable and adequate written
> indicia, shall be presumed to be correct, unless the applicant shall
> establish or it shall otherwise appear, or the respondent shall
> admit—
> (1) that the merits of the factual dispute were not resolved in the
> State court hearing;
> (2) that the factfinding procedure employed by the State court was
> not adequate to afford a full and fair hearing;
> (3) that the material facts were not adequately developed at the
> State court hearing;
> (4) that the State court lacked jurisdiction of the subject matter or
> over the person of the applicant in the State court proceeding;
> (5) that the applicant was an indigent and the State court, in
> deprivation of his constitutional right, failed to appoint counsel to
> represent him in the State court proceeding;
> (6) that the applicant did not receive a full, fair, and adequate

hearing in the State court proceeding; or
(7) <u>that the applicant was otherwise denied due process of law in the State court proceeding</u>;
(8) or <u>unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record</u> . . . .

28 U.S.C. § 2254(d) (1994) (emphasis added); <u>see</u> <u>Sumner v. Mata</u> , 449 U.S. 539, 544-47, 101 S.Ct. 764, 769 (1981) (making no distinction between factual determinations of state trial or appellate courts); <u>Bundy v. Wainwright</u>, 808 F.2d 1410, 1416 (11th Cir. 1987) ("[N]o presumption arises if any one of the eight numbered conditions is shown to exist.").

In contrast to the dissent's acceptance of the factual findings in the trial judge's supplemental order following the augmented 3.850 proceeding, the majority views the first part of the 3.850 proceeding to have failed in providing "a full, fair, and adequate hearing."  28 U.S.C. § 2254(d)(6).  That evidentiary hearing, consisting only of Tassone's testimony that the Florida Supreme Court found to be deficient, was conducted with an unprepared, stand-in counsel because Hardwick's principal counsel could not be present.  Although counsel and the witness, Tassone, were weary, the trial judge nonetheless forced them to complete the hearing, which began in the early afternoon and did not end until the following morning.  Because witnesses and Hardwick were unavailable late that night, and the trial judge refused to grant a continuance, facts material to mitigating circumstances relevant to Hardwick's sentencing proceeding were not presented and resolved adequately.

Although the Florida Supreme Court found this proceeding to have been deficient, Tassone never testified again.  In the two subsequent portions of the 3.850 proceeding, the witnesses presented testified regarding Hardwick's deprived and abusive childhood as well as Tassone's errant advice to them or lack of contact.  This testimony exposed issues of Tassone's ineffectiveness relating to Hardwick's sentencing, but Tassone never addressed or responded to this testimony, which the district court's evidentiary hearing on remand will reconcile.

Additionally, we conclude that some factual issues decided by the state judge were "not fairly supported by the record."  28 U.S.C. § 2254(d)(8); <u>see</u> <u>Fortenberry v. Haley</u>, 297 F.3d 1213, 1220 (11th Cir. 2002) (per curiam).  To the extent that the dissent seems to fault the majority for "repeatedly contrast[ing] statements or findings of the 3.850 court with the [record] evidence," Dissent at 4, our review under § 2254(d)(8) requires such evaluation of the state judge's 3.850 factual findings before they are accorded a presumption of correctness.  <u>See</u> <u>Marshall v. Lonberger</u>, 459 U.S. 422, 432, 103 S.Ct. 843, 850 (1983) ("This deference requires that a federal habeas corpus court more than simply disagree with the state court before rejecting its factual determinations.  Instead, it must conclude that the state court's findings lacked even 'fair support' in the record.").  Simply because a state judge's postconviction order states certain

60

A presumption of correctness usually applies to "basic, primary, or historical facts." Thompson v. Keohane, 516 U.S. 99, 109-10, 116 S.Ct. 457, 464 (1995). Questions of law or mixed questions of law and fact, however, are not subject to the presumption.[142] Id. at 109-10 & n.9, 116 S.Ct. at 464-65 & n.9. Accordingly, our court has recognized that the presumption of correctness generally applicable to federal habeas review of state-court factual findings is not insurmountable or irrebuttable. Historical facts found by state courts in evaluating ineffectiveness claims are not presumed correct if they are clearly erroneous. Bolender v. Singletary, 16 F.3d 1547, 1558 n.12 (11th Cir. 1994). State-court factual findings

---

factual findings does not mean that a federal habeas court automatically accepts them if the record shows that those fact findings are erroneous. That is, a state judge's factual findings are not presumed correct for federal habeas review purposes just because the state judge says so, when the record evidence on federal review shows otherwise.

[142] Under pre-AEDPA review standards, a federal habeas court owes no deference to a state court's resolution of mixed questions of constitutional law and fact. Williams, 529 U.S. at 400, 120 S.Ct. at 1516 (O'Connor, J., concurring) (citing Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 450 (1985)). A determination by state courts of ineffective assistance of counsel is a mixed question of law and fact, which is not entitled to a presumption of correctness under 28 U.S.C. § 2254(d), as our court consistently has held. See, e.g., Routly v. Singletary, 33 F.3d 1279, 1284 (11th Cir. 1994) (per curiam); Cave v. Singletary, 971 F.2d 1513, 1516 (11th Cir. 1992); Davis v. Kemp, 829 F.2d 1522, 1537 (11th Cir. 1987); Thomas v. Kemp, 796 F.2d 1322, 1324 (11th Cir. 1986). Unless one of the § 2254(d) exemptions applies, we accord a presumption of correctness to the trial court's findings of historical facts underlying the claim. The separate determination of whether counsel's representation was effective or ineffective is a question of law. Thus, we generally accept the historical facts found by a state court and then decide whether counsel's representation satisfied Sixth Amendment requirements under Strickland.

are not entitled to a presumption of correctness where the petitioner "did not receive a full, fair and adequate hearing in the state court proceeding." 28 U.S.C. § 2254(d)(6); Porter v. Wainwright, 805 F.2d 930, 938 (11th Cir. 1986). "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 696, 104 S.Ct. at 2069. Consequently, an evidentiary hearing in district court may be required to resolve "conflicting inferences." Porter, 805 F.2d at 938. A federal court reviewing a state prisoner's petition for habeas relief must make an "independent federal determination" in deciding questions involving constitutional law and the application of constitutional law to the facts "under the totality of the circumstances" of a particular case. Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 450-51 (1985). Therefore, a trial court's determination as to whether a petitioner has been denied his Sixth Amendment right to effective counsel is not entitled to the presumption; we must make that determination anew.[143] Strickland v. Washington, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

---

[143] "'We have always held that federal courts, even on habeas, have an independent obligation to say what the law is.'" Williams, 529 U.S. at 402, 120 S.Ct. at 1517 (O'Connor, J., concurring) (quoting Wright v. West, 505 U.S. 277, 305, 112 S.Ct. 2482, 2497 (1992)).

undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686, 104 S.Ct. at 2064.

B. Guilt Phase

The crux of Hardwick's discontent with his trial counsel was Tassone's failure to call witnesses that Hardwick wanted to testify on his behalf. Hardwick, who has a G.E.D. acquired during previous incarceration, has not specified which witnesses he desired or what their testimony would be. There is no dispute that Hardwick handed Tassone a list of witnesses that he wanted to testify, but that list inexplicably has disappeared from the record, while Hardwick's other handwritten motions are part of the record. Nonetheless, the lack of specificity as to the identity of the witnesses Hardwick wanted called for his defense or the substance of their testimony even at this appellate stage in the federal habeas proceedings makes his unsubstantiated allegation of ineffective assistance of his trial counsel difficult to analyze.

To be successful in his contention of his trial counsel's ineffective representation, Hardwick must satisfy well-delineated Supreme Court and circuit law. In Strickland, the Court established a two-part test to show ineffective assistance that violates the Sixth Amendment right to counsel: (1) "the defendant must show that counsel's performance was deficient," defined as "representation

[that] fell below an objective standard of reasonableness," and (2) "the defendant must show that the deficient performance prejudiced the defense" by demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 687, 688, 694, 104 S.Ct. at 2064, 2068.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694, 104 S.Ct. at 2068.

"[I]t is sufficient that a petitioner must show only a reasonable probability that the outcome would have been different; he 'need not show that counsel's deficient conduct more likely than not altered the outcome in the case.'"  Brownlee v. Haley, 306 F.3d 1043, 1059-60 (11th Cir. 2002) (quoting Strickland, 466 U.S. at 693, 104 S.Ct. at 2068); see DeLuca v. Lord, 77 F.3d 578, 590 (2d Cir. 1996) ("The Strickland test does not require certainty that the result would have been different.").  "When evaluating this probability, 'a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.'"  Brownlee, 306 F.3d at 1060 (quoting Strickland, 466 U.S. at 695, 104 S.Ct. at 2069).   "The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a Strickland claim, and both prongs must be proved to prevail."  Johnson, 256 F.3d at 1176.

64

Our circuit reviews an attorney's performance "with considerable deference." Id. "[T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126 (1987)), cert. denied, 531 U.S. 1204, 121 S.Ct. 1217 (2001). "The petitioner must establish that particular and identified acts or omissions of counsel 'were outside the wide range of professionally competent assistance.'" Id. at 1314 (quoting Burger, 483 U.S. at 795, 107 S.Ct. at 3126).

In this case, court-appointed Tassone took a number of pretrial depositions, which he did not use to explain, moderate, or mitigate the direct testimony of the state's witnesses, many of whom were quite young at the relevant time and embittered toward Hardwick, a newcomer to their community, for killing Pullum, their longstanding, neighborhood friend. Convinced of Hardwick's guilt, Tassone advised him to plead guilty. When the evidence shows that a defendant was so intoxicated that he could not form specific intent to commit murder, Florida law recognizes voluntary intoxication as a defense, and an instruction on the defense should be given to the jury. Gardner v. State, 480 So. 2d 91, 92 (Fla. 1985) (per curiam). Tassone apparently believed that there was sufficient credible evidence that Hardwick was sober at the time of the murder to justify not presenting this

65

defense and pursued sufficiency of the evidence as Hardwick's defense.[144]

Additionally, witnesses had testified that Hardwick threatened to kill Pullum prior

to the murder and boasted of the killing afterward.  Together with the multiple

means of inflicting death, a jury could have found premeditation for first-degree

murder.[145]  There has been no claim of actual innocence in this case.

While other attorneys may have used voluntary intoxication as Hardwick's

primary defense theory, Tassone's decision to forego this defense is not outside the

ambit of strategic choice recognized by Strickland and our circuit law.  Because

Hardwick has failed to prove the performance and prejudice prongs of the

Strickland test, we conclude that constitutional ineffective assistance of counsel in

---

[144] As a practical matter, an attorney might decide that he does not want to argue to a jury that his client did not commit the murder, but, if he did, he was incapable of formulating specific intent because of voluntary intoxication.  While this argument may not be inconsistent legally, see Pope v. State, 458 So. 2d 327 (Fla. Dist. Ct. App. 1984); Mellins v. State, 395 So. 2d 1207 (Fla. Dist. Ct. App. 1981), it may be so perceived by a jury.  Hardwick's refusal to plead guilty presented this dilemma for Tassone.  Consequently, he elected not to develop and present a voluntary-intoxication defense that might have created reasonable doubt regarding Hardwick's ability to formulate premeditated intent and may have resulted in an instruction on this defense to the jury, the jury's consideration of a verdict on second-degree murder rather than first-degree murder, and foundation information for the sentencing phase.

[145] Tassone also determined that some of the witnesses that Hardwick wanted to call might have been subject to impeachment or have given damaging testimony on other points. While our review of the record shows otherwise, as we discuss in our sentencing-phase analysis, Tassone made a defense choice at the guilt phase, and the testimony plus the ballistics evidence appear to have been insurmountable as to Hardwick's guilt.

the guilt phase has not been established and, consequently, affirm the district court's denial of habeas relief as to the guilt phase.[146]

C. Sentencing Phase

"The Sixth Amendment guarantees a criminal defendant the right of effective assistance of counsel during a capital sentencing hearing." Harris v. Dugger, 874 F.2d 756, 762 (11th Cir. 1989). The two-part Strickland test also applies in a capital sentencing proceeding because "counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision." 466 U.S. at 687, 104 S.Ct. at 2064; Glock v. Moore, 195 F.3d 625, 634-35 (11th Cir. 1999). "Circumstances which would warrant a presumption of prejudice from counsel's ineffectiveness are those where 'the adversary process itself is [rendered]

---

[146] Even when we have been convinced that the trial attorney misunderstood the applicable law, which was outside reasonably competent representation in a capital murder case, the petitioner's confession "sealed his conviction" and prevented his proving prejudice because "even a highly competent lawyer could not have won [petitioner] an acquittal." Cave, 971 F.2d at 1518. To the extent that Hardwick contends that Tassone should have conducted more investigation for presentation at trial, we have determined that "'[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.'" Brownlee, 306 F.3d at 1060 (alteration in original) (quoting Aldrich v. Wainwright, 777 F.2d 630, 636 (11th Cir. 1985)). "The decision whether to present a line of defense or even to investigate it, 'is a matter of strategy and is not ineffective unless the petitioner can prove that the chosen course, in itself, was unreasonable.'" Id. (quoting Chandler, 218 F.3d at 1318).

presumptively unreliable [by the circumstances]." Blanco v. Singletary, 943 F.2d 1477, 1496 (11th Cir. 1991) (alterations in original) (citation omitted).

When "'the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results,' our confidence is undermined." Brownlee, 306 F.3d at 1069 (quoting Strickland, 466 U.S. at 696, 104 S.Ct. at 2069). "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. "Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." Strickland, 466 U.S. 692, 104 S.Ct. 2067.

"'The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant. By failing to provide such evidence to the jury, though readily available, trial counsel's deficient performance prejudice[s a petitioner's] ability to receive an individualized sentence.'" Brownlee, 306 F.3d at 1074 (alterations in original) (quoting Cunningham v. Zant, 928 F.2d 1006, 1019 (11th Cir. 1991)); see Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1988) (same); Thomas v. Kemp, 796 F.2d 1322, 1325 (11th Cir. 1986) (same). "[T]he Eleventh Circuit has

68

enunciated the rule that effective representation, consistent with the sixth amendment, also involves 'the independent duty to investigate and prepare.'" House v. Balkcom, 725 F.2d 608, 618 (11th Cir. 1984) (citations omitted); see Bolender, 16 F.3d at 1557 ("The failure to conduct a reasonable investigation into possible mitigating circumstances may render counsel's assistance ineffective.").

> [C]ounsel's duty of inquiry in the death penalty sentencing phase is somewhat unique. First, the preparation and investigation for the penalty phase are different from the guilt phase. The penalty phase focuses not on absolving the defendant from guilt, but rather on the production of evidence to make a case for life. The purpose of investigation is to find witnesses to help humanize the defendant, given that a jury has found him guilty of a capital offense. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. at 2052.
> . . . .
> [E]ven where a client is recalcitrant, courts have been ambivalent in whether counsel is relieved of any further duty of investigation, particularly where the client exhibits signs of instability.

Marshall v. Hendricks, 307 F.3d 36, 103 (3d Cir. 2002) (citing Johnston v. Singletary, 162 F.3d 630, 641-42 (11th Cir. 1998)). Trial counsel performs deficiently by not providing readily available mitigating evidence to the jury at the penalty phase because he prejudices a convicted defendant's receiving an individualized sentence. Cunningham, 928 F.2d at 1019; see Armstrong, 833 F.2d at 1433, 1434 (concluding that "investigation and preparation for the penalty phase of [petitioner's] trial was negligible" and that the "demonstrated availability of

69

undiscovered mitigating evidence clearly met the prejudice requirement"); House, 725 F.2d at 618 ("While we do not require that a lawyer be a private investigator in order to discern every possible avenue which may hurt or help the client, we do require that the lawyer make an effort to investigate the obvious.").

Concomitantly, a tactical or strategic decision is unreasonable if it is based on a failure to understand the law. Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether counsel's decision is tactical is a question of fact, but "whether this tactic was reasonable is a question of law, and we owe neither the district court nor the state court any deference on this point." Id. We have decided that failure to present mitigating evidence because of misunderstanding the state law as to presentation of mitigating evidence is unreasonable as a tactical decision: "Mitigating evidence, when available, is appropriate in every case where the defendant is placed in jeopardy of receiving the death penalty. To fail to do any investigation because of the mistaken notion that mitigating evidence is inappropriate is indisputably below reasonable professional norms." Id. (emphasis added). Similarly, "[w]here defense counsel is so ill prepared that he fails to understand his client's factual claims or the legal significance of those claims . . ., we have held that counsel fails to provide service within the range of competency

expected of members of the criminal defense bar."  Young v. Zant, 677 F.2d 792, 798 (11th Cir. 1982).

Regarding mental health mitigating evidence, our court has distinguished between its use during the guilt phase to establish competency to stand trial and presenting mental health mitigating evidence at the penalty phase:

> [T]here is a great difference between failing to present evidence sufficient to establish incompetency at trial and failing to pursue mental health mitigating evidence at all.  One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider.

Blanco, 943 F.2d at 1503.[147]  When mental health mitigating evidence was available, and "absolutely none was presented [by counsel] to the sentencing body, and . . . no strategic reason [w]as . . . put forward for this failure," our court determined that this omission was "objectively unreasonable."  Id. (citing Middleton v. Dugger, 849 F.2d 491, 493-95 (11th Cir. 1988) (emphasis added). Additionally, our court has recognized that "[p]sychiatric mitigating evidence not only can act in mitigation, it also could significantly weaken the aggravating factors."  Elledge v. Dugger, 823 F.2d 1439, 1447 (11th Cir.), withdrawn in part on

---

[147] Florida law recognizes that "[a] defendant may be legally answerable for his actions and legally sane, and even though he may be capable of assisting his counsel at trial, he may still deserve some mitigation of sentence because of his mental state."  Perri v. State, 441 So. 2d 606, 609 (Fla. 1983).

denial of rehearing en banc, 833 F.2d 250 (11ᵗʰ Cir. 1987) (withdrawing only unrelated Part III of the opinion).

Similarly, we have decided that failure to present mitigation evidence as to a defendant's family background or alcohol and drug abuse at the penalty phase of a capital case constitutes ineffective assistance of counsel, particularly when defense counsel "was aware of [petitioner's] past and knew that mitigation was his client's sole defense."[148] Elledge, 823 F.2d at 1445 (emphasis added). Concluding that counsel rendered ineffective assistance for failing to present mitigating background information at the sentencing phase, we have explained: "[T]he sentencing jury knew much about the crime, having just convicted [the defendant] of a brutal murder, but little about the circumstances of the defendant." Harris, 874 F.2d at 763. In Brownlee, the psychiatric expert at the state proceeding for postconviction

---

[148] See, e.g., Brownlee, 306 F.3d at 1071 (determining that petitioner was entitled to habeas relief as to his sentence for failing to present mitigating evidence at the sentencing phase, we noted that, among the mitigating factors not presented at sentencing, was petitioner's "extensive drug abuse, particularly on the night in question"); Cave, 971 F.2d at 1519 (affirming granting habeas relief as to sentencing, we recognized that, despite the willingness of petitioner's mother, sister, and three aunts to testify, his counsel's "failure to present any witnesses at the sentencing hearing allowed the prosecutor to emphasize [petitioner's] lack of redeeming character during the State's closing argument" and, thus, prejudiced the sentencing proceeding because there was a reasonable probability that the sentence would have been different if the available character witnesses had testified); Horton, 941 F.2d at 1463 (deciding that petitioner had established ineffective assistance of counsel at sentencing because he had "met his burden of proof on the prejudice prong," since he "ha[d] gathered the affidavits of ten individuals who claim they would have testified if they ever were asked to testify"); Elledge, 823 F.2d at 1445 (concluding that defense counsel's failure to interrogate family members and to obtain an expert witness for the sentencing phase "was outside the range of competent assistance").

72

relief diagnosed petitioner as a "'polypharmacy individual'" and testified that, based on his "long history of drug and alcohol abuse, . . . dating to his teenage years," particularly, his "[d]rug or alcohol use on the day of the crime would have substantially aggravated [his] pre-existing [intellectual and psychiatric] limitations," which, if presented at the sentencing phase, could have assisted in a finding that the level of intoxication substantially impaired his ability to conform his conduct to the requirements of law. 306 F.3d at 1056, 1071, 1072.

In Harris, although family members were willing to testify that the defendant's life was meaningful to them, the defendant's attorney "erroneously told the jury that [defendant's] family had 'turned against him.' Thus, the jury did not assess 'the information needed to properly focus on the particularized characteristics of this petitioner.'" 874 F.2d at 763 (quoting Armstrong, 833 F.2d at 1433). "[I]njecting [defendant's] character as an issue during sentencing was fraught with danger": petitioner "committed the murder while on parole," which would have permitted the prosecution to expose his "other felony convictions as well as his dishonorable discharge from the Army." Id. at 764. "Nevertheless," we determined, "on this record, we cannot conclude that effective counsel would have made a strategic decision to forego testimony about [defendant's] good character merely because its use would have permitted the state to add some prior unlawful

73

acts to the proof already in the case." Id. We noted that defense counsel

"conceded that he would have used the [background] evidence had he known about

it." Id. Recognizing that the mitigating background evidence "constituted the only

means of showing that [petitioner] was perhaps less reprehensible than the facts of

the murder indicated," we concluded that "a reasonable probability exist[ed] that a

jury hearing this evidence would have recommended life," and that petitioner

"suffered prejudice from counsel's errors" at the penalty phase. Id.

> Of course, "[t]he right to present, and to have the sentencer consider,
> any and all mitigating evidence means little if defense counsel fails to
> look for mitigating evidence or fails to present a case in mitigation at
> the capital sentencing hearing." Accordingly, counsel's general duty
> to investigate takes on supreme importance to a defendant in the
> context of developing mitigating evidence to present to a judge or jury
> considering the sentence of death; claims of ineffective assistance in
> the performance of that duty should therefore be considered with
> commensurate care.

Strickland, 466 U.S. at 706, 104 S.Ct. at 2074 (Brennan, J., concurring in part and

dissenting in part) (alteration in original) (citations omitted) (emphasis added).

"Florida is a weighing State; the death penalty may be imposed only where

specified aggravating circumstances outweigh all mitigating circumstances."[149]

---

[149] While "Florida's death penalty statute, section 921.141, limits the aggravating circumstances on which a sentence of death may be imposed to the circumstances listed in the statute," Grossman, 525 So. 2d at 842, the Florida Supreme Court "has repeatedly held that all mitigating evidence, found anywhere in the record, must be considered and weighed by the trial court in its determination of whether to impose a sentence of death," Walker v. State, 707 So. 2d 300, 318 (Fla. 1998) (per curiam) (citing cases) (second and third emphases added).

74

Parker v. Dugger, 498 U.S. 308, 318, 111 S.Ct. 731, 738 (1991) (citing Fla. Stat. §

921.141(3) (1985)) (emphasis added). "[T]he Supreme Court and this Court . . .

have repeatedly emphasized the constitutional right of a defendant facing the death

penalty to present any relevant evidence of mitigating circumstances." Brownlee,

306 F.3d at 1070. "[T]he question is whether there is a reasonable probability that,

absent the errors, the sentencer—including an appellate court . . . would have

concluded that the balancing of aggravating and mitigating circumstances did not

warrant death."[150] Strickland, 466 U.S. at 695, 104 S.Ct. at 2069. "The appropriate

analysis of the prejudice prong of Strickland requires an evaluation of 'the totality

of the available mitigation evidence—both that adduced at trial, and the evidence

adduced in the habeas proceeding—in reweighing it against the evidence in

aggravation.'" Bottoson v. Moore, 234 F.3d 526, 534 (11th Cir. 2000) (quoting

Williams, 529 U.S. at 397-98, 120 S.Ct. at 1515); see Clemons v. Mississippi, 494

U.S. 738, 752, 110 S.Ct. 1441, 1450 (1990) (vacating state supreme court's

upholding death sentence because it was not apparent that the appellate reweighing

of the aggravating and mitigating factors accorded "defendant[] the individualized

---

[150] The Florida Supreme Court has "repeatedly stressed [that] a trial judge's weighing of statutory aggravating factors and statutory and nonstatutory mitigating circumstances is the essential ingredient in the constitutionality of our death penalty statute." Porter v. State, 723 So. 2d 191, 196 (Fla. 1998) (per curiam); see State v. Dixon, 283 So. 2d 1, 8 (Fla. 1973) ("The most important safeguard presented in Fla. Stat. § 921.141, F.S.A., is the propounding of aggravating and mitigating circumstances which must be determinative of the sentence imposed.").

75

treatment that would result from actual reweighing of the mix of mitigating factors and aggravating circumstances" or "that the [state appellate] court fully heeded our cases emphasizing the importance of the sentencer's consideration of a defendant's mitigating evidence" required in a weighing state).

The Supreme Court has been clear that both statutory and nonstatutory mitigating factors must be considered in a capital sentencing proceeding:

> "[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."
>
>    . . . .
>
> Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.

Eddings v. Oklahoma, 455 U.S. 104, 110, 113-14, 102 S.Ct. 869, 874, 876-77 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964 (1978) (plurality opinion)) (alteration, first ellipsis, and emphasis in original).[151] When a

---

[151] The Florida Supreme Court has been explicit that "[a]ll evidence of mitigating circumstances may be considered by the judge or jury." Dixon, 283 So. 2d at 9 (emphasis added). "[T]he jury is not limited, in its evaluation of the question of sentencing, to consideration of the statutory mitigating circumstances. It is allowed to draw on any considerations reasonably relevant to the question of mitigation of punishment." Lewis, 398 So. 2d at 439 (emphasis added).

"While all judicial proceedings require fair and deliberate

petitioner contends that the presentation of additional mitigating evidence would have changed the weighing process so that death is not warranted, "we look at the mitigating circumstance evidence that was not presented, along with that which was, and consider the totality of it against the aggravating circumstances that were found."[152]  Tompkins v. Moore, 193 F.3d 1327, 1336 (11th Cir. 1999).

---

> consideration by a trial judge, this is particularly important in a capital case because, as we have said, <u>death is different</u>."
>
> Since the ultimate penalty of death cannot be remedied if erroneously imposed, trial courts have the undelegable duty and solemn obligation to not only consider any and all mitigating evidence, but also to "expressly evaluate in [their] written order[s] each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence."
>
> This bedrock requirement cannot be met by treating mitigating evidence as an academic exercise which may be summarily addressed and disposed of.

Walker, 707 So. 2d at 319 (citations omitted) (emphasis and alterations in original).  "It is within the sentencing judge's discretion to determine the relative weight given to each established mitigator; however, <u>some weight must be given to all established mitigators.</u>"  Ferrell v. State, 653 So. 2d 367, 371 (Fla. 1995) (per curiam) (reaffirming Campbell v. State, 571 So. 2d 415 (Fla. 1990), which clarified evaluating and weighing mitigating evidence) (emphasis added).


[152] The Florida Supreme Court similarly has stressed the great significance of the sentencing-phase weighing process by the trial judge and jury in determining whether a sentence is death or life imprisonment:

> It must be emphasized that the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present.

Dixon, 283 So. 2d at 10.

Tassone presented no mitigating evidence at the sentencing proceeding.

Therefore, we first consider the record evidence of statutory mitigating factors.[153]

Because of Hardwick's alcohol and drug consumption before Pullum's murder, the

most significant statutory factor was Hardwick's cognitive ability to conform his

conduct to the requirements of law. Tassone failed to present the record evidence

at the sentencing phase of Hardwick's drunk and drugged condition resulting from

the well-documented, long Christmas weekend binge of drugs and alcohol as well

---

[153] At the time of Hardwick's sentencing proceeding, Florida law provided the following mitigating factors:

> Mitigating circumstances shall be the following:
> (a) The defendant has no significant history of prior criminal activity.
> (b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.
> (c) The victim was a participant in the defendant's conduct or consented to the act.
> (d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor.
> (e) The defendant acted under extreme duress or under the substantial domination of another person.
> (f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
> (g) The age of the defendant at the time of the crime.

Fla. Stat. § 921.141(6) (1985).

as expert testimony, like that given at the 3.850 proceeding.[154]  This omission kept

from the judge and jury knowledge that, at the time of the murder, Hardwick could

have lacked the judgment to conform his conduct to the requirements of law.  In

his report for the 3.850 proceeding, Dr. Levin considered "that during the five days

leading to his offense that [Hardwick] ingested forty or fifty of the Quaaludes,

continually smoked marijuana, drank a fifth of vodka and shared 'a couple of cases

of beer' with friends."[155]  Dr. George W. Barnard, who was court-

---

[154] Even the dissent recognizes that "[n]umerous witnesses who were clearly available to Tassone at the time testified during the 3.850 proceedings about Hardwick's extensive use of drugs and alcohol during the relevant weekend," Dissent at 10, and that "Tassone's own testimony at the 3.850 hearing acknowledged awareness of such use in the days leading up to the murder," id. at 10 n.3.  An expert witness could have provided mitigating testimony that Hardwick was "'significantly impaired' . . . at the time of the crime," which would have caused him to have "'difficulty conforming his behavior'" to law.  Brownlee, 306 F.3d at 1071.  Tassone's awareness of Hardwick's drunk and drugged state and his failure to present this mitigating evidence during the sentencing phase demonstrates his misunderstanding of mitigation law.

[155] Levin Report at 2.  Darlene Hardwick told Dr. Barnard that, from her observations, Hardwick was intoxicated during the five-day weekend: "She thought that he was basically under the influence of it so that it was enough to change him significantly during that whole five-day period of 20 to 25 December."  3.850 Proceeding at 286.  She also observed that Hardwick got "very little" sleep during this period: "he was very restless, in and out a lot, and did not seem to eat too much, and slept for very short periods of time."  Id.  Darlene Hardwick further said that, during the five-day period, Hardwick's drug and alcohol intake was greater than usual.  Id. at 285.  She explained to Dr. Barnard the difference in Hardwick's behavior when he was under the influence of alcohol and drugs:

> [W]hen he was not drinking and under the influence of drugs he was quite
> different toward her and toward others, and she also felt that he had a behavior
> that would indicate changes that she usually did not see in his normal state when
> he was not under the influence of alcohol and drugs.

Id. at 285.

appointed, testified that Hardwick suffered from multiple substance abuse disorder.[156] Hardwick "denied that he ever had preplanned murdering the victim" and "indicated that his entire focus was to reobtain his drugs for the primary purpose of ingesting drugs."[157] Thus, "the source of his anger [toward Pullum] was his loss of drugs and inability to 'get high.'"[158]

Dr. Levin explained the effect of the combination of quaaludes, alcohol, and lack of sleep:

---

While Bartley purports to have passed out from the drugs that he had taken prior to the murder, he makes clear that Hardwick demonstrated the effects of ingesting considerable amounts of drugs and alcohol:

> The weekend before Hardwick was arrested for murder, Pete McCoy, Hardwick and myself part[i]ed together. Friday night we bought three fifths of vodka. Hardwick had a bunch of quaaludes and quite a bit of pot. All weekend we were drinking and smoking. Hardwick was eating quaaludes all weekend. It was not unusual for Hardwick to be high. I was partying with Hardwick until a few hours before Keith was killed. I passed out, only to find out later that Keith had been killed. Just a few hours before Keith was killed Hardwick and I were real messed up. As I said before, Hardwick had been doing quaaludes all weekend. I saw Hardwick take at least one quaalude just a few hours before the murder. That night Hardwick was acting pretty crazy. He was drinking whiskey, smoking pot, laughing and running around.

Affidavit of Jeff Bartley ¶ 2 (emphasis added).

[156] 3.850 Proceeding at 282. Consistent with experts Dr. Barnard and Dr. Dee, Dr. Levin diagnosed Hardwick "as [being] a poly-substance abuse dependent and [having] an anti-social personality disorder." Id. at 789.

[157] Levin Report at 2.

[158] Id.

It's well known that alcohol and Methyquaalone has an added effect of inflated euphoric feelings, intoxication just as one would be drunk on alcohol. The effects on top of that of quaaludes would enhance that effect.

. . . .

Lack of sleep exacerbates . . . ability to be coherent, to think linearly, to be able to be in control of one's thought process.[159]

Dr. Levin's review of the affidavits of individuals who observed Hardwick over the weekend prior to the murder typically described "erratic behavior, sweating, slurring of speech, inconsistent behavior and . . . mood swings."[160] In Dr. Levin's opinion, Hardwick "was intoxicated at the time of the offense."[161]

---

[159] 3.850 Proceeding at 786. In his written report, Dr. Levin further explained the effects of the drugs and alcohol that Hardwick had consumed prior to the murder:

> At the time of the instant offense, Mr. Hardwick was apparently using large dosages of Methaqualone (Quaaludes), alcohol and marijuana. Methaqualone is a non-barbiturate sedative-hypnotic that is a general depressant of the central nervous system depression. The combined use of alcohol with Methaqualone enhances the absorption, and hence the reaction, to the drug's affect. At low dosages, the ingestion of Methaqualone results in a sedative affect or a drowsiness, and at higher dosages, a deep intoxication can result that is similar to affects from excessive use of alcohol. It can be stated within a reasonable degree of psychological certainty that mental functioning, in terms of reasoning, becomes substantially impaired with the ingestion of Methaqualone. As with alcohol intoxication, Methaqualone's affect is explained by the release of inhibitions that produces feelings of relaxation, confidence, and euphoria. Addicted individuals refer to this as a "high," but they are actually undergoing central nervous system [depression]. It is of note that Mr. Hardwick described his "high" at the time of the offense similarly to the features of a hypnotic and alcohol "high" described in the literature.

Levin Report at 6 (emphasis added).

[160] 3.850 Proceeding at 784.

[161] Id. at 787.

81

Regarding Hardwick's cognitive ability to formulate intent, Dr. Levin testified to a

reasonable degree of psychological certainty that Hardwick "had some ability to

think rationally, but . . . he was significantly impaired in his judgment and

reasoning skills" resulting in his inability to have premeditated intent.[162] He

concluded that Hardwick's capacity to conform his conduct to the requirements of

law was substantially impaired at the time of the offense, which constitutes a

mitigating factor under the Florida death penalty statute.[163]

In response to cross-examination questions suggesting that Hardwick's

description of the killing indicated his mental clarity at the time of the murder, Dr.

Levin explained that Hardwick's manner of killing Pullum exemplified his

diminished cognitive functioning in terms of his "somewhat cloudy" memory of

the events, his thought process, and his "very erratic" behavior:

> [M]y understanding that it took him a great deal of effort and different
> means to strike the victim in terms of striking him with a jack from a
> car, with a tire iron, with a knife, trying to stab him with a tire iron,
> trying to drown him, trying to—and shoot him.
> This showed to me behavior that was something that reflected
> some erratic intent or erratic direction in his behavior in terms of—if
> you will getting the job done. He seemed to be ineffective and that
> was where the erratic—his thinking in terms of talking about—talking
> over shall I complete this, not being sure of what he was doing or

---

[162] Id. at 791.

[163] Id. at 792.

82

<u>whether he should complete the task in conferring with another person there</u>.[164]

Similarly, Dr. Dee, who also interviewed and examined Hardwick as well as reviewed the record of the 3.850 proceeding and concluded that Hardwick was "acutely intoxicated" at the time of the offense,[165] found the manner of death was consistent with drug and alcohol influence, despite the impression created by the

---

[164] <u>Id.</u> at 853-54 (emphasis added).  Dr. Levin's report states that "[a]lthough [Hardwick] admitted culpability in the murder, his descriptions of the events imply impulsivity and lack of foresight in his execution of the crime."  Levin Report at 7.  These explanations should have been weighed by the advisory jury and judge against the aggravating factor that the murder was "especially heinous, atrocious, or cruel," because Hardwick seemed unknowing as to how to proceed when his efforts to cause Pullum to produce the missing quaaludes were unsuccessful, and he showed remorse following the killing.  Fla. Stat. § 921.141(5)(h).  Describing the characteristics of the " heinous, atrocious, or cruel" aggravator, the Florida Supreme Court stated: "What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies— <u>the conscienceless or pitiless crime</u> which is unnecessarily torturous to the victim."  <u>Dixon</u>, 283 So. 2d at 9 (emphasis added).

Similarly, the "cold, calculated, and premeditated" aggravator seems inapplicable to Hardwick, who, in a drunk and drugged state, made threats upon the discovery that his quaaludes were missing, and witnesses testified that he generally had his gun with him; it was not procured to kill Pullum.  Fla. Stat. § 921.141(5)(i); <u>cf.</u> <u>Walker</u>, 707 So. 2d at 317 (concluding that the record supported "the trial court's finding that 'the defendant carefully, calmly and with reflection, planned to lure [the female victim] to a place where she could be abducted, enlisted the assistance of his brothers to kill her, and then proceeded according to plan'" and citing cases involving advance procurement of the murder weapon).  Additionally, the reference to Bartley, who advised and urged Hardwick, who was in a drunk and drugged condition, to kill Pullum, implicates the statutory mitigating factor that Hardwick acted "under the substantial domination of another person."  Fla. Stat. § 921.141(6)(e).  It is also noteworthy that, during the weekend prior to Pullum's murder, Hardwick's pregnant wife had told him that she planned to leave him, which relates to the statutory mitigator of committing the capital felony "while the defendant was under the influence of extreme mental or emotional disturbance."  <u>Id.</u> § 921.141(6)(b).

[165] 3.850 Proceeding at 976.

medical examiner's report.[166]  To a reasonable degree of psychological certainty,

_____

[166] Id. at 973.  Dr. Dee also related Hardwick's description of the murder, which evidenced obvious, excessive drug and alcohol influence:

> Mr. Hardwick told me that he was acutely intoxicated.  That's not his term.  It's mine.  He said he was so stoned that he had a hard time moving around.  At one point I think I said in the record he told me that it took him 30 minutes to attempt to get the body in the trunk of the car when he was going to take [Pullum] to the hospital.  And not sure he ever achieved that.
>    He said that he had been drinking and using Quaaludes for days, and had continued during that night and the subsequent days.
>    And he characterized his behavior—he said that he was so clumsy from being high that he couldn't bury the body.  So, he threw it in the river.  And that he had done it in a sort of intoxicated fury and afterwards became acutely remorseful and hysterical that this so-called other person that was with him had to calm him down and get him quieted again.
>    . . . .
> [P]eople that abuse drugs and alcohol develop a certain tolerance for them and they can be acutely intoxicated and still carry out many complex activities.
>    According to Mr. Hardwick's account of the crime, it wasn't done particularly gracefully.  He was clumsy.  He missed the victim more and he shot at him a second time, et cetera.

Id. at 969-70, 977 (emphasis added).  Dr. Dee explained his disagreement with the impression created by the medical examiner's report:

> [F]rom reading the Medical Examiner's report when he goes into the impression that this was done in a kind of—it was a particularly brutal crime and it was done in sort of a frenzy.  Because of the numerous blows to the head, the shooting and the stabbing, it all seemed excessive from what you frequently see during the events of intoxication or drug abuse induced psychosis, however you want to describe the mental state.

Id. at 974 (emphasis added).

84

Dr. Dee opined that Hardwick was so intoxicated that his ability to formulate specific intent was diminished.[167]

In contrast, Dr. Barnard, the court-appointed psychiatrist, testified at the 3.850 proceeding that Hardwick, whom he examined on April 10, 1985, was not insane at the time of the offense and that he did know that his actions were wrong.[168] Dr. Barnard testified, however, that he was asked to evaluate Hardwick for only two purposes: (1) competency to stand trial, and (2) legal sanity at the time

---

[167] Id. at 975. Dr. Dee also addressed the effect that extreme intoxication would have had on Hardwick specifically:

> I said that he was skill poor on the MMPI. That was only on the elevated scale. These people are impulsive and overactive and the use of psychoactive substances makes them more so and they are less likely to be able to control their actions in conformity with the dictates of the law.
> . . . .
> Less likely to be able to plan anything with any kind of deliberation. . . . . both because intoxicants render them just incredibly impulsive.

Id. at 962 (emphasis added). Hardwick's history of alcohol and drug abuse is clearly established as well as the binge during the weekend of the murder. Thus, this case is distinguished from other death-penalty cases where the petitioner's use of drugs and/or alcohol at the time of the murder was either exaggerated, Brown v. Jones, 255 F.3d 1273, 1278-79 (11th Cir. 2001), cert. denied, __ U.S. __, 122 S.Ct. 823 (2002), or not credible, Duren v. Hopper, 161 F.3d 655, 661-62 (11th Cir. 1998).

[168] 3.850 Proceeding at 309. After interviewing Hardwick in 1985, Dr. Barnard determined that Hardwick was competent to stand trial and that "he did not meet the criteria for involuntary hospitalization" and further opined "that at the time of the alleged crimes he knew what he was doing, did know the results from his actions, and did know that they were wrong." Id. at 261.

of the alleged crime.[169]  Consequently, he did not evaluate Hardwick regarding

specific intent relating to a voluntary intoxication defense or as to statutory or

nonstatutory mitigation.[170]  Further, Dr. Barnard's notes show that he did not have

any conversations with Tassone.[171]

Dr. Barnard testified that Hardwick had experienced blackouts from alcohol

since age thirteen and that he had extensive drug use at an early age: "[m]ultiple

drug usage, including pot, LSD, uppers, downers, MDA, cocaine, Quaaludes, glue

sniffing."[172]  When the offense occurred, Hardwick told Dr. Barnard that "he had

taken Quaaludes and drunk part of a couple of fifths of vodka with four or five

other people and smoked six to eight joints of pot," which "he had been more or

less doing . . . since December 20th."[173]  Stating that Hardwick had a history of

poor impulse control, Dr. Barnard explained that the alcohol and drugs lifted his

---

[169] Id. at 252-53.

[170] Id. at 261.

[171] Id. at 261-62, 309.  This fact from Dr. Barnard's notes blatantly conflicts with the state judge's factual finding in his supplemental order that not only states that Tassone interviewed Dr. Barnard, Transcript of Record, Vol. IV at 596, but also that he "had a very clear and vivid recollection of having numerous conversations and discussions with Dr. Barnard regarding possible mitigation testimony and evidence," id. at 597.  In making this credibility choice, the state judge chose Tassone's 3.850 testimony, which was determined to be problematic by the Florida Supreme Court and occurred in a protracted court session, over Dr. Barnard's notes made at the time of his consultation/evaluation.

[172] Id. at 281.

[173] Id. at 275-76.

inhibitions, thereby releasing his impulsive behavior and causing him to become "a lot more aggressive when he was under the influence of alcohol and drugs."[174] Dr. Barnard stated that quaaludes gave Hardwick "a sense of power and a feeling of importance" and explained how they affected Hardwick's cognitive functioning: "specifically . . . his judgment . . . more than anything," "his reaction time," "his level of alertness," "his ability to . . . project ahead to the consequences of what he was doing," and "he would make more errors in judgment."[175] Based upon his understanding of the amount of drugs and alcohol that Hardwick had ingested near the time of the offense, Dr. Barnard testified that Hardwick's judgment and impulse control were substantially impaired and that his ability to reason was affected.[176] If

---

[174] Id. at 295 (emphasis added). See Brownlee, 306 F.3d at 1072 (recognizing that psychiatric expert testified that "[d]rug or alcohol use on the day of the crime would have substantially aggravated these pre-existing [psychiatric] limitations" and "substantially impaired" capital defendant's ability to conform his conduct to law).

[175] Id.

[176] Id. at 297. The only reason that Dr. Barnard would not commit to diminished cognitive ability was that he believed that a mental status evaluation would have had to have been conducted at the relevant time for that determination. Id. Pursuant to his psychiatric examination of Hardwick, we note that Dr. Barnard wrote the judge and requested relevant information concerning Hardwick's behavior on the day of the offense, which had not been provided to him. While the state provided him with some additional evidence, Tassone did not. Id. at 253-55. Significantly, Tassone testified that he never reviewed with Dr. Barnard or even saw the information subsequently produced by the state attorney's office. Id. at 185. The time that Dr. Barnard expended obtaining background information on Hardwick would have been better spent on his diagnostic evaluation of Hardwick, which would have been more comprehensive if Tassone had provided the background information to Dr. Barnard prior to his evaluation and report, used as the basis of his trial testimony.

he had been asked to evaluate mitigation evidence, such as Hardwick's poor and

abusive family life and its effect on his life, or his ability to conform his conduct to

the requirements of law, Dr. Barnard testified that he would have been willing to

do so.[177] At the 3.850 proceeding, Dr. Barnard testified that Hardwick's capacity to

conform his conduct to the requirements of law was substantially impaired within

the meaning of the Florida statute, that Hardwick did not have a normal life as

child or young man, that his multiple substance abuse disorder was longstanding,

and that such abuse of drugs can damage the brain.[178] He testified that he could

have provided statutory mitigating circumstances if Tassone had given him an idea

of what he was seeking.[179]

Based upon his review of the entire record, Dr. Dee testified at the 3.850

proceeding concerning Hardwick's intoxication at the time of the murder:

> [B]ased on the affidavit[s] and the testimony that I have reviewed
> [Hardwick] appears to have been extremely intoxicated at the time he
> committed this crime.
> . . . .
> [I]t sort of brackets in time when you consider all the statements
> together. We have people saying that [Hardwick] was high

---

[177] Id. at 296.

[178] Id. at 299.

[179] Id. at 300-01.

88

beforehand and that he was high afterwards.  It probably strains credulity to believe that he was sober in between.[180]

Although the conclusions as to mitigation factors under the Florida statute were essentially the same among the psychiatrists who testified at the 3.850 proceeding, the judge and jury heard none of this testimony at either the guilt or penalty phase.[181]

---

[180] 3.850 Proceeding at 961, 968 (emphasis added).

[181] In Hudson v. State, 708 So. 2d 256 (Fla. 1998) (per curiam), the Florida Supreme Court vacated the second death sentence pursuant to a second penalty-phase proceeding before a jury.  Although Hudson's conviction and death sentence had been affirmed on direct appeal, Hudson v. State, 538 So. 2d 829 (Fla. 1989) (per curiam), the trial court concluded after the post-conviction proceedings that "Hudson's penalty-phase counsel had provided ineffective representation in that he had failed to adequately investigate and present extensive mitigation evidence," Hudson, 708 So. 2d at 257, and the Florida Supreme Court affirmed, Hudson v. State, 614 So. 2d 482 (Fla. 1993) (per curiam).  Critical to this determination was the failure of penalty-phase counsel to provide the mental-health expert with available evidence of Hudson's cocaine addiction and its effect on his mental state at the time of the armed burglary and murder, which would have affected the weighing or proportionality in the penalty phase.  708 So. 2d at 258.  At resentencing, however, the trial judge assigned little weight to mitigation evidence of the examining psychiatrist that Hudson, "at the time of the murder, was suffering from an extreme mental or emotional disturbance because of cocaine addiction and ingestion, a personality disorder and a deprived background."  Id. at 258-59 (emphasis added).  In vacating the death sentence for the second time and remanding the case for a new and detailed sentencing order, the Florida Supreme Court explicitly directed that the sentencing order fully address all mitigating evidence:

> Our reading of the record shows that the trial court must consider, address, and weigh in detail the testimony of defense expert [psychiatrist] (on direct and cross-examination) and other witnesses concerning Hudson's drug use, including the following considerations: whether Hudson was intoxicated by crack cocaine at the time of the murder; how Hudson reacted to crack cocaine ingestion; whether the murder was related to crack cocaine intoxication; and whether the prior violent felonies were related to drug use.  The trial court also must consider, address, and weigh resentencing testimony concerning a domestic dispute . . . as well as testimony about Hudson's family history;  Hudson's degree of cooperation with law enforcement officers; Hudson's character traits as demonstrated by various

89

Regarding nonstatutory mitigating factors, Tassone failed to recognize Hardwick's dysfunctional family life and the mental and physical abuse that he endured during his childhood and teen years.[182] "[U]nder the Florida procedure for trying capital cases, an advisory jury may not be prohibited from considering relevant nonstatutory mitigating circumstances in making its sentencing recommendation, and . . . the judge must consider such mitigating evidence in determining an appropriate sentence." Bolender, 16 F.3d at 1562 (citing Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821 (1987)). Hardwick's family background was a mitigating factor because it was formative in Hardwick's development as a young man; yet Tassone failed to present this evidence to the judge and jury at the sentencing phase.

He also did not obtain social services and juvenile records that showed that Hardwick's father was an abusive alcoholic who had dislocated Hardwick's

---

activities; and Hudson's potential for adapting to a structured life in prison. In considering and weighing this evidence, the court shall consider cases from this Court which have evaluated the presentation of mitigation evidence in sentencing orders.

Hudson, 708 So. 2d at 260 (collecting cases) (emphasis added). The drugged state of the defendant in Hudson at the time of the killing as well as his drug addiction is analogous to Hardwick's condition when Pullum was killed.

[182] The Florida Supreme Court "has repeatedly acknowledged that evidence of abuse of the defendant is mitigating in nature," and, "[a]s to the nonstatutory mitigator of [defendant's] abusive childhood . . . agree[d] with [defendant] that the trial court erred in rejecting this factor and giving it no weight in the sentencing process." Walker, 707 So. 2d at 318.

90

shoulder when he was a child, among other physical and emotional abuses.[183]

Hardwick's mother testified at the 3.850 proceeding that his father would take his

rage out on Hardwick and that she had seen her husband "take his shoe and kick

[Hardwick] with it."[184]  These records further showed that Hardwick had witnessed

his father having sex with another man and that the father routinely would get the

children out of bed, expose himself, and urinate on the floor in front of them.

When he was seven years old, Hardwick was placed in a boys' home in

Jacksonville because his mother was pregnant again and could not support any

more children.  Hardwick repeatedly ran away from the institution to return to his

---

[183] Florrie Benton, Hardwick's aunt and sister of his father averred concerning the physical abuse that she witnessed from Hardwick's father:

> I never saw Johnny [the father] play with Little Johnny [Hardwick].  Once when Little Johnny was about 12 or 13 years old, Johnny beat his son with a belt so badly that the blood came up to the skin.  I saw 4 belt marks on Little Johnny's back.  I told Johnny that if he ever did that again I'd go to the police.  Once during this time my husband told me that he had seen Johnny kick Little Johnny, after Johnny had been drinking.

Affidavit of Florrie Benton ¶ 5.

[184] 3.850 Proceeding at 498.

abusive father in South Carolina.[185] His father gave him drugs and alcohol to keep him occupied.

When he was thirteen, Hardwick was having drug and alcohol-induced blackouts and contracted hepatitis from dirty intravenous needles. Eventually, social services found the father's home unfit and placed Hardwick in a foster home. Social services records show that, at fourteen, Hardwick was found to possess dirty syringes and that he had spent most of his fourteen years in and out of institutions. In 1974, Hardwick attempted suicide twice: first by drug overdose and then by slashing his wrists. In 1975, Hardwick was accepted into the South Carolina Youth Services Intensive Care Unit as an emotionally disturbed child. Hardwick's mother testified that he "felt like he was abandoned" and that he needed psychological help.[186] Even Dr. Barnard, the court-appointed psychiatrist, found Hardwick's dysfunctional upbringing to be significant.[187]

---

[185] Dr. Levin testified that Hardwick had "a classic love hate relationship" with his father. 3.850 Proceeding at 766. He had "some very deep seeded positive feelings towards his father as a father figure," who had "rescued him from residential treatment and taken him into his home" combined with "some underlying rage towards his father" resulting from "physical abuse and inconsistency he received at his father's hand." Id. Dr. Levin further testified that "typically this type of environment leads to a very insecure and untrusting individual and someone who has a great deal of difficulty forming intimate relationships and has a great deal of anger that can emerge as an adult." Id. at 766-67.

[186] Id. at 499, 517.

[187] With no assistance from Tassone and doing his own research into Hardwick's background, Dr. Barnard testified at the 3.850 proceeding as follows:

The story was that he had come from a family that was disunited;

His parents got a divorce when he was about four, and he was . . . in a boy's home for a year and a half, I think, when he was about seven.

But most of the time after the divorce he was with one parent and then the other.

At times he was—or for a brief period he was with an aunt or an uncle.

There was a story of heavy alcoholism on both sides of his family, mother and father, especially on the father's side, with . . . his father being an alcoholic. I think an aunt and uncle and also his maternal grandmother had problems with alcohol.

There was a history of physical abuse shown . . . . [b]y his father toward his mother and toward [Hardwick].

. . . .

There was a history that there was a lack of parenting support or structure by either parent [] in the opinion of the other relatives.

And that during brief periods of time before he was in his mid-teens when he was with them he seemed somewhat amenable to the influence of others, but later on after he had been in and out of correctional facilities for youths he had hardened and it did not seem to affect him as much.

There was the internal consistency of several people saying that he changed when he was under the influence of drugs and alcohol in terms of behavior.

. . . .

He went from someone who was quiet and nontalkative to someone who was very talkative, argumentative or pushy.

. . . .

[This background information] gave some insight or understanding about the environment in which he was raised and the kind of stresses he may have been exposed to as a child, and the support system or lack thereof that he had during his childhood and formative years.

. . . .

I think the message from it is that pretty early in his life he was out on his own and not receiving the parental influence that he may have had in a more—I can't say normal, but—less dysfunctional family.

93

In Williams, the Supreme Court recognized that "[t]he Virginia Supreme Court ignored or overlooked the evidence of Williams' difficult childhood and abuse." 529 U.S. at 373 n.5, 120 S.Ct. at 1502 n.5. In that case, where Williams had a background analogous to that of Hardwick, the Court clarified that "errors that undermine confidence in the fundamental fairness of the state adjudication certainly justify the issuance of the federal writ."[188] Id. at 375, 120 S.Ct. at 1503.

_____

Id. at 278-80 (emphasis added). Dr. Barnard also testified that Hardwick began his alcohol and drug use by age 12 and that he had "[m]ultiple drug usage, including pot, LSD, uppers, downers, MDA, cocaine, Quaaludes, glue sniffing" and PCP at an early age. Id. at 281.

[188] In a Florida death-penalty case concerning the rape and murder of a seven-year-old girl, where twice the trial judge had overridden the jury's life imprisonment recommendation and imposed the death sentence, the Florida Supreme Court quashed the death sentence and remanded "with directions that the trial court impose a sentence of life imprisonment without parole for twenty-five years from the date of the original sentencing" based on nonstatutory, background mitigation evidence similar to Hardwick's background. Buford v. State, 570 So. 2d 923, 925 (Fla. 1990) (per curiam). "Upon rehearing before a different judge (the original judge having recused himself), Buford presented testimony concerning his abused, neglected, and impoverished childhood, his history of drug and alcohol abuse, and his intoxication on the night of the offense." Id. at 924. When the trial judge again imposed the death penalty, the Florida Supreme Court explained its reasoning in quashing the death sentence because of this mitigating background evidence:

Many witnesses testified concerning Buford's background. A Lakeland policeman who had patrolled the neighborhood described the squalor and conditions of parental neglect in which Buford had been raised. Both parents beat the children periodically, and neither worked steadily enough to keep the family above the poverty level. Because of his father's alcoholism and his mother's penchant for spending months at a time away from home, Buford was given the responsibility, at an early age, of caring for his five younger siblings. Buford was shown to be an alcoholic who had been drinking heavily and taking drugs since his early teens. Two cousins said they almost never saw him when he wasn't obviously under the influence of alcohol or drugs. There was also testimony that

94

Confirming that the Strickland test is analyzed on a case-by-case basis, the Court determined that "it is undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer."[189] Id. at 391, 392, 120 S.Ct. at 1512, 1513.

The reasons given by Tassone and the state for not calling family members and other individuals as mitigating witnesses are not substantiated by the record in our plenary review.[190] As we reveal, notable examples show the opposite of

---

Buford was intoxicated at the time of the killing. A psychiatrist expressed the opinion that Buford's ability to appreciate the criminality of his conduct and his ability to conform his conduct to the requirements of law were substantially impaired. He further testified that Buford was under mental and emotional disturbance throughout his entire life after the first six or seven years. The medical evidence introduced at the original trial corroborated Buford's serious alcohol problem. Despite the heinous nature of the crime, we conclude that there was sufficient mitigating evidence to provide a reasonable basis for a life recommendation.

Id. at 925 (emphasis added).

[189] The dissent omits any reference to Williams and its requirements for presentation of mitigating factors at sentencing, which we specifically asked counsel to brief.

[190] With respect to witnesses that a capital defendant wants to call on his behalf, although his counsel may not believe their testimony would be in his "best interests," the Florida Supreme Court has held that "[t]he ultimate decision [regarding defense witnesses in a capital case] is the defendant's." Blanco, 452 So. 2d at 524. Although the dissent states that "[t]he state judge expressly found: 'Mr. Hardwick was allowed to call all desired witnesses,'" this reference in the state judge's supplemental order is to the 3.850 proceeding, and not to Hardwick's trial. Dissent at 3 (quoting Transcript of Record, Vol. IV at 592). Clearly, Hardwick was not permitted to call the witnesses he desired at his trial, and the record shows that he repeatedly so informed the trial judge. Indeed, Hardwick was so disheartened regarding his trial representation that he refused to

counsel's representations to be true.  Significantly, "[t]he key aspect of the penalty trial is that the sentence be individualized, focusing on the particularized characteristics of the individual."[191]  Thomas v. Kemp, 796 F.2d at 1325 (citing Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909 (1976)).

The state has made much of the alleged fact that, of the eleven children born to Nell Lawrence, Hardwick is the only one who has drug problems, a criminal record, and who has committed murder.  The state's representation of the record evidence is inaccurate.  Lawrence testified that a son from her first marriage, Roger Britt, is a drug addict and that she has several children who have been on drugs.[192] She also testified that her son Jerry, Hardwick's brother by the same father, had a drug and alcohol problem as well as serious problems with the law.[193]  Hardwick's half brother James Britt testified concerning his brothers that Terry has "a real bad

leave his cell to be in the courtroom for closing arguments.  The record is unclear as to whether Hardwick wanted witnesses at his sentencing proceeding.  The record does reveal that, by the sentencing phase, Tassone and Hardwick were not getting along and that Tassone did not understand mitigation law or the benefit to Hardwick at sentencing of having witnesses testify concerning mitigating evidence that could have resulted in a life sentence rather than death.

[191] Our court has continued to emphasize that "'[t]he purpose of a sentencing hearing is to provide the [sentencer] with the information necessary for it to render an individualized sentencing determination . . . [based upon] the character and record of the individualized offender and the circumstances of the particular offense.'" Fortenberry, 297 F.3d at 1232 (quoting Collier v. Turpin, 177 F.3d 1184, 1202 (11th Cir. 1999)) (alterations and omission in original).

[192] 3.850 Proceeding at 560-61, 565.

[193] Id. at 570-71.

96

temper" and has "never been able to hold a job," Roger "had a real bad problem with drugs" and "was really heavy into pot and shooting up speed," Jerry "had a pretty good drug problem," which has moderated into a "pretty heavy" drinking problem, and that James also had a drug problem when he was younger.[194] James further testified that half or more of the eleven children have had drug and alcohol problems and that Jerry has been in and out of prison almost as many times as Hardwick for the same type of Hardwick's previous crimes, such as robbery, and that "Roger has been in and out of jail quite a bit" for "selling stolen goods and drunk driving."[195]

Moreover, James testified that Hardwick "is not the worst of the lot."[196] He recounted a time, when his brother Terry, who had been drinking and fighting Roger almost shot and would have killed James when he tried to stop the fight: Terry pointed a shotgun at James's face, pulled the trigger, and would have killed him had his brother Roger not "hit the gun right as the trigger went off."[197] Regarding Terry's additional violent behavior, James testified that Terry threw "an axe at [his] stepfather one time, and he broke [his] grandfather's nose with a paint

---

[194] Id. at 650, 651.

[195] Id. at 660, 661.

[196] Id. at 661.

[197] Id. 668, 669.

97

brush, and that he used to beat Roger a lot" so severely that on several occasions "[h]e knocked out teeth and everything else."[198] Additionally, Terry "pulled a knife on [their mother] on several occasions, and threatened to kill her," and "a majority" of those instances involved drugs or alcohol.[199] This testimony prompted the trial judge to comment: "I think [the testimony] does relate to his characterization this sibling is not the worst of the lot because obviously one issue here is whether or not there . . . are factors in the background of this sibling that should be brought out."[200] When the prosecutor pressed James as to his testimony that Hardwick was not the worst of the lot after killing Pullum for stealing quaaludes, Hardwick's brother James testified: "I still don't know was he high on drugs when he did it or what, did he know what he was doing[?]"[201] This testimony concerning the drug, alcohol, violent, and criminal behavior that infected many of Nell Lawrence's children was not presented to the jurors, which withheld from their consideration the significant mitigating evidence of Hardwick's unstable, dysfunctional, and physically and emotionally abusive background.

---

[198] Id. at 669-70.

[199] Id. at 670.

[200] Id. at 672.

[201] Id. at 677.

Furthermore, rather than being absent, unavailable, or unwilling to cooperate in Hardwick's defense as Tassone has represented, his mother and brother Jeff attended the trial each day and repeatedly offered to testify. At the 3.850 proceeding, Hardwick's mother testified that Tassone had been incorrect in testifying that she was unwilling to testify for her son or that she thought that he deserved the death penalty:

> Q <u>Did you ever refuse to cooperate with Mr. Tassone</u>?
>
> A <u>No, sir</u>.
>
> Q <u>Did he ever ask you questions</u>?
>
> A <u>Very few questions</u>.
> . . . .
> Q Did [Tassone] ever talk to you about the actual trial and what was going to happen at the trial, specifics?
>
> A Specifics, no, sir.
>
> Q Did he ever ask you about some of the things that we have talked about here in court today?
>
> A No, sir.
>
> Q <u>Mr. Tassone has testified previously that you refused to testify on behalf of your son</u>.
>
> A <u>That's not true</u>.
>
> Q <u>Did he ever ask you to testify?</u>

A <u>No. He never asked me to testify, but I asked him about testifying</u> and Mr. Tassone told me that if I—did I have anything to say that would help Johnny, and I said well what kind of things do you mean. <u>He says well can you say that Johnny was a real good boy, that he was a Christian boy, that he was a Boy Scout, that he did good deeds for people</u>, and I said, no, sir, <u>I can't say he was a Christian boy but Johnny has always been good to people.</u> He said, you know, <u>if you can't say things like that then you cannot do anything to help him. Whatever you might say would only harm him.</u>

Q <u>But you never refused to testify</u>?

A <u>No, sir.</u>

Q <u>Mr. Tassone also testified that your son Jeff refused to cooperate or to testify on behalf of Johnny</u>.

A <u>That's not true. Neither one of us has ever refused to testify or to cooperate.</u>

Q Mr. Tassone testified that <u>prior to trial you expressed to him your personal opinion that perhaps it would be best that your son Johnny receive the death penalty. Did you ever say that to Mr. Tassone</u>?

A <u>No, sir, not in any type of words.</u>[202]

---

[202] Throughout this case, the state has represented that Tassone did not call Hardwick's mother as a witness because she had told him that she believed that her son deserved the death penalty. <u>See, e.g.</u>, Appellee's Brief at 4. The district judge also makes this representation and accords it a presumption of correctness. R4-54-15 & n.8. Yet, the sworn testimony of Hardwick's mother at the 3.850 proceeding is contrary. Counsel for the state reiterated this alleged fact to this panel at oral argument as the reason that Hardwick's mother was not called as a witness. Lawrence's testimony at the 3.850 proceeding belies this representation and explains that she and her son Jeff were present at trial and willing to testify on Hardwick's behalf. Interestingly, Hardwick's counsel did not and has not challenged this apparently false representation by the state, which Lawrence contradicts. We are left with the impression that

100

neither side has reviewed the record in this capital case and are troubled that counsel, as officers of the court, have perpetuated this misrepresentation of the facts to the district court and this court, when a man's life is at stake.

The dissent also accepts as a fact that Tassone did not call Hardwick's mother as a witness at sentencing because she refused to testify and that she believed that Hardwick deserved the death penalty, based on the trial judge's finding in the guilt-innocence portion of his supplemental order. Our plenary review of the record in this capital case has revealed that the actions of Hardwick's mother speak louder than Tassone's representation of her hearsay statements, to which he testified at the 3.850 proceeding outside of her presence. The record shows that, when Hardwick was charged with a misdemeanor in North Carolina in 1978 for throwing his hardhat at a prison guard who had thrown hot tar in Hardwick's face, his mother, contacted by fellow inmates regarding this incident, obtained and paid an attorney to represent Hardwick. Affidavit of Nell Lawrence ¶ 17. The bond that Hardwick had with his mother is further evidenced by the fact that the purpose of his visit to see his mother, even in his drunk and drugged state on December 23rd, the afternoon before the killing of Pullum, was to wish her a Merry Christmas. 3.850 Proceeding at 528. Not only did Lawrence testify that she attended Hardwick's trial, 3.850 Proceeding at 536, but also Tassone testified that she attended, id. at 163. Mary Braddy, the Sheriff's Office chaplain's assistant who developed a counseling relationship with Hardwick, testified that she had telephone conversations with Hardwick's mother and arranged special visits in her office for Lawrence to see Hardwick. Id. at 617-18. Despite Lawrence's admitted failings in her maternal responsibilities, these are the actions of a concerned and caring mother and not the callous, vengeful mother that Tassone portrays to substantiate his not calling her to testify at Hardwick's sentencing because he misunderstood mitigating factors. Moreover, the cumulative testimony relating to Hardwick's mother's actions supporting Hardwick, in the past and at the time of the trial, substantiate her testimony that she was willing to testify on her son's behalf in a reasonable credibility choice between Tassone and Lawrence's testimony.

The dissent adopts the trial judge's acceptance of Tassone's reasons for not calling Lawrence, although the trial judge admits that "[t]his testimony is the clearest conflicting evidence in this case." Transcript of Record, Vol. IV at 594. Rather than supporting his credibility choice of the court-appointed attorney, Tassone, with record citations or documentation, the trial judge speculates and states his conclusory opinion. As the trial judge recognizes, this discrepancy in the testimony of these two witnesses regarding Lawrence's potential testimony is a direct conflict in testimony. This conflict, which would have presented significant mitigating background evidence to the sentencing jury, should have been resolved at the 3.850 proceeding as opposed to the state judge's speculation in favor of Tassone to substantiate his findings and decision. Instead of the trial judge's undocumented speculation, accepted by the dissent, that Lawrence "succumbed to internal pressure to save her son's life by testifying at this late date" making her credibility "certainly suspect," the cumulative record evidence, such as her hiring an attorney to represent Hardwick on the North Carolina misdemeanor charge in 1978, shows to the contrary that she has been supportive of Hardwick, particularly, in his adult life. Id. (emphasis added). We reiterate that the state judge's findings

101

Q Were you concerned for your son at that time?

A Very much so.

Q Did you go to his trial?

A Yes, sir.

Q Did anyone go with you?

A. Yes, sir. My son Jeff went.

Q Did Jeff ever talk with Mr. Tassone?

A The only time that Jeff ever talked to Mr. Tassone was sitting right outside the courtroom.

Q Did you ever hear Jeff saying that he would not testify on behalf of his brother Johnny?

A No, sir. He told Mr. Tassone that he would be more happy if there was anything at all that he could—that

concerning Hardwick's mother, accepted by the dissent, occur in the guilt-innocence portion of his supplemental order, his only discussion of this testimony, which is merely referenced in the penalty-phase portion of the order. Information concerning Hardwick's childhood and adolescence, including his alcohol and drug dependencies, about which Lawrence could have testified would have been relevant to the sentencing phase of his trial as Williams instructs. Tassone's telling Lawrence that her testimony would be unhelpful unless she could state that Hardwick was a Christian, Boy Scout, or good person and that Hardwick's substance addiction would have no bearing on the case manifests Tassone's misunderstanding of mitigating factors at sentencing and his incorrect knowledge of sentencing law. Id. at 535, 536-37. This material conflict in the evidence and others relating to Tassone's reasons for not calling certain witnesses as well as his deficient knowledge of sentencing, mitigation law confirm the need for an evidentiary hearing to resolve these conflicts concerning the constitutionality of the sentencing phase of Hardwick's trial.

would help Johnny that he could—that he would be glad to.

Q Did he ever ask you about Johnny's past history, his background?

A No, sir.

Q Did he ever ask you about any drug or alcohol problem that Johnny may have had?

A I—Mr. Tassone was aware that Johnny had an alcohol and a drug problem because I told him.

Q Did he ask you any questions specifically about that?

A No, sir.  I especially made it a point to talk with Mr. Tassone about the drug problem because I was under the understanding that if someone was, you know, extremely out of their minds and he was on drugs that . . . they wouldn't give him the death penalty, and he said—Mr. Tassone told me that the laws had changed on that and that had no bearing whatsoever on the case, and so I actually thought that was true.

Q Mr. Tassone ever ask you about other family members that may have some information concerning Johnny's background?

A No, sir.

Q Had he done that would you have provided him with that information?

A Certainly.

Q Had he asked you to testify, ma'am, would you have testified as you have testified here today?

103

A Yes, sir.[203]

Jeff Hardwick testified similarly:

> Q Did you go to your brother's trial?
>
> A Yes, sir. I was there.
>
> Q Did you ever talk to his lawyer?
>
> A Yes, sir.
>
> Q Do you remember his lawyer's name?
>
> A Mr. Tassone.
>
> Q Mr. Tassone testified that he asked you to speak on behalf of your brother Johnny and that you refused to do so. Is that true?
>
> A No, sir.
>
> Q Would you have testified for your brother if Mr. Tassone had asked you?
>
> A Yes, sir.   I told him I would.
>
> Q Did Mr. Tassone ever ask you about your knowledge of Johnny's drug and alcohol problem?
>
> A No, sir.
>
> Q Did he ever ask you . . . about seeing [Hardwick] on the 23rd?

---

[203] Id. at 534-37 (emphasis added).

.

A <u>No</u>.  He was pretty short.  <u>It was a pretty short conversation</u>.  He asked if I would help and I said I would, and <u>basically only thing he did ask me—he asked me what kind of brother is Johnny</u>, and <u>I said he was a good brother</u>, . . . and I said, . . . when we was kids and stuff and—he was our older brother.  <u>He used to take up for us when we was kids</u>.

We was all kids in school and stuff, and when I mentioned fighting, . . . as kids and stuff he said that was no good.  <u>All I would do was hurt him and he didn't want me up there.</u>

Q <u>And that's all he asked you about</u>?

A <u>That was it</u>.  That was the end of the whole meeting.

. . . .

Q <u>If he had asked you about your observations of Johnny on the 23rd of December would you have told him what you have told us here</u>?

A <u>Yes, sir</u>.

Q <u>If he had asked you about your background, Johnny's background, your upbringing, would you [have] sat down with Mr. Tassone and discussed that with him</u>?

A <u>Right.  Anything he asked</u>.

Q <u>You were willing to cooperate</u>?

A <u>Yes</u>.

Q In fact, you would—

A Like I said I would help, whatever it took.

Q <u>In fact you were there at the trial</u>?

105

A <u>Yes, sir</u>.

Q <u>To support your brother</u>?

. . . .

A <u>Yes, sir</u>.[204]

The only potential witnesses that Tassone interviewed were Hardwick's

mother, brother Jeff, and his wife, who would have been privileged not to testify at

her husband's murder trial. Based on Hardwick's mother and brother's testimony at

the 3.850 hearing, Tassone did not understand the mitigating testimony that these

two willing family members, who also saw Hardwick drunk and drugged at 3:00

P.M. the afternoon before the murder, would have given, despite his experience

with capital cases. He also did not appear to understand the value of mitigating

testimony from other family members. Yet, the most essential purpose of the

sentencing proceeding was for defense counsel to present the jury with background

mitigating information to enable the jurors to render an individualized sentence

based on the particular circumstances of Hardwick's life and the murder.

<u>Brownlee</u>, 306 F.3d at 1070.

_____

[204] <u>Id.</u> at 693-95 (emphasis added). Interestingly, Jeff Hardwick's testimony at the 3.850 proceeding substantiates his mother, Nell Lawrence's testimony, which the trial judge as well as the dissent chose to disregard and not attempt to explain or reconcile. It also makes clear that, not only Tassone but also the trial judge, apparently failed to appreciate the constitutional significance of immediate family members' testimony concerning Hardwick's dysfunctional family life and upbringing as mitigating evidence at the penalty phase.

Hardwick's sobriety at the time of the murder is based in large part on the testimony of then fourteen-year-old Showalter, who last saw Hardwick at approximately midnight on Christmas Eve and testified that Hardwick was driving his car. Yet, Dr. Levin concluded that Hardwick was severely addicted, which is characterized by "extensive usage, tolerance, pre-occupation with usage and multiple harmful consequences associated with drug and alcohol usage." Levin Report at 6 (emphasis added). Even Dr. Barnard, the court-appointed psychiatrist who testified at the 3.850 proceeding, acknowledged that it would not be inconsistent with diminished capacity to have sufficient faculties to be able "to operate and carry out . . . a lot of different kinds of motor activities, including some complex ones, like driving." 3.850 Proceeding at 332. Dr. Barnard testified that Hardwick "may have been able to drive a car but his coordination . . . should have been off[,]. . . . . especially his reaction time." Id. at 317-18. Additionally, Showalter may have been comparing the condition of Bartley, who, Showalter witnessed taking several quaaludes earlier that day, Trial Transcript at 323, and who "couldn't keep his eyes open," id. at 328, with Hardwick, a seasoned drug user and addict with a high tolerance for drugs and alcohol.

The explanation for not calling Connie Wright as a witness for the defense was because she had said that Hardwick had found Pullum in bed with his wife,

which would have provided an additional motive for Hardwick's killing Pullum.

Wright, who was fourteen at the time of the murder, was a close friend and daily

visitor of Hardwick's wife, Darlene, who was experiencing a difficult pregnancy.

She also was a friend of Pullum's, so her allegiances were not with Hardwick,

which could have been exposed in questioning.[205] Yet, this testimony came only

from Wright, while others living in the youthful drug community testified that

Darlene Hardwick was not having an affair with anyone to their knowledge and

that she was pregnant.[206] Since it could have been diffused, this alleged motive

testimony as the reason for not calling Wright as a witness for the defense was not

sufficient. Wright had relevant testimony concerning seeing Hardwick take

quaaludes later in the evening on December 23rd as well as daily observations of

Hardwick from her visits with his wife.

---

[205] Unless a witness is called for the defense, cross examination is limited to the scope of direct examination and, thus, was controlled by the prosecution in this death-penalty case. See Fla. Stat. 90.612 (2).

[206] See, e.g., Pretrial Deposition of Jeffrey Showalter at 351; Pretrial Deposition of William Bavar at 40. Tassone testified that he talked to Wright regarding a love letter that she had written to Hardwick, who informed Tassone that Wright would not testify against him. 3.850 Proceeding at 92. Wright, who purportedly was a friend and daily visitor of Hardwick's wife, may have turned on Hardwick and decided to testify for the state when her overtures were not returned. Significantly, Wright was 14 at the relevant time and subject to the whims and emotions of adolescence that can influence actions and perceptions. The testimonies of these two fourteen-year-olds, Showalter and Wright, could have been biased, because both were longtime friends of Keith Pullum and had known Hardwick only for several weeks.

Therefore, Tassone's investigation for the sentencing phase in this capital case appears deficient. "An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." Middletown v. Dugger, 849 F.2d 491, 493 (11th Cir. 1988). When preparing for the penalty phase in a capital case, trial counsel's performance is unreasonable where counsel either fails to investigate possible mitigating evidence or "makes only a desultory or cursory effort to find mitigating evidence." Fortenberry, 297 F.3d at 1229. We have enunciated the proper analysis for investigation omissions in a death-penalty case:

> First, it must be determined whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end. If, however, the failure to present the mitigating evidence was an oversight, and not a tactical decision, then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Thus, it must be determined that defendant suffered actual prejudice due to the ineffectiveness of his trial counsel before relief will be granted.

Middleton, 849 F.2d at 493 (citation omitted). The petitioner in Middleton, where we affirmed the district court's determination that a new sentencing proceeding was required, had strikingly similar circumstances to those of Hardwick, including a deprived and abusive childhood as well as favorable assistance from psychiatric

109

experts.  We recognized that "'psychiatric mitigating evidence not only can act in mitigation, it also could significantly weaken the aggravating factors.'"  Id. at 495 (quoting Huckaby v. State, 343 So. 2d 29, 33-34 (Fla. 1977)).

"An attorney is not obligated to present mitigation evidence if, after reasonable investigation, he or she determines that such evidence may do more harm than good."  Harris, 874 F.2d at 763.  For such a decision to be permitted under Strickland, it "must flow from an informed judgment"; "counsel's failure to present or investigate mitigation evidence" cannot result from "neglect."  Id.  On remand, the district judge will conduct an evidentiary hearing in which he will determine whether the state jury and judge at the sentencing phase were afforded the opportunity to weigh fairly and accurately all of the mitigating evidence in this case against the aggravating evidence, as is constitutionally required.[207]  We

_____

[207] In pre-AEDPA cases, a district court is not required to conduct an evidentiary hearing on an ineffective-assistance-of-counsel claim "unless the petitioner alleges facts, which, if proved, would entitle him to federal habeas relief."  Porter v. Wainwright, 805 F.2d 930, 933 (11th Cir. 1986) (citing Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 756 (1963)); Meeks v. Singletary, 963 F.2d 316, 319 (11th Cir. 1992).  "The mere occurrence of a full and fair hearing in the state court, however, does not neutralize petitioner's right to an evidentiary hearing in federal court."  Meeks, 963 F.2d at 319.  When a district court finds "the state record insufficient to permit a determination of whether counsel's decision not to present mitigating evidence was strategic or negligent, it [i]s proper to hold an evidentiary hearing."  Thomas, 796 F.2d at 1324.

In Porter, we remanded for an evidentiary hearing in district court for a determination of whether petitioner's attorneys failed to adequately investigate and present evidence of mitigating circumstances at sentencing and resentencing because we determined that the material facts were not adequately developed in state court, and we directed the district court to elicit the facts required to resolve the issues.  805 F.2d at 936-37.  Provided petitioner's version of the facts proved to be correct, we stated that petitioner "would have satisfied both the performance and

prejudice prongs of the Strickland test for ineffective assistance of counsel." Id. at 936. If the district judge on remand determined that petitioner's attorneys were "constitutionally ineffective," then the petitioner "would be entitled to a new sentencing hearing before the [state] trial judge." Id. at 937. To the extent that conflicting inferences arose as to whether the attorney's decision not to present mitigating character evidence at the sentencing proceeding was tactical, "without the benefit of an evidentiary hearing, this finding is not entitled to a presumption of correctness normally afforded state fact findings in federal habeas corpus proceedings" if the "habeas petitioner 'did not receive a full, fair and adequate hearing in the state court proceeding.'" Id. at 938 (quoting 28 U.S.C. § 2254(d)(6)). In an evidentiary hearing in district court to make such a determination of ineffectiveness at sentencing, the judge "must consider the totality of the evidence before the [state] judge or jury." Strickland,466 U.S. at 695, 104 S.Ct. at 2069.

The dissent opposes remand to the district court for an evidentiary hearing concerning Tassone's representation of Hardwick during the penalty phase because the dissent credits the factual findings of the state trial judge following the three-part 3.850 proceedings. The state judge, in turn, credits Tassone's sole testimony in the initial segment of the 3.850 proceedings, which the Florida Supreme Court found to be insufficient and remanded for further proceedings. In his supplemental order, the state trial judge found "that Mr. Hardwick has failed to establish the ineffective assistance of trial counsel under Strickland v. Washington," Transcript of Record, Vol. IV at 598, that, even with a seven/five jury recommendation for death without any mitigation evidence, "Mr. Hardwick has failed in his burden to prove a likelihood of a different guilty phase verdict under these facts," id. at 599, and "that even if counsel had given cumulative evidence to Dr. Barnard, nothing in this record supports the idea that either the strategic decision not to use Dr. Barnard would have changed or that the outcome of the case would have been different," id. (emphasis added). The trial judge ultimately concludes: "There is no proof, therefore, of error or prejudice under Strickland. Having failed to satisfy his burden of proof under Strickland v. Washington, Mr. Hardwick is not entitled to relief." Id. at 600 (citation omitted).

Regarding Tassone's failure to present mitigation evidence at the penalty phase, the state trial judge concluded:

> Counsel has been proved, by Hardwick's own witnesses, to have tactically considered and rejected certain penalty phase evidence. Counsel appears to have felt that evidence that Hardwick was an illegal drug user and seller was as damaging as his alleged "addiction" was mitigating. Hardwick's childhood neglect was offset by his juvenile record and the fact that his ten siblings did not follow his path of crime, drugs and murder. Of course, Hardwick was sane and competent despite any drug problem. Counsel's strategic decision to rely upon argument rather than this evidence of mixed value cannot be second guessed. The court does not find any reasonable probability that a different recommendation would have come from the advisory jury. The evidence would not, if offered, have prompted a sentence other than death from this Court.

111

Id. at 599 (emphasis added). As the majority has established, stated facts, such as none of Hardwick's siblings were involved in drugs and crime, are factually incorrect, based on the record evidence. See 28 U.S.C. § 2254(d)(3). While Tassone's 3.850 testimony reveals that he misunderstood mitigation law at the sentencing phase, the trial judge's reference to Hardwick's sanity at the time of the crime and his competence to stand trial is inappropriate legally in penalty-phase analysis, where mitigation evidence was Hardwick's only defense against the death penalty.

The state judge found that Dr. Barnard "did not recall any conversations with Mr. Tassone regarding mitigation testimony"and that "Dr. Barnard's recollection on this point was vague." Id. at 597 (emphasis added). The judge also found that Tassone "had a very clear and vivid recollection of having numerous conversations and discussions with Dr. Barnard regarding possible mitigation testimony and evidence." Id. The trial judge made a credibility determination "that Mr. Tassone did discuss possible mitigation testimony and evidence with Dr. Barnard." Id. at 598. This credibility choice is inconsistent with the trial judge's finding that "Dr. Barnard is an experienced, professional doctor who presumptively does his job in a professional manner." Id. Dr. Barnard, the psychiatric expert who was court-appointed to evaluate Hardwick, would have remembered if he had been asked to analyze mitigation evidence as to the penalty phase, and he so testified at the 3.850 proceeding. Even if the discussion occurred as "as afterthought," Dissent at 11, it was ineffective because the only expert who testified at Hardwick's trial evaluated and testified about Hardwick's sanity at the time of the crime and his competence to stand trial: neither issue is relevant to penalty-phase mitigation evidence. Rather than being an afterthought, with the considerable inculpatory evidence in Hardwick's case, Tassone's inquiry of Dr. Barnard as to mitigating evidence for the penalty phase, Hardwick's only defense at sentencing, should have been a forethought.

Therefore, the dissent misunderstands the majority's concern with the fact that Dr. Barnard was not asked to evaluate mitigation evidence relative to the sentencing phase. This is an example of the record inconsistency and spurious credibility choices exhibited in the state judge's supplemental order that show that Hardwick did not receive a full and fair hearing and that the state judge's factual findings are not consistent with the record evidence. There was ample mitigating evidence that could have been presented, demonstrated by Dr. Dee and Dr. Levin, who testified essentially the same at the 3.850 proceeding regarding the significant and considerable mitigation evidence of Hardwick's abusive and deprived upbringing as well as his alcohol and drug addictions. Dr. Barnard testified that he would have testified similarly if he had been asked to do so. Thus, the consensus of the 3.850 experts as to the mitigation evidence of Hardwick's background was representative of psychological experts' conclusions concerning such mitigation evidence, and not the testimony of a specific psychological expert, Dr. Barnard, who not asked to analyze mitigation evidence. Indeed, it appears that Hardwick's background would have rendered a similar analysis from any such expert if the expert had been asked to evaluate Hardwick's background in terms of penalty-phase, mitigation evidence.

Similarly, the majority concludes that the state judge's decision not only to disregard Hardwick's mother's denial of saying that she was unwilling to testify and that she thought that her son deserved the death penalty but also her entire testimony as to his abusive and deprived

childhood is unjustifiable. Just as a psychological expert is the best witness as to the effect of a dysfunctional background and alcohol and drug dependencies on an individual at a particular developmental time, Hardwick's mother was critical to understanding his childhood as to mitigating evidence. This credibility choice by the state judge regarding Nell Lawrence's testimony is inconsistent with the record evidence of Hardwick's mother's actions, such as attending his trial daily, and their care and concern for each other, demonstrated by such examples as Hardwick's going to her home to wish her a Merry Christmas, even in a very drunk and drugged state, and her visiting him regularly in prison. The dissent accepts the state judge's finding regarding Lawrence's testimony and rationalizes it by saying that the evidence was presented through the testimony of other family members. Such consistent record evidence, however, serves to bolster, not negate, the testimony of Nell Lawrence.

While the dissent accepts the state trial judge's disregard of the entirety of Lawrence's testimony, although corroborated by other family witnesses, it misunderstands the majority's conclusion as to the entirety of the 3.850 proceedings. Dissent at 4. The majority finds procedural problems only with the first of the three-part proceedings, where solely Tassone testified in a protracted session that lasted through the night into the early morning with stand-in counsel for Hardwick. This was the part of the 3.850 proceeding that the Florida Supreme Court found to be insufficient and remanded for further proceedings. Tassone never testified again. Thus, the evident concerns with his testimony were never rectified. These problems do not exist with the second two parts of the extended 3.850 proceedings, which contain mitigation evidence from family members and others, that serve to emphasize and show the mitigation evidence that Tassone could have presented at the penalty phase.

The majority does not accept the state judge's supplemental order insofar as it relates to the sentencing phase of Hardwick's trial. The majority, however, does not reject the state judge's supplemental order in its entirety, specifically, regarding the guilt phase. The dissent misunderstands the majority's determination regarding the state judge's supplemental order following the augmented 3.850 proceedings. Based on unreasonable credibility choices and a myopic view of the lack of mitigation evidence presented at the penalty phase to uphold Tassone's conduct of the sentencing proceedings, the state judge's findings and consequent legal conclusions relating to the penalty phase are untenable because they are contrary to the evidence.

Our responsibility as a federal court conducting habeas review is not to accept carte blanche the state-court proceedings, if they fail to comply with constitutional due process, or the state judge's factual findings are not supported by the record. While the dissent upholds the state-court factual findings following review of the entire record, the dissent also repeatedly states reasonable and substantial doubt as to Tassone's performance at the penalty phase. See, e.g., Dissent at 7 ("I agree with the strong doubt which the majority opinion expresses with respect to whether Tassone rendered constitutionally effective assistance of counsel at sentencing."); id. at 9 ("My review leaves me with substantial doubt about whether Tassone rendered effective assistance of counsel at sentencing, and whether there is a reasonable probability that the result would have been different."); id. at 9-10 ("[M]y review of the record leaves me with considerable doubt about: (a) whether counsel's performance at sentencing measured up even to that minimum constitutional standard required by Strickland v.

113

Washington, and (b) whether there is a reasonable probability that the result of the penalty phase would have been different had there been effective counsel." (citation omitted)).  This is the essence of undermining confidence in the result, which defines ineffectiveness under Strickland and its progeny.  The dissent further acknowledges that  "[t]he record is also clear that Tassone provided Dr. B[a]rnard with no background information on Hardwick which would have focused the doctor's attention on Hardwick's harsh upbringing or his history of alcohol and drug abuse," that Dr. Barnard testified at the 3.850 proceeding "that Hardwick's capacity to conform his conduct to the requirements of the law was substantially impaired and that his judgment and impulse control were substantially impaired—indicat[ing] that it would not have been futile to provide Dr. B[a]rnard with appropriate background information and seek his studied opinion with respect to mitigating evidence," and that "the state judge's finding of fact with respect to Dr. B[a]rnard does not ultimately excuse Tassone's failure to investigate and pursue mitigating evidence either with Dr. B[a]rnard or with some other mental health expert."  Dissent at 11. Nevertheless, the dissent upholds the state judge's 3.850 factual findings and dissents to the remand for an evidentiary hearing, although the dissent "share[s] the majority's considerable doubt about whether Tassone rendered effective assistance of counsel at the penalty stage of this case."  Id. at 12.

While registering considerable doubt regarding Tassone's conduct of the sentencing phase of Hardwick's trial, the dissent nonetheless focuses its analysis on substantiating the factual findings of the state judge's supplemental order following the three-part, 3.850 proceeding.  Thus, the dissent accepts the state judge's factual findings that comprise the basis for his conclusion that Tassone did provide Hardwick effective representation at the penalty phase under Strickland.  Nevertheless, the substantial doubt concerning Tassone's preparation for and conduct of Hardwick's sentencing proceeding is reiterated throughout the dissent, as the excerpts above show, and evidence the requisite undermining of confidence sufficient to conclude that Tassone did perform ineffectively at sentencing.  See Brownlee, 306 F.3d at 1074 ("Quite simply, our confidence is undermined because there is a reasonable probability that the jury would have recommended a life sentence if it had heard all of the powerful mitigating evidence that could have been presented.").  This will be the likely result when the district court conducts an evidentiary hearing, which should reveal the erroneous facts and credibility choices on which the state judge determined that Tassone performed effectively at Hardwick's sentencing proceeding under Strickland.

The dissent cannot have it both ways by stating an undermining of confidence in Tassone's conduct of Hardwick's sentencing proceeding, while inconsistently accepting the state judge's factual findings and taking them out of the context of use by the state judge to support his decision that Tassone was effective at Hardwick's sentencing.  The state judge dealt with the same evidence that we review and was bound by the same law, Strickland.  Yet, the state judge disregarded Strickland's mandated analysis to reach his conclusion that Tassone was effective at Hardwick's sentencing.

In federal habeas review for a capital case, our task is not to rehabilitate or resurrect a state judge's postconviction order that our review reveals is based on erroneous fact findings and questionable credibility choices.  The Supreme Court has stressed that the

caution that attorney strategy is not a shield or panacea for failure to investigate all

mitigating evidence in a capital case.  "[T]he mere incantation of 'strategy' does not

insulate attorney behavior from review; an attorney must have chosen not to

present mitigating evidence after having investigated the defendant's background,

---

qualitative difference between death and other penalties calls for a
greater degree of reliability when the death sentence is imposed. . .
. [T]he Eighth and Fourteenth Amendments require that the
sentencer, in all but the rarest kind of capital case, not be precluded
from considering, as a mitigating factor, any aspect of a
defendant's character or record and any of the circumstances of the
offense that the defendant proffers as a basis for a sentence less
than death.

Lockett, 438 U.S. at 604, 98 S.Ct. at 2964-65 (footnote omitted).

Yet, the dissent speculates that "[t]he most plausible explanation for Tassone's failure to pursue the significance of the potential mitigating evidence" or "hypothesis" in an attempt to justify the state judge's order, which upholds Tassone's representation at Hardwick's sentencing as "either a misunderstanding of how such evidence could be helpful, or a simple lack of investigation and preparation." Dissent at 10.  Either explanation is not only unacceptable under Supreme Court and circuit law, particularly, Tassone's lack of knowledge or misunderstanding of the governing mitigation law required at sentencing, but also is reprehensible representation in a death-penalty case with Hardwick's life weighing in the balance.  Although the dissent states that "I am persuaded that counsel rendered constitutionally ineffective performance at the penalty phase, and my confidence in the result of that phase is undermined," Dissent at 12, it also reinforces the state judge's errant factual findings, which reach the inconsistent result in the supplemental order that Tassone's representation at the penalty phase complied with Strickland's requirements for effective assistance of counsel.  This reasoning by the state judge in his supplemental order is outside our presumption of correctness for state-court fact findings.

In contrast, the majority cannot accept the state judge's factual findings that are contradicted by the record evidence and, therefore, not entitled to a presumption of correctness. The district court, which denied habeas relief to Hardwick as to both the guilt and sentencing phases without an evidentiary hearing, must conduct an evidentiary hearing not only to reconcile the failure to present mitigating evidence and credibility choices but also other questionable fact findings resulting in erroneous legal conclusions of the state judge.  Additionally, the district judge must consider the various affidavits that we requested from the state 3.850 proceeding, but which were not part of the record before the district judge when he made his habeas determination.

115

and that choice must have been <u>reasonable</u> under the circumstances."[208]  <u>Stevens</u>,

968 Fd.2d at 1083; <u>Bolender</u>, 16 F.3d at 1558.  In <u>Strickland</u>, "the Court

recognized that merely invoking the word strategy to explain errors was

insufficient since 'particular decision[s] must be directly assessed for

reasonableness [in light of] all the circumstances'"[;] "so called 'strategic'

decisions that are based on a mistaken understanding of the law, or that are based

on a misunderstanding of the facts are entitled to less deference."[209]  <u>Horton</u>, 941

F.2d at 1461& n. 30 (citations omitted) (first and second alterations in original).

---

[208] "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  <u>Strickland</u>, 466 U.S. at 690-91, 104 S.Ct. 2066.  We have clarified, however, that ignorance of available mitigation evidence, such as family background, precludes counsel's strategic-decision reasoning and constitutes ineffective assistance of counsel.  <u>Harris</u>, 874 F.2d at 763; <u>see</u> <u>Armstrong</u>, 833 F.2d at 1433 (determining that omission of background evidence was not strategic when trial counsel's testimony at evidentiary hearing revealed negligible preparation and investigation for penalty phase); <u>Blake v. Kemp</u>, 758 F.2d 523, 533 (11th Cir. 1985) ("It should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness.").

[209] To the extent that Tassone has attempted to justify his omission of Hardwick's drug and alcohol addictions as well as his voluntary use of drugs and alcohol during the relevant time period encompassing Pullum's murder as purposeful because of the negative effect this information would have had on the jury, we have found such alleged strategic rationale to be unreasonable.  We concluded that, when "counsel did not probe [a capital defendant's] drug problems because they believed that a [local] jury would not be sympathetic to an account of voluntary drug use, " this was insufficient strategic reasoning to justify not presenting the evidence to the sentencing jury.  <u>Brownlee</u>, 306 F.3d at 1054.  Such evidence is critical at the sentencing phase because it is relevant to the mental state of the capital defendant at the time of the murder and to the legal mitigating factor of conforming conduct to the dictates of law.  Tassone's ignorance or misunderstanding of this crucial mitigating evidence cannot masquerade in the guise of strategy.

116

Had Tassone obtained and presented expert testimony, such as the

psychiatric professionals who testified at the 3.850 proceeding,[210] as well as

testimony concerning Hardwick's background, he would have had a defense to

---

[210] As guidance to the district judge at the evidentiary hearing on remand, we note that it is incumbent on Hardwick to "establish a reasonable likelihood that a similar expert could have been found at the pertinent time by an ordinarily competent attorney using reasonably diligent effort." Elledge, 823 F.2d at 1446.

> Simply put, the Strickland test requires a habeas petitioner in [Hardwick's] position to show: (a) that it was professionally unreasonable for counsel not to investigate; (b) what kind of, and how much, investigation an ordinary, reasonable lawyer would have undertaken; (c) that it is reasonably probable that a reasonable investigation would have turned up an expert who would have presented testimony similar to that which was eventually adduced; and (d) that it is reasonably probable that this testimony would have affected the sentence eventually imposed. Failure to meet any of these steps defeats the ineffectiveness claim.

Id. at 1446 n.15.

Additionally, we have explained that a capital petitioner shows "that it was reasonably probable that an ordinary, reasonable lawyer, operating under the time and monetary constraints [Hardwick's] counsel faced and using reasonable diligence, would have discovered a psychiatrist who would have testified as did [Dr. Levin and Dr. Dee]." Id. at 1446-47.

> To prove it is reasonably probable that such an expert could have been found by a competent lawyer exercising a reasonable amount of diligence, a petitioner could present testimony from (a) members of the bar relating to the amount of investigation that is reasonable in such a situation and the ease or difficulty in finding such experts at that time, (b) psychiatrists, or other experts in the field, relating to how widely the proposed theory was accepted at the time the investigation occurred and the ease an attorney would have had in getting such experts, and (c) any other relevant testimony that would tend to demonstrate it was reasonably probable that reasonable diligence would uncover an expert similar to the one[s] eventually located.

Id. at 1447 n.17.

117

present.[211] Since he did not, there was no mitigating evidence for the jury to

consider.[212] We also have concluded that the absence of witnesses at the

sentencing phase coupled with the failure to present "a great deal of mitigating

evidence [that] was available to [a death-penalty defendant's] attorneys had they

more thoroughly investigated" exposed "a reasonable probability that [the

convicted defendant's] jury might have recommended a life sentence absent the

errors," Blanco, 943 F.2d at 1505, and presenting no available mental health

mitigating evidence with no evident strategic reason for this failure, was

"objectively unreasonable," id. at 1503. Given the considerable quantity of

mitigating evidence that exists in this record that could have rendered a legitimate

---

[211] At the initial 3.850 proceeding, Tassone made the following admissions regarding his knowledge or lack of knowledge as to mitigating evidence that would have been significant at Hardwick's sentencing: Tassone "kn[e]w there was testimony concerning the use of drugs or alcohol by Hardwick and others . . . from December 22 to say 26 or 27," 3.850 Proceedings at 135; Tassone knew "from Mr. Hardwick and Mrs. Lawrence that [Hardwick] had been physically abused" and, from his mother, "that he had been sexually abused," and he testified concerning a defendant's physical and sexual abuse at an early age: "I think it's mitigating evidence," id. at 160, 161; Tassone testified that he did not think that he was aware of Mary Braddy, the chaplain at the local jail where Hardwick was taken when he was arrested, and recognized that her testimony would have been significant in preparing Hardwick's case because "she is indicating that Mr. Hardwick appeared to be either intoxicated or under the influence of drugs at the time or right after he was arrested for murder and brought to the jail," id. at 165, 166; when shown Nell Lawrence's affidavit and asked if he would have used that information at trial, if he had had it, Tassone answered, "Probably," id. at 181.

[212] When a defense attorney fails to present available mitigating witnesses at the sentencing phase of a capital case, we have explained that "the jury easily could have concluded that the defense attorneys could discover nothing positive or mitigating in [the convicted defendant's] background." Blanco, 943 F.2d at 1505.

118

defense for Hardwick at sentencing, Tassone's performance was arguably

unreasonable at the sentencing phase and below the standard established in

Williams.  "The consequence of counsel's failure to conduct the requisite, diligent

investigation into his client's troubling background and unique personal

circumstances manifested itself during his generic, unapologetic closing argument,

which provided the jury with no reasons to spare petitioner's life."[213]  Williams,

---

[213]  After providing Hardwick with no defense at either the guilt or sentencing phase, Tassone's closing argument at the penalty phase consists of portions of 12 double-spaced pages of transcript, Penalty Phase Transcript at 990-1002, of which 6 pages contain Tassone's discussion of the individual aggravating factors and the process of weighing the aggravating factors with the unnamed mitigating factors.  The obvious problem is that Tassone presented no mitigating evidence; the first time that the jurors learned the statutory mitigating factors was in the judge's instructions, and they had no evidence to which to apply them.

Moreover, closing arguments are not evidence for jurors to consider in deciding on a penalty, and they are so instructed by the trial judge.  See Cargill v. Turpin, 120 F.3d 1366, 1380-81 (11th Cir. 1997).  At the sentencing phase of this case, the trial judge gave the following pertinent instructions to the jury following counsel's closing arguments:

THE COURT: . . . .
       As you have been told, the final decision as to what punishment shall be imposed is the responsibility of the Judge; however, it is your duty to follow the law that will now be given you by the Court and render to the Court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.
       Your advisory sentence should be based upon the evidence that you have heard while trying the guilt or innocence of the defendant and evidence that has been presented to you in these proceedings.
       . . . . [listing of statutory aggravating and mitigating circumstances]
       Each aggravating circumstance must be established beyond a reasonable doubt before it may be considered by you in arriving at your decision.
       If one or more aggravating circumstances are established, you should consider all the evidence tending to establish one or more mitigating circumstances, and give that evidence such weight as you feel it should receive in

119

reaching your conclusion as to the sentence that should be imposed.

A mitigating circumstance need not be proved beyond a reasonable doubt by the defendant. If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established.

The sentence that you recommend to the Court must be based upon the facts as you find them from the evidence and the law. You should weigh the aggravating circumstances against the mitigating circumstances, and your advisory sentence must be based on these considerations.

Penalty Phase Transcript at 1002-03, 1005-06 (emphasis added).

As we have explained, statutory and nonstatutory mitigating factors existed that Tassone should have presented to provide Hardwick a defense at sentencing and to make a case for sparing his life: Hardwick's deprived and abusive family life, his alcohol and drug dependency that began in childhood, and his participation in overindulgence of alcohol and drugs during the binge holiday weekend that encompassed the homicide. Concluding that penalty-phase counsel provided ineffective assistance to a death-penalty petitioner for not presenting mitigating background evidence at the penalty phase, our court explained that "when a capital sentencing proceeding is contemplated by counsel aware of the facts of which appellant's trial counsel was aware, professionally reasonable representation requires more of an investigation into the possibility of introducing evidence of the defendant's mental history and mental capacity in the sentencing phase than was conducted by trial counsel in this case." Stephens v. Kemp, 846 F.2d 642, 653 (11th Cir. 1988). In that case, the petitioner's mother testified concerning his "mental history and condition, including bizarre behavior he occasionally exhibited," and "her testimony makes clear, many others could have testified concerning his behavior; the fact that others did not do so undoubtedly diminished the impact on the jury of the facts she described." Id. at 653-54. Concluding that the writ of habeas corpus should be granted as to the death sentence, our court determined "that there is a reasonable probability that, if not for counsel's omissions in the representation he provided his client in the penalty phase, the result of the sentencing proceeding would have been different." Id. at 652. Rejecting a claim of ineffective assistance, our court subsequently distinguished Stephens where sentencing counsel "called two mitigation witnesses who talked about [petitioner's] childhood, abuse, neglect, illiteracy, and learning difficulties," and petitioner's "father testified to his neglect, abuse at the hands of foster parents, and enrollment in special education classes." Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000). Additionally, sentencing counsel's closing argument "reminded the jury of [petitioner's] manifold problems, including his family circumstances, his abuse and neglect as a child, and his mental problems," which contributed to his being tried for committing murder. Id. This sentencing-phase representation was declared "far superior" to that in Stephens. Id.

Hardwick's case is analogous to Stephens, which our court found to be unconstitutional representation. Given the seven/five jury vote with none of Hardwick's background and substance dependency revealed, there is a strong probability that presentation of a defense at sentencing that included this information, like that in Holladay approved by our court, would have resulted in a sentence of life instead of death. There was no need for Tassone to resort to

120

529 U.S. at 415, 120 S.Ct. at 1524-25. The function of the sentencing phase is to provide the jury with <u>all mitigating evidence</u> concerning the convicted defendant and the crime so that it can render an individualized sentence. "Under the facts of this case, we are compelled to conclude that counsel's failure to investigate, obtain, or present <u>any</u> mitigating evidence to the jury, let alone the powerful mitigating evidence," including Hardwick's deprived and abusive upbringing and his "history of drug and alcohol abuse undermines our confidence in [Hardwick's] death sentence." <u>Brownlee</u>, 306 F.3d at 1070.

We also note that, because Tassone and Hardwick were not getting along and were at odds as to the presentation of witnesses, Tassone appears to have given up on defending Hardwick and seemingly expended no effort, either in presentation of mitigating evidence or in understanding mitigation law, to prevent Hardwick's receiving the death penalty.[214] In a similar Florida death-penalty case,

_____

religious sentiment in his closing argument at sentencing. He should have reviewed for the jury and judge the mitigating factors, which he should have established at the sentencing proceeding, to weigh against the aggravating factors, a defense that could have saved Hardwick's life. Consequently, the weighing process for the jury at the penalty phase was skewed because the jurors were not informed of facts applicable to the statutory and nonstatutory mitigating factors.

[214] Tassone testified at the 3.850 proceeding that he "believed that a jury would convict Mr. Hardwick of first-degree murder" and that view appeared to color his defense of Hardwick from the outset of his representation through sentencing, where it was his apparent belief that Hardwick would receive the death penalty. 3.850 Proceedings at 133. Indeed, the state judge, in his supplemental order, found as a fact "that Mr. Hardwick and Mr. Tassone openly disagreed on trial (defense) strategy." Transcript of Record, Vol. IV at 593. At trial, Hardwick repeatedly

121

where counsel did not investigate or call trial witnesses that the defendant

suggested or mitigation witnesses allegedly at the defendant's instruction, we

explained:

> [T]his court has held that a defendant's desires not to present
> mitigating evidence do not terminate counsels' responsibilities during
> the sentencing phase of a death penalty trial: "The reason lawyers may
> not 'blindly follow' such commands is that although the decision
> whether to use such evidence is for the client, the lawyer first must
> evaluate potential avenues and advise the client of those offering
> potential merit."[215]

Blanco, 943 F.2d at 1502 (citation omitted). Although a defendant may become

"depressed and unresponsive," even "morose and irrational" following conviction,

---

complained to the judge that Tassone refused to call the witnesses that he wanted. The attorney/client relationship had become unworkable such that Tassone requested to be removed as counsel. The trial judge required him to remain as Hardwick's counsel and informed Hardwick that Tassone's decisions as to conducting his trial would override any calling of witnesses or presentation of other trial evidence that Hardwick wanted produced on his behalf. The attorney/client relationship was completely severed by the time of closing argument, when Hardwick refused to emerge from his cell to be present in the courtroom. Clearly, at the sentencing phase, the attorney/client relationship was destroyed, and Tassone's decision to provide no defense to Hardwick at sentencing by presenting the jury with no mitigation evidence was his own decision and could have been influenced consciously or subconsciously by his ruptured relationship with Hardwick. Tassone's misunderstanding of mitigation law and the presentation of mitigating evidence to deter the death penalty only compounds his ineffective performance at sentencing to Hardwick's detriment. Any reasoning that Tassone has offered subsequently for this prejudicial omission appears to be self-serving to counter Hardwick's claims of ineffective assistance.

[215] Even if Hardwick did ask Tassone not to present mitigating witnesses at the sentencing proceeding, as Tassone has represented and the district court can determine at the evidentiary hearing on remand, Tassone had a duty to Hardwick at the sentencing phase to present available mitigating witnesses as Hardwick's defense against the death penalty.

"[c]ounsel therefore ha[s] a greater obligation to investigate and analyze available mitigation evidence," id., rather than"latch[ing] onto [defendant's] statements that he did not want any witnesses called," id. at 1503.[216] In this case, Tassone's fractured relationship with Hardwick prior to trial, had broken down completely at trial, which provided no incentive to court-appointed Tassone to assist his contrary client at the sentencing phase, although he had a constitutional duty to do so.

Confronted with forceful statutory aggravating circumstances concerning Pullum's death, the most basic defense that Tassone could have provided Hardwick at the sentencing phase of his capital case in Florida, a weighing state, would have been to present any statutory and nonstatutory mitigating factors, which necessarily would have involved investigation and preparation. In contrast to the guilt phase, where the Strickland performance-and-prejudice test was not proved, there is an obvious probability that the presentation of mitigating evidence in the sentencing phase could have changed the jury's recommended sentence from death to life imprisonment, which constitutes actual prejudice.[217] While Tassone's trial strategy

---

[216] Regarding using Dr. Barnard as a mental health, mitigating witness, Tassone testified at the 3.850 proceeding: "As to mental health related, it was clear from my conversations with Dr. Barnard that I could not present Dr. Barnard as a witness in mitigation. . . . [i]f I was even allowed to call him" because "[m]y client didn't want me to call anybody." 3.850 Proceedings at 180-81. Tassone's testimony shows his misunderstanding of mitigation law and his duty to Hardwick at the sentencing phase.

[217] Although the trial judge "independently weighs the aggravating and mitigating circumstances and renders the final determination as to life and death," the judge "is required to

123

can substantiate his lack of a defense for Hardwick in the guilt phase, it should

prove insufficient to justify his total lack of a defense at the penalty phase, when

there was significant mitigation testimony available from experts and other

witnesses, of whom Tassone was aware or should have discovered. Consequently,

the jurors might have weighed the mitigating factors against the aggravating

factors differently and decided on a life sentence instead of death.

At the 3.850 proceeding, Tassone admitted that he did not understand the

difference in mitigating and aggravating factors, particularly in relation to drug use

or intoxication and Hardwick's family background. This misunderstanding clearly

influenced Tassone's decision to present no mitigating evidence in Hardwick's

defense at sentencing. The reasons given for not presenting this evidence and

---

place 'great weight' upon the recommendation by the jury." Glock, 195 F.3d at 627 n.1 (quoting Tedder v. State, 322 So. 2d 908, 910 (Fla. 1975)); see Lewis, 398 So.2d at 438 ("Under the Florida capital felony sentencing law, the recommendation of the jury is entitled to great weight, and should not be overruled unless, based on the aggravating circumstances and the lack of mitigating circumstances, a sentence of death is clearly appropriate."). The Florida Supreme Court has explained the significance of the jury's participation in the sentencing phase of a capital case through its advisory sentence:

> In the penalty phase of a capital proceeding, the jury is instructed, in pertinent part, that although the final responsibility for sentencing is with the judge, that it should not act hastily or without due regard to the gravity of the proceedings, that it should carefully weigh, sift, and consider evidence of mitigation and statutory aggravation, realizing that human life is at stake, and bring to bear its best judgment in reaching the advisory sentence.

Grossman, 525 So.2d at 840 (emphasis added).

witness testimony reveal Tassone's misapprehension of mitigating evidence or a misrepresentation of the record, either of which could have been compelling to the jury and resulted in a vote for life imprisonment instead of death. In a Florida capital case, where no witnesses were presented in the sentencing phase and the jury's recommended death sentence was an eight/four vote, we concluded:

> Given that some members of [the convicted defendant's] jury were inclined to mercy even without having been presented with any mitigating evidence and that a great deal of mitigating evidence was available to [defendant's] attorneys had they more thoroughly investigated, we find that there was a reasonable probability that [defendant's] jury might have recommended a life sentence absent the errors.

Blanco, 943 F.2d at 1505 (emphasis added).

Even with investigation omissions and no defense at sentencing, the jury still was only one vote short of recommending a life sentence instead of death for Hardwick.[218] The entirety of Hardwick's postconviction record under a Strickland

_____

[218] In a prior seven/five sentencing vote in a Florida capital case where defense counsel presented no available mitigating evidence at sentencing, which gave the prosecutor the opportunity to comment on the lack of witnesses in the state's closing argument, we found that there was prejudice sufficient to establish ineffective assistance of counsel at sentencing:

> However, despite [the prosecutor's] statement [in closing argument] and the lack of preparation on counsel's part, five jurors voted for a life sentence. In Florida, a vote of six jurors for life constitutes a recommendation against the death penalty. Thus, despite the presentation of no mitigating circumstances, [defendant] came within one vote of being spared execution. There is a reasonable probability that if [his counsel] had provided adequate representation, her client would not have received a death sentence.
>   . . . .

125

analysis at least strongly suggests "'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." Williams, 529 U.S. at 399, 120 S.Ct. at 1516; see Thomas, 796 F.2d at 1325 ("It cannot be said that there is no reasonable probability that the results of the sentencing phase of the trial would have been different if mitigating evidence had been presented to the jury."). Accordingly, we vacate the district judge's denial of habeas relief as to the sentencing phase and remand this case to the district court for the limited purpose of conducting an evidentiary hearing on ineffective assistance of Hardwick's trial counsel at the sentencing phase and a determination of whether habeas relief should be granted.[219] See Porter v. Wainwright, 805 F.2d 930, 937

> Competent counsel would have prepared for sentencing and would have produced witnesses that the district court found were ready and willing to testify for [defendant]. Even without this evidence the sentencing jury came within one vote of recommending life imprisonment. Petitioner has demonstrated prejudice such that our confidence in the sentence of death is greatly undermined.

Cave, 971 F.2d at 1519, 1520 (emphasis added).

[219] Our requiring the district court to conduct an evidentiary hearing to determine whether Hardwick's habeas corpus petition should be granted as to ineffective assistance of his counsel at the sentencing phase of his trial does not contravene Keeney v. Tamayo-Reyes, 540 U.S. 1, 112 S.Ct. 1715 (1992), because we are not asking the district judge to consider issues or evidence that was not before the state courts. See Footman v. Singletary, 978 F.2d 1207, 1210 (11th Cir. 1992) (recognizing that Keeney "determined the standard a federal court should use when deciding if a habeas corpus petitioner should get an evidentiary hearing after he failed to develop a material fact in his state court proceedings"). In our plenary review of the record, we have

126

(11th Cir. 1986) (remanding to district court for an evidentiary hearing on whether petitioner's "attorneys at his original sentencing were unconstitutionally ineffective for failing to investigate into and present mitigating character evidence").  We retain jurisdiction of this appeal and will complete our disposition concerning the constitutionality of Hardwick's sentencing phase in this capital case after the

evaluated the same documentary and testimonial evidence that was before the state courts, particularly, the 3.850 proceeding.  As we have explained, the full exposition of Hardwick's deprived and abusive childhood and adolescence, including longstanding alcohol and drug dependency; his binge or extensive and consistent consumption of drugs and alcohol during the relevant time period of Pullum's homicide; and the testimony of examining experts as to the presence of statutory and nonstatutory mitigating factors, especially, his ability to conform his conduct to the dictates of law, must be evaluated in accordance with the Supreme Court's direction in Williams to determine if counsel's performance at Hardwick's sentencing proceeding was reasonable and constitutional.

We do not want to inhibit the district judge in his conduct of an evidentiary hearing to determine whether Hardwick's habeas corpus petition should be granted as to ineffective assistance of his trial counsel at sentencing.  While the issue remains the same, to the extent that evidence at the federal hearing may exceed that presented in state court, we conclude that Hardwick already has proffered specific facts that overcome the procedural bar: he has shown cause, Tassone's failure to call defense witnesses Hardwick desired or to provide Hardwick any defense at the guilt or sentencing phase, and prejudice, the seven/five jury recommendation for death, when knowledge and presentation of the applicable statutory and nonstatutory mitigating factors well may have resulted in one more vote that would have rendered a jury recommendation of life rather than death, as well as a "'fundamental miscarriage of justice'" if a federal evidentiary hearing were not conducted, given the 3.850 proceedings in state court, the findings from which the district judge accorded a presumption of correctness that could result in Hardwick's death.  Hill v. Jones, 81 F.3d 1015, 1023 (11th Cir. 1996) (quoting Keeney, 504 U.S. at 12, 112 S.Ct. at 1721); see Fortenberry, 297 F.3d at 1222 (recognizing that "[a] petitioner can establish cause by showing that a procedural default was caused by constitutionally ineffective assistance of counsel under Strickland"); Stephens, 846 F.2d at 652 (determining that cause was established by habeas petitioner's trial counsel who failed "to investigate, present and argue to the jury at sentencing any evidence of [petitioner's] mental history and condition," which violated the Sixth Amendment under Strickland, and the same counsel failed to raise ineffective assistance in the state habeas proceeding).  In view of our disposition, we need not reach Hardwick's claim of conflict of interests with his counsel at this time.

127

district court's evidentiary hearing and reconsideration of Hardwick's habeas petition relating to his sentencing. See Buenoano v. Singletary, 963 F.2d 1433, 1436 (11th Cir. 1992).

## III. CONCLUSION

In this appeal from denial of his habeas corpus petition, Hardwick argues that his counsel provided ineffective assistance at the guilt and sentencing phases. While we AFFIRM the denial of habeas relief as to his conviction, we VACATE the denial of habeas relief as to his death sentence. On remand, the district judge will conduct an evidentiary hearing on the statutory and nonstatutory mitigating evidence that Tassone could have been presented at the state sentencing proceeding. Based on the totality of this mitigating evidence weighed against the valid aggravating factors and the controlling law that we have explained in this opinion, the district judge will determine whether Hardwick is entitled to habeas relief on his claim of ineffective assistance of counsel at his sentencing proceeding. Therefore, we REMAND this case to the district court for further, limited proceedings as we have directed, while retaining jurisdiction of this appeal.

ANDERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's disposition of Hardwick's claim of ineffective assistance of counsel at the guilt phase of the trial. I also agree with the majority's expression of doubt with respect to whether Hardwick's counsel rendered effective assistance of counsel at the penalty stage. However, I dissent from the court's refusal to honor the state court findings of fact and the court's remand of the case to the district court.

The basis for the court's remand to the district court for an evidentiary hearing is apparently a conclusion that, under pre-AEDPA law, either

(a)     the fact-finding procedure employed by the state 3.850 court was not adequate to afford a full and fair hearing, 28 U.S.C. § 2254(d)(2); or

(b)     its findings of fact were not fairly supported by the record, §2254(d)(8).

Respectfully, I cannot agree. The most specific reason indicated by the majority involves the finding of fact of the 3.850 judge relating to whether or not Hardwick's trial counsel, Tassone, discussed possible mitigation testimony with Dr. Barnard. In his 3.850 testimony, Dr. Barnard could not recall such conversations with Tassone. On the other hand, the 3.850 judge found:

Mr. Tassone, on the other hand, had a very clear and vivid recollection of having numerous conversations and discussions with Dr. Barnard regarding possible mitigation testimony and evidence.

This court, having heard and observed both Dr. Barnard and Mr. Tassone testify regarding this matter, finds that Mr. Tassone did discuss possible mitigation testimony and evidence with Dr. Barnard.

Supplemental Order, Circuit Court of the Fourth Judicial Circuit, Duval County, Florida, March 21, 1991, at 6-7 (hereafter "3.850 order").

It is clear from the 3.850 order that the testimony of attorney Tassone was found to be credible in this regard. The findings of fact of the 3.850 court with respect to Dr. Barnard and attorney Tassone are supported by the record and entitled to a presumption of correctness. Indeed, Tassone testified that when he questioned Dr. Barnard about a diminished capacity, the doctor indicated that "he could have had diminished capacity ..., but my bottom line is the guy knew exactly what he was doing." February 22, 1990 hearing at 116. When asked why Dr. Barnard's written report included nothing with respect to mitigating circumstances, and nothing with respect to diminished capacity, Tassone explained that he thought the report was prepared prior to his talking to Dr. Barnard about those issues.

The majority suggests that the 3.850 proceedings conducted on February 22, 1990, i.e., the examination of Tassone, failed to provide a full and fair hearing because it was conducted with an unprepared, stand-in counsel, principal counsel

130

having been engaged in another previously-scheduled trial, and because the hearing was conducted beginning in the early afternoon and not ending until 1 a.m. the next morning. Majority opinion at ___, n.130 (M/S at 50-54 n.130), and ____, n.141 (M/S at 60-61 n.141). I disagree. I need not either condone or condemn the procedures employed by the 3.850 judge during the February 22, 1990, hearing (a matter which has not been addressed by the parties), because the Florida Supreme Court granted a stay of execution and remanded the case for a complete evidentiary hearing on Hardwick's claim. On remand, the 3.850 judge conducted hearings on May 3-4, 1990, and August 15-16, 1990, in order to "fully accommodate Mr. Hardwick." 3.850 order at 1. The state judge expressly found: "Mr. Hardwick was allowed to call all desired witnesses." Id. Thus, to the extent Hardwick might have found fault with the examination or cross-examination of Tassone, the record is clear that there was ample opportunity to recall Tassone either in May or August 1990. Indeed, at the beginning of the evidentiary hearing on remand, on May 3, 1990, the 3.850 judge noted that Tassone's previous testimony was in the record. However, he expressly advised the parties that: "I don't want to preclude anybody from calling Mr. Tassone that wishes to." May 3, 1990 hearing at 209. Counsel for Hardwick entered no objection, and did not recall Tassone. I know of no case

holding that a deficient hearing by a lower state court forever taints the state proceedings, notwithstanding an appellate remand for a full evidentiary hearing.

The foregoing is the only specific reason apparent to me in the majority's decision to discount completely the entirety of the 3.850 proceedings, thus discounting other findings of fact by the 3.850 judge. The majority does not seem to challenge the fullness or fairness of the proceedings conducted on remand from the Florida Supreme Court, including the May 1990 and August 1990 evidentiary hearings. Rather, the majority seems to conclude that remaining findings of fact are not fairly supported by the record. 28 U.S.C. § 2254(d)(8). I deduce this from the fact that the majority repeatedly contrasts statements or findings of the 3.850 court with the evidence recited in the majority opinion. Again, I respectfully disagree. After a careful reading of the forceful and comprehensive majority opinion and a careful reading of the 3.850 order and the record, I cannot conclude that there is warrant for disregarding the entirety of the 3.850 proceedings, or for disregarding other crucial findings of fact of the 3.850 judge. In particular, I cannot conclude that the 3.850 judge's findings of fact with respect to Hardwick's mother, Nell Lawrence, are not fairly supported by the record. The 3.850 court noted:

> Mr. Tassone stated that he was in regular contact with Ms. Lawrence and that she refused to testify, did not get along that well with Mr. Hardwick,

132

and that she felt he deserved a death sentence.... Ms. Lawrence agreed with Mr. Tassone about their regular contact but denied refusing to testify ... [and] agreeing with the result.... This testimony is the clearest conflicting evidence in this case and causes the Court to gauge their respective credibility of these witnesses.

3.850 Order, at 3. The 3.850 court then found as a fact that:

Ms. Lawrence confronted with her child's execution, has succumbed to internal pressure to save her son's life by testifying at this late date. As such, her credibility is certainly suspect in comparison to Mr. Tassone. For that reason, the court finds Mr. Tassone's statement more credible and concludes that Ms. Lawrence was not a willing witness in 1985.

Id. My careful review of the transcript of the 3.850 evidentiary hearing persuades me that the state judge's fact finding is supported by the record. Tassone testified that he discussed the case with Ms. Lawrence many times, that she "felt great sympathy for her son ... [but] did not want to testify at the penalty phase of the trial." February 22, 1990, hearing, at 159. The attorney testified that he urged her repeatedly to testify, but that "she finally told me that if, in fact, she did testify she would say that death rather than life was a more appropriate penalty for her son." Id. Although Ms. Lawrence's testimony was directly contrary, the state judge actually heard and saw the testimony of the two witnesses, was in position to evaluate their demeanor, and gave a plausible explanation for finding that Tassone

133

was credible and that Ms. Lawrence was not.  I cannot conclude that this credibility finding is lacking in record support.[1]

The majority justifies its disregard of the state court finding by asserting that the actions of Hardwick's mother speak louder than Tassone's recollection of what she said.  It is true that the majority lists a number of actions on the part of Hardwick's mother indicating a mother's love and concern for her son, which would seem to be inconsistent with a refusal to testify or with an opinion that her son deserved the death penalty.  On the other hand, her son was pretty clearly guilty of a heinous murder and the record does paint a clear picture of her son as leading a very degenerate life involving, inter alia, activities as a drug dealer as well as abuser of alcohol and drugs.  Even conceding some considerable probative value in the mother's actions indicating sympathy, I very respectfully can see no warrant for disregarding the finding of fact by the state judge who observed both Tassone and Nell Lawrence testify, who had an opportunity to observe their demeanor, who made an express credibility finding, and who gave a plausible

---

[1] I also cannot agree with the majority's suggestion that the state court's finding with respect to the mother applied only to the guilt phase.  It is true that the language quoted above appeared during the judge's discussion of ineffective assistance of counsel at the guilt phase.  However, in discussing ineffective assistance of counsel at the sentencing phase, the judge specifically incorporated his previous discussion: "Nell Lawrence's testimony has already been discussed."  3.850 order at 6.

reason therefore. Such a change of heart on the part of a mother faced with the imminent execution of her son is clearly plausible.

For the foregoing reasons, I cannot agree with the majority that this court is justified in completely disregarding the 3.850 proceedings and the findings of fact by the state judge. Thus, I doubt our authorty to remand for an evidentiary hearing. The majority of course finds authority to remand because it concludes that the state 3.850 proceedings were not full and fair and because it concludes that significant state court findings of fact were not fairly supported by the record. Because I disagree with those two conclusions, and see no other basis for remanding, I must dissent from that decision. However, I agree with the strong doubt which the majority opinion expresses with respect to whether Tassone rendered constitutionally effective assistance of counsel at sentencing. Even accepting the findings of fact of the state judge, my careful review of this record leaves me in considerable doubt as to whether Tassone did render effective assistance of counsel at the penalty stage, and considerable doubt as to whether there is a reasonable probability that effective counsel would have produced a different result.

Even accepting the state court's finding of fact that Tassone did in fact discuss the possibility of mitigation evidence with Dr. Barnard, the record, as so

135

forcefully described in the majority opinion, does suggest strongly that Tassone was ineffective in failing to provide Dr. Barnard with the information which would have resulted in much different conversations between the doctor and Tassone about mitigating evidence. As the majority points out, it is pretty clear that Tassone did not initially ask Dr. Barnard for an evaluation relating to mitigating evidence, nor did he provide Dr. Barnard with information conducive thereto. My reading of the state judge's finding of fact is that it finds only that Tassone did discuss possible mitigating testimony with Dr. Barnard. Tassone's testimony, upon which the finding was based, suggests that this discussion occurred after his report was rendered; in other words, Tassone's discussion in this regard was more of an afterthought, and what Dr. Barnard told him at that time had to have been influenced by that fact and the fact that Tassone had provided to Dr. Barnard little or none of the evidence which we now know was available. For these reasons, I do not regard the state judge's finding of fact with respect to Dr. Barnard as an obstacle to a conclusion that Tassone was ineffective.

The other crucial finding of fact by the 3.850 judge involves the testimony of Hardwick's mother, Nell Lawrence. For the reasons discussed above, I must honor the 3.850 judge's credibility finding, and presume correct his finding of fact that she refused to testify, and indeed thought at that time that her son deserved the

136

death penalty. Thus, I feel compelled to disregard Nell Lawrence's testimony in the 3.850 hearing. It is true that Ms. Lawrence was a forceful witness in support of Hardwick in the 3.850 proceedings. However, my review of the record suggests to me that most of the evidence she provided was also provided by one or more other witnesses. In other words, in my review of the record, I discounted the testimony of Nell Lawrence, and evaluated the totality of the circumstances without her 3.850 testimony. My review leaves me with substantial doubt about whether Tassone rendered effective assistance of counsel at sentencing, and whether there is a reasonable probability that the result would have been different.

In other words, after discounting the evidence which we should not consider because of the state judge's findings of fact (e.g., after discounting the testimony of Hardwick's mother)[2], my review of the record leaves me with considerable doubt about: (a) whether counsel's performance at sentencing measured up even to that minimum constitutional standard required by <u>Strickland v. Washington</u>,466 U.S.

---

[2] The elimination of the testimony of Hardwick's mother is clearly the most significant discount we must make. The other findings of the state judge are much less significant. The finding with respect to Dr. Barnard has already been discussed. The judge's credibility finding with respect to Hardwick's brother, Jeff Hardwick, related to the guilt phase. Indeed, the 3.850 Order expressly said with respect to the penalty phase: " Jeff Hardwick discussed his testimony with Mr. Tassone and the strategic decision was made not to use it." 3.850 Order at 6. Similarly, other witnesses discounted by the state judge, including Connie Wright, were discounted because the state judge honored Tassone's strategic decision to that effect. Of course, it is within our purview to exercise appropriate review with respect to the reasonableness of such strategic decisions.

668, 698, 104 S.Ct. 2052, 2070 (1984), and (b) whether there is a reasonable probability that the result of the penalty phase would have been different had there been effective counsel.   The gist of the mother's testimony – evidence with respect to Hardwick's alcohol and drug use over that weekend and evidence about his upbringing including his history of alcohol and drug abuse – is duplicated in this record from several sources.  Numerous witnesses who were clearly available to Tassone at the time testified  during the 3.850 proceedings about Hardwick's extensive use of drugs and alcohol during the relevant weekend.[3]  With respect to Hardwick's harsh upbringing, the other focus of the mother's testimony, there was ample other evidence, for example, the completely objective evidence in the social service and juvenile records.

The most plausible explanation for Tassone's failure to pursue the significance of the potential mitigating evidence is either a misunderstanding of how such evidence could be helpful, or a simple lack of investigation and preparation.  This hypothesis is not only not inconsistent with the state judge's finding that Tassone did discuss possible mitigating evidence with Dr. Barnard, it

---

[3] Tassone's own testimony at the 3.850 hearing acknowledged awareness of such use in the days leading up to the murder.  And strong evidence from wholly disinterested witnesses establishes the drug, alcohol and emotional influences upon him at the time of his arrest.  The booking clerk at the jail, Braddy, testified that he was intoxicated when booked late Christmas afternoon.  Even the arresting officers testified that shortly after the arrest he became incoherent and out of control.

138

is actually supported by Tassone's testimony which the judge credited. Tassone essentially acknowledged that he did not discuss mitigating evidence with Dr. Barnard until Dr. Barnard's report was already tendered. Moreover, the record is clear that Dr. Barnard was not asked in formal fashion to evaluate anything but competence to stand trial and insanity at the time of the offense. Tassone's own testimony thus supports the inference that Tassone's discussions with Dr. Barnard about mitigating evidence were an afterthought. The record is also clear that Tassone provided Dr. Barnard with no background information on Hardwick which would have focused the doctor's attention on Hardwick's harsh upbringing or his history of alcohol and drug abuse. Dr. Barnard's testimony at the 3.850 hearing and the opinions he expressed there – that Hardwick's capacity to conform his conduct to the requirements of the law was substantially impaired and that his judgment and impulse control were substantially impaired – indicate that it would not have been futile to provide Dr. Barnard with appropriate background information and seek his studied opinion with respect to mitigating evidence. Thus, the state judge's finding of fact with respect to Dr. Barnard does not ultimately excuse Tassone's failure to investigate and pursue mitigating evidence either with Dr. Barnard or with some other mental health expert.

In conclusion, although I part company with the majority's decision to disregard the findings of fact of the 3.850 court, and thus must dissent from the decision to remand, I share the majority's considerable doubt about whether Tassone rendered effective assistance of counsel at the penalty stage of this case. Had the majority concluded on the basis of the current record that counsel was ineffective at the penalty phase, that confidence in that result had been undermined, and thus that the writ should issue with respect to the penalty phase, I would probably have agreed, even though I would rely on only part of the evidence marshalled so persuasively by the majority opinion. That is, even accepting the above mentioned findings of fact by the state 3.850 judge, I am persuaded that counsel rendered constitutionally ineffective performance at the penalty phase, and my confidence in the result of that phase is undermined. While I disagree with the grounds upon which the majority relies in remanding for an evidentiary hearing, and therefore dissent in that regard, I share the concerns of the majority with respect to the penalty phase and concur in much of what the majority says.